50.    Upon information and belief, Imhoff knew or should have known that Chrisos was limiting, segregating or overloading Riley so as to adversely affect her pay and knew or should have known that he was retaliating for her refusal of his requests for sexual favors.

51.    In September 2002, five months after her promotion had been promised, Chrisos told Riley that she was officially the Regional Manager, and that Mike Coleman, the new manager in the Woburn office was to report to her, but he didn't tell Mike Coleman he was to report directly to Riley and didn't give Riley the promised pay raise. Riley had now been given the Wakefield, Boston and Woburn offices, with three times the responsibility and more direct reports than Chrisos had, which detracted from her ability to make her own commission sales, with no increase in either base salary or bonus structure.

52.    The combination of the base salary increases and the bonus structure was supposed to increase her pay by at least $30,000 per year and none of it had become effective.

53.    A male Peter Ernst, had been Woburn manager and was retained despite misconduct, failure to perform, sleeping in the manager's office on the floor all day, and making his subordinates responsible for all the management work, including the hiring and training of new employees. Chrisos did not interfere with or harass or encourage Riley to fire the male, Peter Ernst.

54.    Chrisos burdened women managers with personnel and administrative decisions adverse to their profitability and required Riley to retain Ernst rather than fire him, while he pressured Catalano to leave by demoting her.

55.    In September 2002, Riley persuaded Catalano to return to work, reporting to her.

56.    Chrisos opposed the rehiring of Catalano. Riley did not understand why Chrisos opposed Catalano as he had supported the return of others who had left, and had forced her to keep a male, Ernst who was significantly under performing.

57.    In November, 2002, CEO Imhoff, and Chrisos flew east to give Riley a coveted national award which had been given only three times in the one hundred year history of the company. Imhoff proclaimed in front of all subordinates something to the effect that it was a big surprise that "a girl" could achieve something like this and "beat out the big boys." Imhoff also acknowledged Marcea Taylor (one of Riley's subordinates in the Wakefield office) for her performance. The award led Riley to believe she

would be given the promised increase in compensation at her annual review.

58. Chrisos began emailing the teen aged recruiter, Amanda Medina, requesting her home email and called her at home allegedly to compliment her on her good work, using access to her employment records to acquire her personal number.

59. In every paycheck, from November 2002 to January, 2003, Chrisos, Imhoff and General Employment continued to fail to give Riley the promised increase in pay, but she believed the increase was coming.

60. From December 2002 to spring, 2003, week after week, Chrisos pressured Riley to harass Catalano about her performance, which Riley did not believe deserved reprimand or discipline, especially where Chrisos did not similarly harass Ernst, the under-performing male who had actively engaged in misconduct.

61. In January 2003, when Chrisos finally gave Riley a salary increase, he failed to give her promised pay which was to have been raised by $12,000 and her bonus structure should have been effective for more than 6 months. The reduced pay, below that promised for her position as Regional Manager, continued in every pay check until Riley's termination.

62. In February 2003, Riley terminated the under-performing male, Ernst, and despite Ernst's severe misconduct and poor performance, Chrisos gave Ernst a severance package, taking it out of Riley's profit and loss figures.

63. From the summer of 2002, to February, 2003, Chrisos repeatedly interfered with Riley's direction of Coleman, unlike his treatment of other male branch managers. In March 2003, Coleman, manager of the Woburn office informed Riley that he "did not understand the reporting structure," and "had not realized I was direct line to you and dotted line to Chrisos." When Riley took this up with Chrisos, Chrisos told her to calm down and asked if she had "PMS."

64. From November 2002 to March 2003, Chrisos had continued to solicit the teenager Amanda Medina to give him her private email, while she avoided his attention.

65. In March 2003, Amanda Medina took a leave of absence for personal, medical reasons.

66. From December 2002 through April 2003, Chrisos continued to pressure Riley to terminate Catalano, constantly calling Marie Catalano a "drain on the payroll" and began referring to Catalano as a "payroll problem,"

despite the fact that she had been asked to build a new market,
Accounting/Finance, and Chrisos had protected males and others hired to
build new markets for a reasonable time, and had protected the male
former branch manager who was under performing.

67.    At one point in about March 2003, Chrisos came to visit Riley's office,
supposedly to see how Riley was handling things, but spent almost no
time in the branch Riley was in. He appeared to stalk Catalano, or subject
her to excessive personal evaluation and intimidation. She changed her
schedule to avoid him and he changed his schedule to be in Woburn,
Boston, or Wakefield at the last minute more than once, which was unlike
him. He had been in the same office as Catalano on every day of his trip
except the first day when he arrived, choosing to sit right across from her
and making leading comments about how she was doing. Catalano felt he
did so to intimidate her.

68.    Chrisos created a hostile environment for Catalano by cumulative conduct
and the totality of circumstances including work sabotage, exclusion,
denial of support, humiliation, the abolition of the Boston office the prior
summer, Catalano's forced choice of demotion or termination, the sexist
remarks of CEO/President Imhoff in November, and the continued
pressure on Catalano in her new area while males with new areas or
lagging areas were not similarly harassed.

69.    The hostile environment affected Catalano's performance.

70.    In May 2003, upon information and belief, Chrisos sent a harassing email
to Monica Friedman, formerly of the Wakefield office, who had abruptly
transferred to California. Her vice president reported it to Imhoff. Human
Resources never called to investigate.

71.    Upon information and belief, Imhoff knew of complaints of sexual
harassment and had condoned a pattern of severe and pervasive
harassment, had trivialized these complaints and/or had failed to
investigate, remedy or deter such conduct, allowing an increasingly
harassing and hostile environment to penalize women who would not
provide sexual favors to a manager.

72.    Chrisos combined sexual stereotypic comments with adverse action,
attributing Monica Friedman's motivation to her pregnancy which Chrisos
claimed prevented her from thinking clearly. A day or two later he told
Riley that Imhoff had handled the matter and that Imhoff believed
"Monica just had an axe to grind" because Chrisos did not follow through
on a promise to Monica involving compensation. This message further
created the impression that Imhoff would rely upon stereotypical

derogatory views of women and would not conduct a full and fair investigation.

73.    Upon information and belief, if a fair and unbiased investigation of sexual harassment complaints had occurred, a pattern of severe sexual harassment would have been discovered, in which women who rejected Chrisos and or Imhoff were penalized, subjected to sexist or false or stereotypic attacks and where women were targeted, limited and segregated in ways men were not.

74.    In May 2003, the Maitland, FL manager left, and Chrisos immediately allowed Panarello to begin doing business in the Maitland/Orlando Area. Panarello's office in Tampa had been severely affected by the limitation excluding Orlando, as Tampa had lost considerable business after 9/11/2001.

75.    In May 2003, succumbing to continued pressure from Chrisos regarding her "payroll problem," Riley informed Catalano she would be laid off. CEO Imhoff, who had not called Riley about any other hiring or firing, called her to congratulate her on "getting rid of her payroll problem," despite the fact that Riley had never mentioned Catalano's productivity to Imhoff.

76.    Based on the totality of the circumstances, it is permissible to infer that Imhoff knew that Chrisos wanted to get rid of Catalano for failure to engage in sexual relations.

77.    In May 2003, Amanda Medina returned to the Wakefield office on a reduced schedule.

78.    From April through June 2003, Imhoff promised Panarello that she would have until August 2003 to rebuild the Tampa office. In or around June 2003, an anonymous FAX was sent to Panarello's office from the Headquarters where Chrisos and Imhoff worked, informing Panarello's employees that the office would be closed, and many of her staff chose to leave.

79.    During the week of July 1, 2003, Riley became aware for the first time that Chrisos had sexually propositioned Lisa Marie Catalano, and when she turned him down, he had delayed her promotion to branch manager, had systematically undermined her authority, and subjected her to rules and conditions in running her branch office which led to low profitability and termination of her position. Catalano learned for the first time that Chrisos had propositioned and coerced Riley into having sexual relations and after her refusal to continue, had delayed, and denied her pay and limited or segregated her opportunities.

12

80. About July 4, 2003, Riley became aware that the company was closing the office of Sandy Panarello, who had outperformed many male branch managers but denied equal opportunity because of her sex, with limitations and interference on territory, not imposed upon the male managers.

81. General Employment, as an employment agency, has, by its agents Chrisos, and Zaccarelli made statements which express, directly or indirectly, limitation, or discrimination based on national origin, sex and race. To the Plaintiffs' knowledge, beginning on July 10, 2003, GEE's collection officer, Zaccarelli, began targeting Riley's customers in the Wakefield office, targeting their women and minority employees, including making fun of the client's foreign-sounding name and making other sarcastic and taunting comments about the sound of his name, and by saying, "Get off your useless ass and get the President on the phone." This had the effect of enraging clients and causing at least one General Employment employee to quit.

82. Despite knowledge of Zaccarelli's conduct and corroboration that Zaccarelli taunted women and minorities, Chrisos, Imhoff and Zaccarelli failed to act to stop using tactics against women and minorities like this and have deliberately used or condoned sexist and derogatory and racist tactics to intimidate threaten or interfere with employees and customers creating a hostile and offensive environment in Riley's office after both Riley and Catalano rejected Chrisos, and all defendants have failed to remedy it.

83. Chrisos pressured Medina herself and other employees for Medina's private email address to sexually proposition her, sent her a private, suggestive email in July 2003, and referred to forthcoming drinking during his visit, despite her being under age.

84. Chrisos made sexually stereotypical comments to and about women including describing a woman as a "crusty old broad,"', referring to Medina as a "tart," attributing success to an Atlanta manager because she was "an attractive woman," and asking if Riley's absence was due to having a "hot date." Chrisos referred to Marie Catalano after her rejection of him as "neurotic," a "high-maintenance girl" and someone who had "constant PMS." He questioned another woman who complained of harassment by asking "if it was because [Monica] is pregnant that she "isn't thinking right," and claimed a woman he had had sex with had "blackmailed" him into a severance pay.

85.  Imhoff similarly made stereotypic statements, proclaiming in front of all
     subordinates something to the effect that it was a big surprise that "a girl"
     could achieve the Presidential Award and "beat out the big boys."

86.  Men who had performance issues were not berated, humiliated and
     demeaned.

87.  The hostile environment interfered with the performance, and caused the
     termination of Catalano, Medina, Riley. The hostile environment also
     caused another female employee, Gadoury, to quit.

88.  General Employment managers were far more likely to be male, while the
     managers of the TRIAD/GenTech offices likely to be female. Upon
     information and belief, Zaccarelli engaged in discriminatory and hostile
     collection practices with the clients of the TRIAD/Gen Tech offices
     headed by females more than for the offices headed by males.

89.  In July, 2003, after sending Medina the suggestive email calling her a
     "tart," Chrisos harassed Medina by departing from normal procedure and
     meeting with her individually, instead of in the open office, for an
     inordinate amount of time as compared to other employees and grilled a
     co-worker about Medina's personal problems. Chrisos took the
     employees, including Medina, out for drinks, despite Medina being under
     age, where he had his hands all over Medina, looked down her shirt, and
     gave her his hotel phone number or room number. When a co worker
     noticed Chrisos rubbing Medina's leg, and told him she saw what he was
     doing, Chrisos told her there might be a space open for her as manager of
     the Boston office.

90.  Medina felt the conduct of Chrisos' hand on her leg unwelcome, and
     froze. Medina made a gesture indicating that she didn't know what to do.

91.  Riley confronted Chrisos and said "What are you doing, stopped the
     conduct and sent Medina outside with others.

92.  Chrisos smiled and said "Come on, it was harmless." Riley said "Chrisos,
     she is 19 years old – how can you say that?" He replied, "Come on, how
     often do I get to touch a 19 year-old girl?"

93.  Riley asked him, "What did you do to Marie Catalano?" He at first
     admitted kissing her only. Riley told him, "You did same thing to her that
     you did to me. Who else have you done this to?  What about those other
     girls you just got rid of when it made no sense--Tonya [Lynam] and Stacy
     [Bohn]?" Chrisos replied, "I never slept with them. I only slept with
     Lauren Grub and a consultant in the Maitland office." (Lauren had been a
     manager and the Maitland office is in Orlando area.)  Despite this

14

confrontation Chrisos called Medina's home and left a message on her voicemail asking Medina to call him.

94. Riley, who had been asked to travel with Chrisos, allegedly to improve other branches, had identified Lynam and Bohn as potential leaders. Lynam, Bohn, Catalano and Panarello had been interfered with by Ken Yeoh, had all been top producers before, and were driven into the ground. There were other, more logical offices to close when their offices were closed, but those offices were managed by men.

95. Chrisos had given the Maitland office a protected territory, the only office in the country to have that right, which prohibited equal opportunity for Sandy Panarello.

96. On July 12, 2003, Riley confronted Chrisos, saying she couldn't believe he was doing to Medina what he had done to her, and he said, "You wanted to." Riley told him he knew his advances were unwelcome and that she had not wanted to.

97. Riley realized that the raise issue was hopeless and that there would be no remedy. Riley said, "Is this why you haven't paid me for my work in a year?" Riley left.

98. Chrisos followed her to the parking lot and put his hand on Riley's back, rubbing up and down. Riley was very upset and made it clear Chrisos' contact was unwelcome, saying, "You need to go now." Chrisos left.

99. On or around July 12, 2003, Chrisos sent an email to Riley, admitting that everything Riley accused him of was true and asking her to forgive him and making reference to his family.

100. Over the weekend of July 12, 2003, and again on July 14, 2003, Riley informed Human Resources of Chrisos' conduct and Imhoff of the need for immediate contact from them.

101. On July 14, 2003, about an hour later, Chrisos called Riley's office. He said, "This is Greg..." and Riley cut him off and said, "I don't want to talk to you." He said, "We wanted to let you know what we are doing..." and Riley cut him off again and said, "I don't want to talk to you. I can't believe you are calling me." Riley then hung up. Marcea Taylor was sitting across from Riley at the time and heard her conversation with him.

102. Upon information and belief, Imhoff or his staff informed Chrisos of Riley's confidential request for assistance on sexual harassment and despite a request that the investigation be made by an unbiased person,

15

placed Chrisos in a position to manage the complaint about his own misbehavior.

103. On or around July 14, 2003, Riley was informed that Imhoff had been informed of her complaints about Chrisos.

104. On or around July 14, 2003 Zaccarelli repeatedly called throughout the day about the harassing collection calls, despite prior commitments by Imhoff and Chrisos to prevent his involvement, and, therefore, his conduct appeared to be deliberate attempts at harassment.

105. General Employment then conducted an investigation which, under the totality of the circumstances, was intimidating and threatening to the employees by insisting initially on un-represented complainants meeting immediately with a trained human resources manager under the direction of outside counsel.

106. Since Riley, Medina, Taylor and Catalano made a complaint of what they believed to be unlawful sexual harassment and hostile environment and disparate treatment of women to Human Resources director Sherry Hubacek, Riley, the complainants, her other employees and her clients have experienced an unprecedented, retaliatory attack on their tangible and intangible economic opportunities including but not limited to:

   a. Completely unprecedented rejection of contract language with key customers, failure to follow precedent of compromising to get deals done, and obstruction of pre-approved language, causing loss of deals.
   b. Delay of necessary business tools and abandoning of "urgency" which was part of normal training, practice and client retention and the resulting loss of client accounts and/or revenue.
   c. Increased interference with business opportunity by Zaccarelli using extremely aggressive and unwarranted attacks on Riley's clients in collection, interfering with business to the detriment of her and her staff.
   d. Continued and intensified harassment of female and minority employees of clients, which Imhoff had promised would be stopped.
   e. Harassment of clients in the region despite requests to have no contact; harassment of clients who are not delinquent, despite notice.
   f. Denial of Riley's status as Regional Manager; failure to confirm the apparent authority since November, 2002 when public announcement had been made by Imhoff and Chrisos, effectively demoting her from authority over three branches, to Branch Manager of one branch.
   g. Investigation of complaint which is not fair and impartial, but which seeks to intimidate Riley's subordinates and dig up adverse information about Riley and the other complainants.

h. Finding cause to believe Chrisos harassed the females and engaged in inappropriate conduct, but then demoting Riley from Regional Manager in charge of Boston, Woburn and Wakefield and closing the Boston office for pretextual reasons.

i. Penalizing the Wakefield office whose contractor was not selected for contractor of the quarter, was named runner up, then removed as runner up, all without fair and adequate justification.

j. Intimidation of Wakefield staff by sending photographs of prior socializing with Chrisos.

k. Changing payroll procedures from normal procedure, attempting to deprive Marcea Taylor of sick time (but finally relenting) and interfering with pay to contractors in the Wakefield office.

l. Threats not to talk to other employees about harassment, which is intimidation to prevent investigation, remedy or deterrence continued harassment.

m. Delay in sending invoices, which adversely affects revenue to the Wakefield office.

n. Delay in processing unemployment claim of Catalano.

o. Harassment of office, clients, Riley, contractors and Catalano and Taylor's sick days; dividing a co-worker, Marcea Taylor from Riley who loses interest in being promoted to Boston Branch manager.

p. Putting a hold on the Boston office, despite prior approval of growth, which effectively eliminates Catalano's authority over the Boston office.

q. Delay in applying cash to invoices so as to reduce commissions to Wakefield office.

r. Denying Riley's office thousands of dollars of receivables that have been collected but not applied to her profitability, thus depriving her of profits for the fiscal year ending September 30, 2003 and causing her to suffer loss of bonus and/or award compensation.

s. In October 7, 2003, terminating the Boston branch office and accruing a large loss of $188,000 rather than permit Riley to staff and manage it to profitability.

t. The Defendants turned staff against Riley, and terminated her on fictitious charges of soliciting clients for a new enterprise, which she did not do, and other false charges of competition.

u. The Defendants opposed the unemployment of Riley's secretary, while having approved unemployment for males who had lost transportation, while asking her former secretary questions about Riley and suggesting a relationship between them caused the opposition to the unemployment.

v. Actions continue to this day, in making adverse business decisions which harm the income, career opportunities and/or managerial advancement of the complainants, and affect adversely their terms and conditions of work, including filing a lawsuit against them in Chicago which is without merit and has no substantiation.

17

w. No reasonable woman in the complainants' shoes would continue to remain employed working for General Employment where she has been demoted and suffered tangible job reduction, interference with her management and staffing decisions, where normal practices are being undermined, usurped or overturned, and her power is being removed or reduced daily, and her bonus and income is being threatened or reduced.

x. The retaliatory environment affected Medina's ability to concentrate and make placements, and the resulting loss in income made it impossible for her to obtain independent transportation required to remain at work.

y. The retaliation and discrimination have become intolerable, emotionally devastating and economically costly for Riley, Catalano and Medina.

## COUNT I – SEXUAL HARASSMENT

107.  The Plaintiffs, reaffirm and incorporate by reference the facts and allegations contained in paragraphs 1-106.

108.  Riley, Catalano and Medina were sexually harassed in violation of G.L.c. 151B, § 4(16A) and, as defined in c. 151B, §1(18) "sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when (a) submission to or rejection of such advances, requests or conduct is made either explicitly or implicitly a term or condition of employment or as a basis for employment decisions." Riley, Catalano and Medina were sexually harassed in violation of G.L.c. 151B, § 4(16) as defined in c. 151B, §1(18)(b) in that "such advances, requests or conduct [had] the purpose or effect of unreasonably interfering with [each] individual's work performance by creating an intimidating, hostile, humiliating or sexually offensive work environment." General Employment and TRIAD supervisory personnel were aware of the situation but failed to adequately respond, investigate or remedy the situation.

109.  As a result, Plaintiffs Riley, Catalano and Medina suffered physical and emotional distress, and a loss of wages and benefits, for which each seeks compensation.

## COUNT II – GENDER HARASSMENT/DISCRIMINATION

110.  Plaintiffs Riley, Catalano and Medina re-allege, reaffirm and incorporate by reference the facts and allegations contained in paragraphs 1-109.

111.  Riley, Catalano and Medina were victims of gender discrimination, in violation of G.L.c. 151B, § 4(1) in that each experienced disparate treatment on the basis or her gender

18

112.    As a result, Plaintiffs suffered physical and emotional distress, and a loss of wages and benefits, for which each seeks compensation.

## COUNT III – FAILURE TO ADEQUATELY INVESTIGATION OR REMEDY A HOSTILE WORK ENVIRONMENT

113.    Plaintiffs Riley and Medina re-allege, reaffirm and incorporate by reference the facts and allegations contained in paragraphs 1-112.

114.    After Riley and Medina reported discriminatory and/or sexually harassing conduct, General Employment, TRIAD Personnel Services, Imhoff and/or Chrisos failed to undertake a reasonable, adequate investigation, and failed to remedy the situation in an appropriate fashion.

115.    As a result, Plaintiffs suffered physical and emotional distress, and a loss of wages and benefits, for which each seeks compensation.

## COUNT IV – DISCRIMINATORY TERMINATION

116.    Plaintiffs Riley, Catalano and Medina re-allege, reaffirm and incorporate by reference the facts and allegations contained in paragraphs 1-115.

117.    General Employment and or TRIAD Personnel Services terminated Riley, Catalano and Medina because of their gender, or in retaliation for their opposition of to discriminatory conduct, or a combination of both of these motives, in violation of G.L. c. 151B, § 4(1) & 4(4).

118.    The conditions at work became objectively and subjectively intolerable for Riley, Catalano and Medina, constituting a constructive discharge by the time each separated from employment.

119.    As a result, Plaintiffs suffered physical and emotional distress, and a loss of wages and benefits, for which each seeks compensation.

## COUNT IV – RETALIATION

120.    Plaintiffs Riley, Catalano and Medina re-allege, reaffirm and incorporate by reference the facts and allegations contained in paragraphs 1-119.

121.    General Employment, TRIAD and Imhoff terminated Riley, Medina and Catalano, because of, or in retaliation for the opposition o each to discriminatory conduct, or a combination of both of these motives, in violation of G.L. c. 151B, § 4(1) & 4(4).

122.    General Employment, TRIAD and Imhoff subjected Riley, Medina and Catalano to disparate treatment in terms and conditions of work, in retaliation for their oppositions to discriminatory conduct, or a combination of retaliation and gender, in violation of G.L. c. 151B, § 4(1) & 4(4).

123.    As a result, Plaintiffs suffered physical and emotional distress, and a loss of wages and benefits, for which each seeks compensation.

## COUNT V – PROMISSORY ESTOPPEL

124.    Plaintiff Panarello re-alleges, reaffirms and incorporates by reference the facts and allegations contained in paragraphs 1-123.

125.    In Boston, in February, 2000, the defendants made statements of material fact made to induce Panarello to give up a lucrative position with them in Boston to accept a branch manager position in Tampa, FL, and she did so, relying upon a representation that she would be entitled to recruit and operate in any territorial area in Florida, and, there is evidence of reasonable reliance on the false statement to the Plaintiff's detriment.

126.    The misstatements were material as a reasonable person in Panarello's shoes would not have moved to Tampa if she knew that her opportunity would be limited in a way which no other branch manager in General Employment or TRIAD was limited. The representation that she would be able to develop clients in Orlando Florida as well as Tampa, FL would, more likely than not, have led a reasonable employee to act.

126.    Panarello reasonably relied upon the statements of Chrisos, who had superior knowledge about the internal processes of the defendant companies as to authority for the Plaintiff to recruit clients.

127.    As a direct result of the material misstatements on which she relied, Panarello gave up lucrative employment opportunities in Boston which she would have enjoyed had the defendants not breached their promised terms, and lost the benefit of lucrative sales in Orlando, FL which she would have been able to achieve, but for the breach of contract.

## COUNT VI – INTENTIONAL INTERFERENCE WITH ADVANTAGEOUS RELATIONS

128.    Plaintiffs Panarello and Riley re-allege, reaffirm and incorporate by reference the facts and allegations contained in paragraphs 1-127.

129.    Panarello and Riley had an expectation of contractual employment with a successor corporation to perform services in lieu of human resources functions.

130.     The Defendants General Employment and/or TRIAD Personnel Services, Inc. have filed suit in bad faith against Panarello and Riley in Chicago, IL for the purpose of causing the performance of that contract to become more expensive or burdensome, knowing that the plaintiffs were entitled to compete and run additional business which did not violate any confidentiality agreement.

131.     The Defendants Imhoff and Chrisos maliciously interfered with Panerello and Riley's contract with General Employment and TRIAD, and caused their termination where the continuing support of upper management was irreparably eroded and both Panarello and Riley experienced a sharp diminution of status due to the malicious interference of Chrisos and/or Imhoff.

132.     The Defendant Kim Cullen maliciously interfered with the advantageous relations which Riley enjoyed with General Employment and or TRIAD in order to secure for herself the position of Branch Manager which Riley enjoyed, and falsely and maliciously accused Riley of competing with General Employment and or TRIAD for customers, or other actions against the interests of General Employment, which caused Riley to be fired, or were a substantial contributing factor to the irreparable erosion of support of upper management and the sharp diminution of status.

133.     As a direct result, Plaintiffs suffered lost economic opportunities, increased costs of defending themselves and emotional distress.

Wherefore, the Plaintiffs demand that this Court order:

a.     That Defendants compensate Plaintiffs for any loss of wages and/or benefits incurred as a result of the termination/failure to rehire;

b.     that the Plaintiffs be awarded an amount of money which will fairly compensate them for their emotional and physical pain and suffering;

c.     that the defendants pay the plaintiffs costs and attorney's fees resulting from this action;

d.     that Defendants pay the Plaintiffs interest on any judgment entered from the time of the filing of their MCAD Charge and from this suit;

e.     that the Defendants be ordered to pay the Plaintiffs punitive damages;

f.     such legal and equitable relief as may be just and proper and/or which will make the Plaintiffs whole.

THE PLAINTIFFS DEMAND A JURY TRIAL ON ALL COUNTS OF THEIR
COMPLAINT

Respectfully submitted,

Lisa Riley, Lisa Marie Catalano,
Sandy Panarello and
Amanda Medina
By their Attorney

Elizabeth A. Rodgers, BBO #424360
Rodgers, Powers & Schwartz LLP
18 Tremont Street
Boston, MA 02108
(617) 742-7010

CERTIFICATE OF SERVICE
I hereby certify that a true copy of the above document was
served upon the attorney of record for each other party
by mail/by hand on 10/21/04

# COMMONWEALTH OF MASSACHUSETTS

Middlesex SS.                                          Docket No. 04-3270

```
                                    )
LISA RILEY, LISA MARIE CATALANO,    )
SANDY PANARELLO AND                 )
AMANDA MEDINA,                      )
                                    )
        Plaintiffs,                 )
                                    )
v.                                  )
                                    )
GENERAL EMPLOYMENT                  )
ENTERPRISES, TRIAD PERSONNEL        )
SERVICES INC., GREGORY CHRISOS,     )
HERBERT F. IMHOFF, JR.,             )
AND KIM CULLEN,                     )
                                    )
        Defendants.                 )
                                    )
```

## ANSWER OF GREGORY CHRISOS

Gregory Chrisos ("Chrisos") hereby responds to the Complaint of Lisa Riley ("Riley"), Lisa Marie Catalano ("Catalano"), Sandy Panarello ("Panarello"), and Amanda Medina ("Medina"). Chrisos denies all allegations of discrimination, harassment, and retaliation and all allegations as to him in the two paragraphs titled "Introduction" in the Complaint. Chrisos responds to the numbered paragraphs of the Complaint as follows:

1.    Chrisos is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

2.    Chrisos is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

3.    Chrisos is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

1

4.      Chrisos is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

5.      Admitted.

6.      Chrisos is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

7.      Denied.

8.      Admitted as to the first sentence, denied as to the second sentence.

9.      Chrisos is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

10.     As to sentences 1 and 4, Chrisos is without knowledge or information sufficient to form a belief as to the truth of their allegations.  The allegations of sentence 2 are denied. Chrisos states that the allegations in the Complaint are similar to the allegations in complaints filed in the MCAD and denies the remaining allegations of this paragraph.

11.     Chrisos is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

12.     Chrisos is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

13.     Chrisos denies that he promoted Panarello and states that General Employment Enterprises ("GEE") promoted her.  Chrisos admits that Panarello worked in Woburn and reported to Chrisos.  Chrisos states that he is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph.

14.     Denied.

15.    Chrisos admits the first two sentences of paragraph 15 and is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations.

16.    Chrisos admits the first sentence of paragraph 16 and is without information or knowledge sufficient to form a belief as to the truth of the allegations of this paragraph.

17.    Chrisos denies that Triad personnel were forced to take in General Employment personnel and admits the other allegations of this paragraph.

18.    Admitted.

19.    Chrisos is without information or knowledge sufficient to form a belief as to the truth of the allegations of this paragraph.

20.    Chrisos admits the allegations of the first sentence and that he had direct managerial authority over Riley, Panarello, and Catalano, and evaluated Medina, and is without information or knowledge sufficient to form a belief as to the truth of the remaining allegations of this paragraph.

21.    Denied.

22.    Chrisos is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

23.    Chrisos is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

24.    Chrisos admits that Catalano became assistant branch manager in 2000 and won an award for her performance; Chrisos also admits that he discussed with Catalano the possibility of her being a manager of the proposed Boston office, possible rented space, and a lease. Chrisos denies any remaining allegations of this paragraph.

3

25.    Admitted.  Chrisos adds that the commission was small, approximately a .5 or 1 percent commission on the margin in the Boston office.

26.    Chrisos admits that Catalano attended the annual manager's meeting to receive a personal achievement award but denies all of the other allegations in this paragraph.

27.    Denied.  Chrisos further states that Panarello struggled from the time she started in the Tampa, Florida office, and her office was far from profitable for GEE.

28.    Denied.

29.    Denied.

30.    Denied.

31.    Denied.

32.    Denied.

33.    Denied.

34.    Denied.

35.    Denied.

36.    Denied.

37.    Denied.

38.    Chrisos admits that he discussed with Riley the possibility of making her a regional manager, but denies any remaining allegations of this paragraph, including that he promised her any specific increased compensation.

39.    Denied.

40.    Denied.

41.    Denied.

4

42.    Chrisos admits that he and Kenneth Yeoh ("Yeoh") came to the region to visit in May 2002 and denies the remaining allegations of this paragraph.

43.    Denied.

44.    Admitted.

45.    Chrisos is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

46.    Denied.

47.    Denied.

48.    Denied.

49.    Chrisos admits the first sentence of this paragraph and denies the second sentence.

50.    Denied.

51.    Denied.

52.    Denied.

53.    Denied.

54.    Denied.

55.    Admitted.

56.    Denied.

57.    Chrisos admits the first and third sentences, but does not have knowledge or information sufficient to form a belief as to the truth of the allegations of the rest of this paragraph.

58.    Chrisos admits that Amanda Medina ("Medina") took a leave of absence for personal reasons in March 2003. Chrisos states that he asked Dawn Bernadino ("Bernadino") of Medina's office for Medina's email because he wanted to send her a

brief note to wish her well and a speedy return to work. Chrisos denies the remaining allegations of this paragraph.

59.     Denied.

60.     Denied.

61.     Denied.

62.     Chrisos admits that Peter Ernst ("Ernst") was terminated for performance reasons in February 2003 and received a severance of approximately 8-10 weeks' pay, which was charged to that office, and denies any remaining allegations of this paragraph.

63.     Chrisos denies the allegations contained in the first and third sentences of this paragraph and does not have sufficient knowledge or information to form a belief as to the truth of the allegations of the second sentence.

64.     Denied.

65.     Admitted.

66.     Denied.

67.     Denied, except for the allegations of the last sentence, for which Chrisos does not have sufficient knowledge or information so as to form a belief as to their truth.

68.     Denied.

69.     Denied.

70.     Chrisos admits to sending an email to Monica Friedman ("Friedman") in May 2003, but denies that it was "a harassing email." Chrisos is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph.

71.     Denied.

72.    Denied.

73.    Denied.

74.    Chrisos admits the allegations of the first sentence of this paragraph and denies the allegations of the second sentence of this paragraph.

75.    Chrisos denies that he pressured Riley to terminate Catalano, but admits that Catalano was terminated in May 2003. Chrisos has no knowledge or information sufficient to form a belief as to the truth of the allegations of the second sentence of this paragraph.

76.    Denied.

77.    Admitted.

78.    Chrisos is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

79.    Denied.

80.    Denied. Chrisos states that Panarello's office in Tampa, Florida, was closed solely for poor performance.

81.    Denied.

82.    Denied.

83.    Denied.

84.    Denied.

85.    Chrisos is without sufficient knowledge or information to form a belief as to the the allegations in this paragraph.

86.    Admitted. Chrisos states that women with performance issues were not berated, humiliated or demeaned either.

7

87.     Denied.

88.     Denied.

89.     Denied.

90.     Chrisos is without sufficient knowledge or information to form a belief as to the
allegations in this paragraph.

91.     Denied.

92.     Denied.

93.     Denied.

94.     Denied.

95.     Denied.

96.     Denied.

97.     Denied.

98.     Denied.

99.     Denied.

100.    Chrisos is without sufficient knowledge or information to form a belief as to the
truth of the allegations of this paragraph.

101.    Chrisos admits that he called Riley on July 14, 2003 and Riley refused to talk with
him. Chrisos is without knowledge or information sufficient to form a belief as to the
remaining allegations of this paragraph.

102.    Chrisos admits that Imhoff or one of his staff told Chrisos that Riley had called
him about allegations and denies the remaining allegations of this paragraph.

103.    Chrisos is without knowledge or information sufficient to form a belief as to the
truth of the allegations of this paragraph.

8

104.    Chrisos is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

105.    Chrisos admits there was an investigation and is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

106.    Chrisos denies the allegations as to himself and is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph.

## COUNT I

106.[sic]  Chrisos reasserts and realleges his responses to paragraphs 1-106 as if fully set forth herein.

107.    Denied.

108.    Denied.

## COUNT II

109.    Chrisos reasserts and realleges his responses to paragraphs 1-108 as if fully set forth herein.

110.    Denied.

111.    Denied.

## COUNT III

112.    Chrisos reasserts and realleges his responses to paragraphs 1-111 as if fully set forth herein, but denies any knowledge as to a Ms. Hoffman.

113.    Denied, and Chrisos further states that he has no knowledge as to a Ms. Hoffman.

114.    Denied, and Chrisos further states that he has no knowledge as to a Ms. Hoffman.

## COUNT IV

115.    Chrisos reasserts and realleges his responses to paragraphs 1-114 as if fully set forth herein.

116.    Chrisos is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

117.    Denied.

118.    Denied.

## COUNT IV [sic]

119.    Chrisos reasserts and realleges his responses to paragraphs 1-118 as if fully set forth herein.

120.    Chrisos is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

121.    Chrisos is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

122.    Chrisos is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

## COUNT V

123.    Chrisos reasserts and realleges his responses to paragraphs 1-122 as if fully set forth herein.

124.    Denied.

125.    Denied.

126.    Denied.

127.    Denied.

## COUNT VI

128.    Chrisos reasserts and realleges his responses to paragraphs 1-127 as if fully set forth herein.

129.    Chrisos is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

130.    Chrisos is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

131.    Chrisos denies the allegations as to him and is without knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in this paragraph.

132.    Chrisos is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

133.    Denied.

## AFFIRMATIVE DEFENSES

Chrisos asserts the following affirmative defenses:

### FIRST AFFIRMATIVE DEFENSE

All of the actions taken by Chrisos were justified by legitimate business reasons.

### SECOND AFFIRMATIVE DEFENSE

All of Chrisos actions and conduct were lawful and justified.

### THIRD AFFIRMATIVE DEFENSE

The Complaint should be dismissed for failure to state a claim upon which relief can be granted.

11

## FOURTH AFFIRMATIVE DEFENSE

The claims of the plaintiffs are barred by the applicable statutes of limitations.

## FIFTH AFFIRMATIVE DEFENSE

The claims fail for lack of jurisdiction.

## SIXTH AFFIRMATIVE DEFENSE

If the plaintiffs have been damaged as alleged in the Complaint, any such damage was a result of acts and/or omissions of persons or entities over whom Chrisos had no control and for whose conduct Chrisos is not legally responsible.

## SEVENTH AFFIRMATIVE DEFENSE

If the plaintiffs have suffered any damages, which Chrisos denies, their claims to relief are barred, in whole or in part, because such damages are a result of the plaintiffs' own conduct.

## EIGHTH AFFIRMATIVE DEFENSE

The plaintiffs have failed to mitigate their damages.

## NINTH AFFIRMATIVE DEFENSE

Chrisos did not discriminate in violation of G. L. c. 151B.

## TENTH AFFIRMATIVE DEFENSE

The plaintiffs were not subject to verbal or physical conduct that would be reasonably perceived to be sexual harassment or gender harassment.

## ELEVENTH AFFIRMATIVE DEFENSE

Chrisos' conduct was proper, not discriminatory, and not unwelcome to the plaintiffs.

12

## TWELFTH AFFIRMATIVE DEFENSE

If any unwelcome conduct occurred, which Chrisos denies, it was not sufficiently severe or pervasive to create a hostile work environment.

## THIRTEENTH AFFIRMATIVE DEFENSE

Plaintiffs are equitably estopped, in whole or in part, from asserting a claim in the Complaint.

## FOURTEENTH AFFIRMATIVE DEFENSE

Plaintiffs have, by their conduct, waived, in whole or in part, their claims.

## FIFTEENTH AFFIRMATIVE DEFENSE

The claims are barred by laches.

## SIXTEENTH AFFIRMATIVE DEFENSE

The relief requested is barred by the plaintiffs' unclean hands.

## SEVENTEENTH AFFIRMATIVE DEFENSE

Defendant Chrisos did not discriminate, harass, or retaliate against the plaintiffs.

## EIGHTEENTH AFFIRMATIVE DEFENSE

Any terminations of the plaintiffs were for legitimate business reasons.

## NINETEENTH AFFIRMATIVE DEFENSE

Chrisos did not make any material misstatements to the plaintiffs.

## TWENTIETH AFFIRMATIVE DEFENSE

Chrisos never entered into any agreements with the plaintiffs.

## TWENTY-FIRST AFFIRMATIVE DEFENSE

The plaintiffs failed to avail themselves of procedures and measures to prevent, correct, or avoid any alleged harm.

13

## TWENTY-SECOND AFFIRMATIVE DEFENSE

Chrisos adopts herein any and all affirmative defenses asserted by the other

defendants in this action.

## TWENTY-THIRD AFFIRMATIVE DEFENSE

Chrisos reserves the right to supplement his affirmative defenses based on

discovery in this action.

Respectfully submitted,
GREGORY CHRISOS,
By his attorneys,

Cheryl A. Waterhouse, BBO #547058
Christian G. Samito, BBO #639825
Donovan Hatem LLP
Two Seaport Lane
Boston, MA 02210
(617) 406-4500

Dated: October 18, 2004

14

## CERTIFICATE OF SERVICE

I, Christian G. Samito, hereby certify that on this 18th day of October, 2004, I served the foregoing *Answer of Gregory Chrisos* upon the other parties to this action by causing a copy thereof to be delivered by hand, postage pre-paid, to Elizabeth A. Rodgers, Esq., Rodgers, Powers & Schwartz, 18 Tremont Street, Boston, MA 02108 and by first class mail to Julie Trester, Esq., Meckler Bulger & Tilson, 123 North Wacker Drive, Chicago, Ill 60606 and to Jeffrey S. Brody, Esq., Jackson Lewis LLP, 75 Park Plaza, 4th Floor, Boston, MA 02116.

Christian G. Samito

00861398

15