## THE COMMONWEALTH OF MASSACHUSETTS

Middlesex SS.                                              **Superior Court**
                                                          **C.A. No. 04-3270**

| | |
|---|---|
| LISA RILEY, LISA MARIE CATALANO, | ) |
| SANDY PANARELLO AND | ) |
| AMANDA MEDINA | ) |
|        **Plaintiffs** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **GENERAL EMPLOYMENT ENTERPRISES,** | ) |
| **TRIAD** | ) |
| **PERSONNEL SERVICES INC** | ) |
| **GREGRORY CHRISOS, HERBERT IMHOFF** | ) |
| **AND** | ) |
| **KIM CULLEN** | ) |
|        **Defendants** | ) |

## AMENDED COMPLAINT

### I.    Introduction

Lisa Riley, Lisa Marie Catalano, and Amanda Medina file this complaint of quid pro quo harassment and retaliation arising from the sexual advances of Gregory Chrisos, the Vice President with responsibility for their offices, and the condoning of his conduct by the defendant Imhoff and the corporation General Employment Enterprises. The defendants failed to create an environment free from sexual harassment, negligently and/or intentionally permitted on its premises a person known to be sexually harassing women, failed to heed increasing signs of offensive and hostile behavior directed towards women, condoned a retaliatory atmosphere and retaliatory acts of employees of the defendant General Employment, and recklessly disregarded the retaliation and harassment of the plaintiffs who opposed the hostile and retaliatory environment, and failed to take adequate steps to investigate or remedy or prevent the harassment or retaliation.

In July, 2003, the plaintiffs discovered that Chrisos had a pattern of approaching women in the company, with requests for sexual intercourse and relations outside of his marriage and of protecting those who complied, and punishing those who resisted or denied him his continued sexual liaisons. In the case of Sandy Panarello, she was promised a branch manager position in Tampa Florida, which she accepted understanding that she could aggressively seek to expand her branch. Chrisos began a consensual, secret affair with an employee in the Maitland, Florida office. Chrisos protected that office in an attempt to hide his affair, and prevented Panarello from doing business in the Maitland/Orlando area. Chrisos propositioned Lisa Riley, who succumbed to his

advances at a Managers' Conference, but found them unwelcome and immediately demanded that they not continue. Riley found her authority and Regional Manager compensation undermined and ultimately denied. Lisa Marie Catalano was propositioned at a Managers' meeting and refused, and soon found her authority undermined, her new office delayed and she was terminated. In July, 2003, Riley and Catalano revealed to each other the similar experiences of Chrisos demanding sexual favors of them at the Managers' Conferences. Shortly after that, Chrisos targeted Amanda Medina, a teenage employee in Riley's office, soliciting her physically in front of Riley. Riley confronted him and demanded he stop. She revealed her knowledge of the other women he had harassed, and he admitted his conduct, and begged her forgiveness, in an email. Riley, Catalano and Medina filed discrimination charges internally with the company and thereafter at the MCAD, alleging continued discrimination and retaliation. Although Chrisos was fired, the women were harassed and retaliated against as a result of their complaints, ultimately leading to the dismissal of Riley, and severe emotional distress to the others.

## II.  Parties

1.  Plaintiff Lisa Riley is an individual, a female, and resides at 49 Buffum Street, Salem, MA, in the county of Essex.

2.  Plaintiff Lisa Marie Catalano is an individual, a female, and resides at 400 Charles Street, Malden, MA 02148, in the county of Middlesex.

3.  Plaintiff Amanda Medina is an individual, a female, and resides in Florida.

4.  Plaintiff Sandy Panarello is an individual, a female, and resides at 18838 Duquensne Drive, Tampa, FL 33647.

5.  Defendant General Employment Enterprises is a corporation with a principal place of business at One Tower Lane, Suite 2100, Oakbrook Terrace, IL 60181. General Employment is the parent company of TRIAD Personnel Services Inc, d/b/a Generation Technologies, Inc. and has done business in Massachusetts as TRIAD Personnel Services and/or Generation Technologies, Inc. at 599 North Avenue, Door 8, Wakefield, MA 01880, and at 99 Summer Street, Suite L1100, Boston, MA, and as General Employment Enterprises at 200 Unicorn Park, Third Floor, Woburn, MA.

6.  TRIAD Personnel Services, Inc. is the wholly owned subsidiary of General Employment Enterprises with a principal place of business of One Tower Lane, Suite 2100, Oakbrook Terrace, IL 60181, and has done business in Massachusetts as TRIAD Personnel Services and/or Generation Technologies, Inc. at 599 North Avenue, Door 8, Wakefield, MA 01880, and at 99 Summer Street, Suite L1100, Boston, MA.

7.  Defendant Greg Chrisos is, upon information and belief, residing at 20 Gateway Lane in Lynn, MA. During the Plaintiffs' employment, Defendant Chrisos was Vice President of General Employment until his termination in 2003 and was an apparent and/or authorized agent of General Employment and aided or abetted the discrimination and retaliation herein.

8.  Defendant Herbert Imhoff was at all times an officer, and/or CEO of Defendant General Employment, and/or TRIAD Personnel Services Inc. He participated in the Defendants' defense of the matter and knew or should have known of Plaintiffs' terms and conditions of employment, and aided and abetted in the hostile and retaliatory environment and/or negligently failed to investigate or remedy the terms and conditions of employment alleged below, and defamed the Plaintiffs in their place of employment.

9.  Defendant Kim Cullen of New Hampshire was at all times an employee of GEE.

## III.  Administrative Exhaustion

10.  Plaintiffs Riley, Catalano and Medina have met all of the administrative requirements of G.L. c. 151B, including the timely filing of a charge of discrimination at the Massachusetts Commission Against Discrimination ("MCAD"), which includes a claim of continuing retaliation. Since the filing of that complaint, retaliation has continued, causing the termination of Ms. Riley, which is included within the scope of the reasonable investigation likely to have arisen at the MCAD. More than ninety (90) days have expired since the date of the filing of each charge with the MCAD and each has informed the MCAD of her intent to bring this action. The facts in this complaint are contained in, or related to, the scope of the complaint and investigation at the MCAD.

## IV.  Factual Background

11.  General Employment hired Lisa Riley as a Personnel Consultant in or about July 6, 1994. After interim successes and promotion, on November 1, 1997, Riley was promoted to the position of Branch Manager of the TRIAD office in Reading, which later moved to Wakefield, MA.  Riley has won a total of 10 awards or trophies, including the 2002 Chairman's Pinnacle Award for Outstanding Managerial Achievement.

12.  Lisa Marie Catalano was hired by General Employment in the TRIAD office in Reading, MA in February 1997; the office later moved to

3

Wakefield. She was promoted to the position of Assistant Branch Manager of the TRIAD Wakefield Branch office on about March 29, 1999, and to the Branch Manager of the Boston TRIAD office in the summer of 2001. She left her employment and was rehired on September 30, 2002, working for Riley as a Recruiter in the TRIAD Wakefield office. Lisa Marie Catalano won over 5 awards including a 1999 award for being the top producer in TRIAD Personnel, while Riley won the Top Producing Manager's award.

13.    Sandy Panarello was working in Woburn from 1994-1999, reporting to Chrisos as Woburn Manager, then to Peter Ernst, a male manager in the Woburn, MA office; Panarello won a trip to Hawaii because of her outstanding sales. Chrisos promoted Panarello to the position of manager of the TRIAD branch office in Tampa, FL in 2000, which was changed to a General Employment office at the time of her transfer.

14.    When Panarello was offered the Tampa branch, Chrisos led her to believe she would be able to develop business or placements in the Maitland/Orlando, FL area.

15.    Amanda Medina was hired as an administrative assistant for the TRIAD Wakefield office on May 14, 2002. She reported to Lisa Riley. On July 8, 2002, she was promoted to Recruiter, based upon her excellent performance.

16.    General Employment provides placement and contract staffing services for business and industry, specializing in the placement of professional information technology, engineering and accounting professionals. As of September 30, 2002, the Company operated 32 offices located in major metropolitan business centers in 12 states. General Employment acquired Generation Technologies ("Gen Tech") in 2001. As of June 30, 2003, the Company operated 25 branch offices

17.    Personnel in both divisions are comparable and similarly situated to a large degree. Employees retain the seniority date from date of hire with either division, TRIAD or General Employment; the same Chief Executive Officer and Chief Financial Officer ran both divisions; the same human resources personnel and policies and manual applied to both divisions; managers meetings for both were held at the same time. General Employment offices could contract and bill temporary placements under the TRIAD name, doing business as TRIAD. The same payroll people processed the payroll checks. Hiring and firing was under the control of the same people, and TRIAD personnel were forced to take in General Employment personnel from time to time.

4

18.  Herbert F. Imhoff, Jr. ("Imhoff") was at all times relevant an officer of General Employment and since 2001 has been Chairman of the Board and Chief Executive Officer. He is an attorney.

19.  Matt Zaccarelli was at all times relevant counsel to General Employment and acted as collection officer.

20.  Greg Chrisos was the Woburn manager for General Employment in 1994, and then became TRIAD Vice President in approximately 1996 and had become Vice President for the entire East Coast, General Employment and TRIAD offices by 1999. Chrisos had direct managerial authority over Riley, Panarello, and Catalano. Medina, reported to Riley and met with Chrisos who evaluated her as part of his duties.

21.  Chrisos created a hostile environment which was both severe and pervasive throughout the offices which he managed, from at least 2000 to 2003. General Employment and or TRIAD continuously, from at least 2000 to the present, engaged in a practice and policy of tolerance of sexual harassment of females by Chrisos, a high level manager, and others, while the company knew or should have known of the conduct, and the company failed to take reasonable steps to remedy, investigate and deter such conduct.

22.  Repeatedly, at sexual harassment training, Imhoff, the President/CEO of GEE, minimized sexual harassment complaints and disparaged investigations of sexual harassment. He referred to business problems caused by sexual harassment complaints, labeled complainants as troublemakers and described the lack of merit of exemplar claims.

23.  Riley reasonably believed the company viewed complainants of sexual harassment as troublemakers.

24.  In 2000, Lisa Marie Catalano became Assistant Branch Manager in Lisa Riley's office.  Catalano won another award for being top producer in TRIAD Personnel. Vice President Chrisos began discussing with her assigning her to be manager of a proposed Boston Office, to start in October 2000. In Approximately August 2000, Chrisos came to Boston and identified office space with Catalano for the Boston office. He described a five-year lease.

25.  On about September of 2000, Chrisos offered Riley an override (commission) on the new Boston Branch, to mentor Catalano and to make sure she did well.

26.    In October 2000, Chrisos invited Catalano to be his personal guest at an annual managers' meeting to receive her personal achievement award. Chrisos told Catalano he had invited a group to his room, but she found herself to be the only invited guest. Chrisos propositioned Catalano sexually. She rejected him, but did not turn him in for fear of losing her promotion and her Boston Office assignment.

27.    In October 2000, Sandy Panarello in Florida won numerous contests for the Tampa, FL General Employment office and managed the third-most profitable office in the country.

28.    Following Catalano's rejection of Chrisos in October 2000, Chrisos delayed her branch manager position for three months, and there was an abrupt stop to the completion of the office.

29.    In about January 2001, Catalano became a branch manager, and Chrisos attempted to control her, telling Riley that she should not give Catalano any advice, that Catalano should learn to come to him and not Riley.

30.    In approximately January 2001, Chrisos made sexual advances to, and became sexually involved with, a recruiter in the Maitland (near Orlando, Florida) office, through April 2001. He sent her sexual emails, suggested techniques for using private emails and paid for leather coats and trips for her. During that period, he repeatedly visited Florida and flew the employee/sexual partner on trips with him, and opposed adverse action against her by her manager, who found her deficient.

31.    In approximately April 2001, the Maitland, Florida manager finally fired the under-performing employee/sexual partner. The manager confronted Chrisos with the emails and he sorrowfully admitted the conduct, apologized and asked her to spare his family. He told her he had been blackmailed by the woman into giving her severance pay to keep her quiet. Upon information and belief, the other defendants knew or should have known of his payment to the employee in Florida for Chrisos' sexual advances.

32.    At the Junior Managers' meeting at the time of his sexual activities with the woman in Maitland, Chrisos limited the business of Sandy Panarello and barred her from competing in the Orlando area, a much larger market where she had developed business client contacts.

33.    Chrisos placed false criticism in the file of the manager in Orlando who had discovered his misconduct.

34.    Male-managed offices were not restricted from placements by geographic areas. This restriction was not a legitimate business decision as Panarello was an award winning business developer and the company needed increased revenues. Panarello had established client relationships with companies in Orlando that she was now required to relinquish.

35.    By June 2001, the Boston office was at an all time high and was extremely successful under Lisa Marie Catalano, who had rejected Chrisos' sexual demand.

36.    Chrisos sent a male, Ken Yeoh, with less experience, education and training to the Boston office and to Panarello's office, and to the office of other female managers, where he interfered with personnel and procedures, and undermined the female branch manager's authority, in a manner not similarly done with males.

37.    During 2001-2002 Chrisos sent Ken Yeoh to offices headed by females where he interfered with authority over personnel, and changed policy or procedure including, offices headed by, but not limited to, Marie Catalano, Stacy Bohn, Tanya Lynam, and Sandy Panarello. All four have been fired or forced out of the company, while men's offices which were less profitable were not similarly targeted for Yeoh's interference, or termination of business.

38.    In the January, 2002, period, as a result of Riley's continued award-winning success, Chrisos began discussing making Riley, the Wakefield, MA branch manager, into a Regional Manager, with Boston and Woburn to report to her. In April 2002, he discussed increasing the base salary immediately, with a six-month increase thereafter, and a bonus structure to increase her pay by $5,000 per quarter, to a total increase of at least $30,000 per year over the branch manager pay. The details were not finalized.

39.    On about April 12, 2002 in Chicago while attending a manager's conference, Vice President Chrisos solicited Riley for sex after requesting her to come to his room to discuss compensation. Riley viewed his sexual proposition to her as unwelcome, and as a veiled threat to her job. She felt emotionally unequipped to deal with potential job consequences if she refused, due to family problems of which Chrisos was aware. Riley slept with Chrisos that weekend, feeling coerced because of economic fear at a vulnerable time.

40.    The second night of that weekend, Riley tried to avoid Chrisos, but he came to her room. Again, Riley was fearful she would lose her job if she didn't sleep with Chrisos and, after protesting, was intimidated into sleeping with him.

41.    During May 2002, Chrisos continued to make requests of Riley to accompany him in traveling to the offices of other managers, and she avoided him.

42.    On May 8, 2002, Chrisos and Ken Yeoh came to the Boston region to visit. Chrisos told Riley that she would be getting a $6,000 raise to base salary immediately and another raise in the same amount within 6 months. He told her he expected her promotion to Regional Manager to be official "any day" and that when it was official, the bonus structure would also be completed and in effect.

43.    In about the week of May 8, 2002, Chrisos propositioned Riley again to go to his hotel room, and Riley refused him.

44.    In May of 2002, Amanda Medina, an 18 year old, started working at General Employment, d/b/a Generation Technology in Wakefield, reporting to Riley.

45.    On July 8, 2002, Riley still expected to be promoted to Regional Manager with the Boston and Woburn managers reporting to her.

46.    Chrisos delayed the promotion and raise after being rejected and told Riley that she would just have the Boston manager reporting to her, "for now," as a step toward the promised Regional Manager position, but withheld the promised authority over the Woburn office. This conduct held out the prospect that if she consented to continued trips with him, the Regional Manager position was still on the horizon.

47.    Chrisos called Riley and told her to go to the Boston office and that while Riley was enroute he would inform Marie Catalano that she now reported to her. Simultaneously, Chrisos told Marie Catalano, who had rejected him outright, that he was eliminating the Boston Manager position effective immediately, but she could return to a lower position of recruiter, in Wakefield, under Riley. Catalano did not accept the demotion. Chrisos did not tell Riley that Catalano's position had been abolished, and led Riley to believe that Catalano had quit.

48.    Although the defendants had removed Catalano's managerial authority, they maliciously opposed Marie Catalano's unemployment benefits by leading Riley to believe she had quit, causing them to be delayed for more than 6 weeks.

49.    Chrisos told Riley the delay in Regional Manager status was due to defendant Imhoff. Riley reasonably requested to speak to Imhoff.

50.   Upon information and belief, Imhoff knew or should have known that Chrisos was limiting, segregating or overloading Riley so as to adversely affect her pay and knew or should have known that he was retaliating for her refusal of his requests for sexual favors.

51.   In September 2002, five months after her promotion had been promised, Chrisos told Riley that she was officially the Regional Manager, and that Mike Coleman, the new manager in the Woburn office was to report to her, but he didn't tell Mike Coleman he was to report directly to Riley and didn't give Riley the promised pay raise. Riley had now been given the Wakefield, Boston and Woburn offices, with three times the responsibility and more direct reports than Chrisos had, which detracted from her ability to make her own commission sales, with no increase in either base salary or bonus structure.

52.   The combination of the base salary increases and the bonus structure was supposed to increase her pay by at least $30,000 per year and none of it had become effective.

53.   A male Peter Ernst, had been Woburn manager and was retained despite misconduct, failure to perform, sleeping in the manager's office on the floor all day, and making his subordinates responsible for all the management work, including the hiring and training of new employees. Chrisos did not interfere with or harass or encourage Riley to fire the male, Peter Ernst.

54.   Chrisos burdened women managers with personnel and administrative decisions adverse to their profitability and required Riley to retain Ernst rather than fire him, while he pressured Catalano to leave by demoting her.

55.   In September 2002, Riley persuaded Catalano to return to work, reporting to her.

56.   Chrisos opposed the rehiring of Catalano. Riley did not understand why Chrisos opposed Catalano as he had supported the return of others who had left, and had forced her to keep a male, Ernst who was significantly under performing.

57.   In November, 2002, CEO Imhoff, and Chrisos flew east to give Riley a coveted national award which had been given only three times in the one hundred year history of the company. Imhoff proclaimed in front of all subordinates something to the effect that it was a big surprise that "a girl" could achieve something like this and "beat out the big boys." Imhoff also acknowledged Marcea Taylor (one of Riley's subordinates in the Wakefield office) for her performance. The award led Riley to believe she

would be given the promised increase in compensation at her annual review.

58.   Chrisos began emailing the teen aged recruiter, Amanda Medina, requesting her home email and called her at home allegedly to compliment her on her good work, using access to her employment records to acquire her personal number.

59.   In every paycheck, from November 2002 to January, 2003, Chrisos, Imhoff and General Employment continued to fail to give Riley the promised increase in pay, but she believed the increase was coming.

60.   From December 2002 to spring, 2003, week after week, Chrisos pressured Riley to harass Catalano about her performance, which Riley did not believe deserved reprimand or discipline, especially where Chrisos did not similarly harass Ernst, the under-performing male who had actively engaged in misconduct.

61.   In January 2003, when Chrisos finally gave Riley a salary increase, he failed to give her promised pay which was to have been raised by $12,000 and her bonus structure should have been effective for more than 6 months. The reduced pay, below that promised for her position as Regional Manager, continued in every pay check until Riley's termination.

62.   In February 2003, Riley terminated the under-performing male, Ernst, and despite Ernst's severe misconduct and poor performance, Chrisos gave Ernst a severance package, taking it out of Riley's profit and loss figures.

63.   From the summer of 2002, to February, 2003, Chrisos repeatedly interfered with Riley's direction of Coleman, unlike his treatment of other male branch managers.  In March 2003, Coleman, manager of the Woburn office informed Riley that he "did not understand the reporting structure," and "had not realized I was direct line to you and dotted line to Chrisos." When Riley took this up with Chrisos, Chrisos told her to calm down and asked if she had "PMS."

64.   From November 2002 to March 2003, Chrisos had continued to solicit the teenager Amanda Medina to give him her private email, while she avoided his attention.

65.   In March 2003, Amanda Medina took a leave of absence for personal, medical reasons.

66.   From December 2002 through April 2003, Chrisos continued to pressure Riley to terminate Catalano, constantly calling Marie Catalano a "drain on the payroll" and began referring to Catalano as a "payroll problem,"

10

despite the fact that she had been asked to build a new market, Accounting/Finance, and Chrisos had protected males and others hired to build new markets for a reasonable time, and had protected the male former branch manager who was under performing.

67. At one point in about March 2003, Chrisos came to visit Riley's office, supposedly to see how Riley was handling things, but spent almost no time in the branch Riley was in. He appeared to stalk Catalano, or subject her to excessive personal evaluation and intimidation. She changed her schedule to avoid him and he changed his schedule to be in Woburn, Boston, or Wakefield at the last minute more than once, which was unlike him. He had been in the same office as Catalano on every day of his trip except the first day when he arrived, choosing to sit right across from her and making leading comments about how she was doing. Catalano felt he did so to intimidate her.

68. Chrisos created a hostile environment for Catalano by cumulative conduct and the totality of circumstances including work sabotage, exclusion, denial of support, humiliation, the abolition of the Boston office the prior summer, Catalano's forced choice of demotion or termination, the sexist remarks of CEO/President Imhoff in November, and the continued pressure on Catalano in her new area while males with new areas or lagging areas were not similarly harassed.

69. The hostile environment affected Catalano's performance.

70. In May 2003, upon information and belief, Chrisos sent a harassing email to Monica Friedman, formerly of the Wakefield office, who had abruptly transferred to California. Her vice president reported it to Imhoff. Human Resources never called to investigate.

71. Upon information and belief, Imhoff knew of complaints of sexual harassment and had condoned a pattern of severe and pervasive harassment, had trivialized these complaints and/or had failed to investigate, remedy or deter such conduct, allowing an increasingly harassing and hostile environment to penalize women who would not provide sexual favors to a manager.

72. Chrisos combined sexual stereotypic comments with adverse action, attributing Monica Friedman's motivation to her pregnancy which Chrisos claimed prevented her from thinking clearly. A day or two later he told Riley that Imhoff had handled the matter and that Imhoff believed "Monica just had an axe to grind" because Chrisos did not follow through on a promise to Monica involving compensation. This message further created the impression that Imhoff would rely upon stereotypical

11

derogatory views of women and would not conduct a full and fair investigation.

73.    Upon information and belief, if a fair and unbiased investigation of sexual harassment complaints had occurred, a pattern of severe sexual harassment would have been discovered, in which women who rejected Chrisos and or Imhoff were penalized, subjected to sexist or false or stereotypic attacks and where women were targeted, limited and segregated in ways men were not.

74.    In May 2003, the Maitland, FL manager left, and Chrisos immediately allowed Panarello to begin doing business in the Maitland/Orlando Area. Panarello's office in Tampa had been severely affected by the limitation excluding Orlando, as Tampa had lost considerable business after 9/11/2001.

75.    In May 2003, succumbing to continued pressure from Chrisos regarding her "payroll problem," Riley informed Catalano she would be laid off. CEO Imhoff, who had not called Riley about any other hiring or firing, called her to congratulate her on "getting rid of her payroll problem," despite the fact that Riley had never mentioned Catalano's productivity to Imhoff.

76.    Based on the totality of the circumstances, it is permissible to infer that Imhoff knew that Chrisos wanted to get rid of Catalano for failure to engage in sexual relations.

77.    In May 2003, Amanda Medina returned to the Wakefield office on a reduced schedule.

78.    From April through June 2003, Imhoff promised Panarello that she would have until August 2003 to rebuild the Tampa office. In or around June 2003, an anonymous FAX was sent to Panarello's office from the Headquarters where Chrisos and Imhoff worked, informing Panarello's employees that the office would be closed, and many of her staff chose to leave.

79.    During the week of July 1, 2003, Riley became aware for the first time that Chrisos had sexually propositioned Lisa Marie Catalano, and when she turned him down, he had delayed her promotion to branch manager, had systematically undermined her authority, and subjected her to rules and conditions in running her branch office which led to low profitability and termination of her position. Catalano learned for the first time that Chrisos had propositioned and coerced Riley into having sexual relations and after her refusal to continue, had delayed, and denied her pay and limited or segregated her opportunities.

80.    About July 4, 2003, Riley became aware that the company was closing the office of Sandy Panarello, who had outperformed many male branch managers but denied equal opportunity because of her sex, with limitations and interference on territory, not imposed upon the male managers.

81.    General Employment, as an employment agency, has, by its agents Chrisos, and Zaccarelli made statements which express, directly or indirectly, limitation, or discrimination based on national origin, sex and race. To the Plaintiffs' knowledge, beginning on July 10, 2003, GEE's collection officer, Zaccarelli, began targeting Riley's customers in the Wakefield office, targeting their women and minority employees, including making fun of the client's foreign-sounding name and making other sarcastic and taunting comments about the sound of his name, and by saying, "Get off your useless ass and get the President on the phone." This had the effect of enraging clients and causing at least one General Employment employee to quit.

82.    Despite knowledge of Zaccarelli's conduct and corroboration that Zaccarelli taunted women and minorities, Chrisos, Imhoff and Zaccarelli failed to act to stop using tactics against women and minorities like this and have deliberately used or condoned sexist and derogatory and racist tactics to intimidate threaten or interfere with employees and customers creating a hostile and offensive environment in Riley's office after both Riley and Catalano rejected Chrisos, and all defendants have failed to remedy it.

83.    Chrisos pressured Medina herself and other employees for Medina's private email address to sexually proposition her, sent her a private, suggestive email in July 2003, and referred to forthcoming drinking during his visit, despite her being under age.

84.    Chrisos made sexually stereotypical comments to and about women including describing a woman as a "crusty old broad,"', referring to Medina as a "tart," attributing success to an Atlanta manager because she was "an attractive woman," and asking if Riley's absence was due to having a "hot date." Chrisos referred to Marie Catalano after her rejection of him as "neurotic," a "high-maintenance girl" and someone who had "constant PMS." He questioned another woman who complained of harassment by asking "if it was because [Monica] is pregnant that she "isn't thinking right," and claimed a woman he had had sex with had "blackmailed" him into a severance pay.

13

85. Imhoff similarly made stereotypic statements, proclaiming in front of all subordinates something to the effect that it was a big surprise that "a girl" could achieve the Presidential Award and "beat out the big boys."

86. Men who had performance issues were not berated, humiliated and demeaned.

87. The hostile environment interfered with the performance, and caused the termination of Catalano, Medina, Riley. The hostile environment also caused another female employee, Gadoury, to quit.

88. General Employment managers were far more likely to be male, while the managers of the TRIAD/GenTech offices likely to be female. Upon information and belief, Zaccarelli engaged in discriminatory and hostile collection practices with the clients of the TRIAD/Gen Tech offices headed by females more than for the offices headed by males.

89. In July, 2003, after sending Medina the suggestive email calling her a "tart," Chrisos harassed Medina by departing from normal procedure and meeting with her individually, instead of in the open office, for an inordinate amount of time as compared to other employees and grilled a co-worker about Medina's personal problems. Chrisos took the employees, including Medina, out for drinks, despite Medina being under age, where he had his hands all over Medina, looked down her shirt, and gave her his hotel phone number or room number. When a co worker noticed Chrisos rubbing Medina's leg, and told him she saw what he was doing, Chrisos told her there might be a space open for her as manager of the Boston office.

90. Medina felt the conduct of Chrisos' hand on her leg unwelcome, and froze. Medina made a gesture indicating that she didn't know what to do.

91. Riley confronted Chrisos and said "What are you doing, stopped the conduct and sent Medina outside with others.

92. Chrisos smiled and said "Come on, it was harmless." Riley said "Chrisos, she is 19 years old – how can you say that?" He replied, "Come on, how often do I get to touch a 19 year-old girl?"

93. Riley asked him, "What did you do to Marie Catalano?" He at first admitted kissing her only. Riley told him, "You did same thing to her that you did to me. Who else have you done this to? What about those other girls you just got rid of when it made no sense--Tonya [Lynam] and Stacy [Bohn]?" Chrisos replied, "I never slept with them. I only slept with Lauren Grub and a consultant in the Maitland office." (Lauren had been a manager and the Maitland office is in Orlando area.) Despite this

14

confrontation Chrisos called Medina's home and left a message on her voicemail asking Medina to call him.

94.     Riley, who had been asked to travel with Chrisos, allegedly to improve other branches, had identified Lynam and Bohn as potential leaders. Lynam, Bohn, Catalano and Panarello had been interfered with by Ken Yeoh, had all been top producers before, and were driven into the ground. There were other, more logical offices to close when their offices were closed, but those offices were managed by men.

95.     Chrisos had given the Maitland office a protected territory, the only office in the country to have that right, which prohibited equal opportunity for Sandy Panarello.

96.     On July 12, 2003, Riley confronted Chrisos, saying she couldn't believe he was doing to Medina what he had done to her, and he said, "You wanted to." Riley told him he knew his advances were unwelcome and that she had not wanted to.

97.     Riley realized that the raise issue was hopeless and that there would be no remedy. Riley said, "Is this why you haven't paid me for my work in a year?" Riley left.

98.     Chrisos followed her to the parking lot and put his hand on Riley's back, rubbing up and down. Riley was very upset and made it clear Chrisos' contact was unwelcome, saying, "You need to go now." Chrisos left.

99.     On or around July 12, 2003, Chrisos sent an email to Riley, admitting that everything Riley accused him of was true and asking her to forgive him and making reference to his family.

100.    Over the weekend of July 12, 2003, and again on July 14, 2003, Riley informed Human Resources of Chrisos' conduct and Imhoff of the need for immediate contact from them.

101.    On July 14, 2003, about an hour later, Chrisos called Riley's office. He said, "This is Greg..." and Riley cut him off and said, "I don't want to talk to you." He said, "We wanted to let you know what we are doing..." and Riley cut him off again and said, "I don't want to talk to you. I can't believe you are calling me." Riley then hung up. Marcea Taylor was sitting across from Riley at the time and heard her conversation with him.

102.    Upon information and belief, Imhoff or his staff informed Chrisos of Riley's confidential request for assistance on sexual harassment and despite a request that the investigation be made by an unbiased person,

placed Chrisos in a position to manage the complaint about his own misbehavior.

103. On or around July 14, 2003, Riley was informed that Imhoff had been informed of her complaints about Chrisos.

104. On or around July 14, 2003 Zaccarelli repeatedly called throughout the day about the harassing collection calls, despite prior commitments by Imhoff and Chrisos to prevent his involvement, and, therefore, his conduct appeared to be deliberate attempts at harassment.

105. General Employment then conducted an investigation which, under the totality of the circumstances, was intimidating and threatening to the employees by insisting initially on un-represented complainants meeting immediately with a trained human resources manager under the direction of outside counsel.

106. Since Riley, Medina, Taylor and Catalano made a complaint of what they believed to be unlawful sexual harassment and hostile environment and disparate treatment of women to Human Resources director Sherry Hubacek, Riley, the complainants, her other employees and her clients have experienced an unprecedented, retaliatory attack on their tangible and intangible economic opportunities including but not limited to:

   a. Completely unprecedented rejection of contract language with key customers, failure to follow precedent of compromising to get deals done, and obstruction of pre-approved language, causing loss of deals.
   b. Delay of necessary business tools and abandoning of "urgency" which was part of normal training, practice and client retention and the resulting loss of client accounts and/or revenue.
   c. Increased interference with business opportunity by Zaccarelli using extremely aggressive and unwarranted attacks on Riley's clients in collection, interfering with business to the detriment of her and her staff.
   d. Continued and intensified harassment of female and minority employees of clients, which Imhoff had promised would be stopped.
   e. Harassment of clients in the region despite requests to have no contact; harassment of clients who are not delinquent, despite notice.
   f. Denial of Riley's status as Regional Manager; failure to confirm the apparent authority since November, 2002 when public announcement had been made by Imhoff and Chrisos, effectively demoting her from authority over three branches, to Branch Manager of one branch.
   g. Investigation of complaint which is not fair and impartial, but which seeks to intimidate Riley's subordinates and dig up adverse information about Riley and the other complainants.

16

h. Finding cause to believe Chrisos harassed the females and engaged in inappropriate conduct, but then demoting Riley from Regional Manager in charge of Boston, Woburn and Wakefield and closing the Boston office for pretextual reasons.

i. Penalizing the Wakefield office whose contractor was not selected for contractor of the quarter, was named runner up, then removed as runner up, all without fair and adequate justification.

j. Intimidation of Wakefield staff by sending photographs of prior socializing with Chrisos.

k. Changing payroll procedures from normal procedure, attempting to deprive Marcea Taylor of sick time (but finally relenting) and interfering with pay to contractors in the Wakefield office.

l. Threats not to talk to other employees about harassment, which is intimidation to prevent investigation, remedy or deterrence continued harassment.

m. Delay in sending invoices, which adversely affects revenue to the Wakefield office.

n. Delay in processing unemployment claim of Catalano.

o. Harassment of office, clients, Riley, contractors and Catalano and Taylor's sick days; dividing a co-worker, Marcea Taylor from Riley who loses interest in being promoted to Boston Branch manager.

p. Putting a hold on the Boston office, despite prior approval of growth, which effectively eliminates Catalano's authority over the Boston office.

q. Delay in applying cash to invoices so as to reduce commissions to Wakefield office.

r. Denying Riley's office thousands of dollars of receivables that have been collected but not applied to her profitability, thus depriving her of profits for the fiscal year ending September 30, 2003 and causing her to suffer loss of bonus and/or award compensation.

s. In October 7, 2003, terminating the Boston branch office and accruing a large loss of $188,000 rather than permit Riley to staff and manage it to profitability.

t. The Defendants turned staff against Riley, and terminated her on fictitious charges of soliciting clients for a new enterprise, which she did not do, and other false charges of competition.

u. The Defendants opposed the unemployment of Riley's secretary, while having approved unemployment for males who had lost transportation, while asking her former secretary questions about Riley and suggesting a relationship between them caused the opposition to the unemployment.

v. Actions continue to this day, in making adverse business decisions which harm the income, career opportunities and/or managerial advancement of the complainants, and affect adversely their terms and conditions of work, including filing a lawsuit against them in Chicago which is without merit and has no substantiation.

17

w. No reasonable woman in the complainants' shoes would continue to remain employed working for General Employment where she has been demoted and suffered tangible job reduction, interference with her management and staffing decisions, where normal practices are being undermined, usurped or overturned, and her power is being removed or reduced daily, and her bonus and income is being threatened or reduced.

x. The retaliatory environment affected Medina's ability to concentrate and make placements, and the resulting loss in income made it impossible for her to obtain independent transportation required to remain at work.

y. The retaliation and discrimination have become intolerable, emotionally devastating and economically costly for Riley, Catalano and Medina.

## COUNT I – SEXUAL HARASSMENT

107. The Plaintiffs, reaffirm and incorporate by reference the facts and allegations contained in paragraphs 1-106.

108. Riley, Catalano and Medina were sexually harassed in violation of G.L.c. 151B, § 4(16A) and, as defined in c. 151B, §1(18) "sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when (a) submission to or rejection of such advances, requests or conduct is made either explicitly or implicitly a term or condition of employment or as a basis for employment decisions." Riley, Catalano and Medina were sexually harassed in violation of G.L.c. 151B, § 4(16) as defined in c. 151B, §1(18)(b) in that "such advances, requests or conduct [had] the purpose or effect of unreasonably interfering with [each] individual's work performance by creating an intimidating, hostile, humiliating or sexually offensive work environment." General Employment and TRIAD supervisory personnel were aware of the situation but failed to adequately respond, investigate or remedy the situation.

109. As a result, Plaintiffs Riley, Catalano and Medina suffered physical and emotional distress, and a loss of wages and benefits, for which each seeks compensation.

## COUNT II – GENDER HARASSMENT/DISCRIMINATION

110. Plaintiffs Riley, Catalano and Medina re-allege, reaffirm and incorporate by reference the facts and allegations contained in paragraphs 1-109.

111. Riley, Catalano and Medina were victims of gender discrimination, in violation of G.L.c. 151B, § 4(1) in that each experienced disparate treatment on the basis or her gender

112.  As a result, Plaintiffs suffered physical and emotional distress, and a loss of wages and benefits, for which each seeks compensation.

## COUNT III – FAILURE TO ADEQUATELY INVESTIGATION OR REMEDY A HOSTILE WORK ENVIRONMENT

113.  Plaintiffs Riley and Medina re-allege, reaffirm and incorporate by reference the facts and allegations contained in paragraphs 1-112.

114.  After Riley and Medina reported discriminatory and/or sexually harassing conduct, General Employment, TRIAD Personnel Services, Imhoff and/or Chrisos failed to undertake a reasonable, adequate investigation, and failed to remedy the situation in an appropriate fashion.

115.  As a result, Plaintiffs suffered physical and emotional distress, and a loss of wages and benefits, for which each seeks compensation.

## COUNT IV – DISCRIMINATORY TERMINATION

116.  Plaintiffs Riley, Catalano and Medina re-allege, reaffirm and incorporate by reference the facts and allegations contained in paragraphs 1-115.

117.  General Employment and or TRIAD Personnel Services terminated Riley, Catalano and Medina because of their gender, or in retaliation for their opposition of to discriminatory conduct, or a combination of both of these motives, in violation of G.L. c. 151B, § 4(1) & 4(4).

118.  The conditions at work became objectively and subjectively intolerable for Riley, Catalano and Medina, constituting a constructive discharge by the time each separated from employment.

119.  As a result, Plaintiffs suffered physical and emotional distress, and a loss of wages and benefits, for which each seeks compensation.

## COUNT IV – RETALIATION

120.  Plaintiffs Riley, Catalano and Medina re-allege, reaffirm and incorporate by reference the facts and allegations contained in paragraphs 1-119.

121.  General Employment, TRIAD and Imhoff terminated Riley, Medina and Catalano, because of, or in retaliation for the opposition o each to discriminatory conduct, or a combination of both of these motives, in violation of G.L. c. 151B, § 4(1) & 4(4).

122. General Employment, TRIAD and Imhoff subjected Riley, Medina and Catalano to disparate treatment in terms and conditions of work, in retaliation for their oppositions to discriminatory conduct, or a combination of retaliation and gender, in violation of G.L. c. 151B, § 4(1) & 4(4).

123. As a result, Plaintiffs suffered physical and emotional distress, and a loss of wages and benefits, for which each seeks compensation.

## COUNT V – PROMISSORY ESTOPPEL

124. Plaintiff Panarello re-alleges, reaffirms and incorporates by reference the facts and allegations contained in paragraphs 1-123.

125. In Boston, in February, 2000, the defendants made statements of material fact made to induce Panarello to give up a lucrative position with them in Boston to accept a branch manager position in Tampa, FL, and she did so, relying upon a representation that she would be entitled to recruit and operate in any territorial area in Florida, and, there is evidence of reasonable reliance on the false statement to the Plaintiff's detriment.

126. The misstatements were material as a reasonable person in Panarello's shoes would not have moved to Tampa if she knew that her opportunity would be limited in a way which no other branch manager in General Employment or TRIAD was limited. The representation that she would be able to develop clients in Orlando Florida as well as Tampa, FL would, more likely than not, have led a reasonable employee to act.

126. Panarello reasonably relied upon the statements of Chrisos, who had superior knowledge about the internal processes of the defendant companies as to authority for the Plaintiff to recruit clients.

127. As a direct result of the material misstatements on which she relied, Panarello gave up lucrative employment opportunities in Boston which she would have enjoyed had the defendants not breached their promised terms, and lost the benefit of lucrative sales in Orlando, FL which she would have been able to achieve, but for the breach of contract.

## COUNT VI – INTENTIONAL INTERFERENCE WITH ADVANTAGEOUS RELATIONS

128. Plaintiffs Panarello and Riley re-allege, reaffirm and incorporate by reference the facts and allegations contained in paragraphs 1-127.

129. Panarello and Riley had an expectation of contractual employment with a successor corporation to perform services in lieu of human resources functions.

130. The Defendants General Employment and/or TRIAD Personnel Services, Inc. have filed suit in bad faith against Panarello and Riley in Chicago, IL for the purpose of causing the performance of that contract to become more expensive or burdensome, knowing that the plaintiffs were entitled to compete and run additional business which did not violate any confidentiality agreement.

131. The Defendants Imhoff and Chrisos maliciously interfered with Panerello and Riley's contract with General Employment and TRIAD, and caused their termination where the continuing support of upper management was irreparably eroded and both Panarello and Riley experienced a sharp diminution of status due to the malicious interference of Chrisos and/or Imhoff.

132. The Defendant Kim Cullen maliciously interfered with the advantageous relations which Riley enjoyed with General Employment and or TRIAD in order to secure for herself the position of Branch Manager which Riley enjoyed, and falsely and maliciously accused Riley of competing with General Employment and or TRIAD for customers, or other actions against the interests of General Employment, which caused Riley to be fired, or were a substantial contributing factor to the irreparable erosion of support of upper management and the sharp diminution of status.

133. As a direct result, Plaintiffs suffered lost economic opportunities, increased costs of defending themselves and emotional distress.

Wherefore, the Plaintiffs demand that this Court order:

a. That Defendants compensate Plaintiffs for any loss of wages and/or benefits incurred as a result of the termination/failure to rehire;

b. that the Plaintiffs be awarded an amount of money which will fairly compensate them for their emotional and physical pain and suffering;

c. that the defendants pay the plaintiffs costs and attorney's fees resulting from this action;

d. that Defendants pay the Plaintiffs interest on any judgment entered from the time of the filing of their MCAD Charge and from this suit;

e. that the Defendants be ordered to pay the Plaintiffs punitive damages;

f. such legal and equitable relief as may be just and proper and/or which will make the Plaintiffs whole.

21

THE PLAINTIFFS DEMAND A JURY TRIAL ON ALL COUNTS OF THEIR
COMPLAINT

Respectfully submitted,

Lisa Riley, Lisa Marie Catalano,
Sandy Panarello and
Amanda Medina
By their Attorney


Elizabeth A. Rodgers, BBO #424360
Rodgers, Powers & Schwartz LLP
18 Tremont Street
Boston, MA 02108
(617) 742-7010

CERTIFICATE OF SERVICE
I hereby certify that a true copy of the above document was
served upon the attorney of record for each other party
by mail/by hand on _10/21/04_

22

# COMMONWEALTH OF MASSACHUSETTS

Middlesex SS.                                    Docket No. 04-3270

| | |
|---|---|
| LISA RILEY, LISA MARIE CATALANO, SANDY PANARELLO AND AMANDA MEDINA, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| GENERAL EMPLOYMENT ENTERPRISES, TRIAD PERSONNEL SERVICES INC., GREGORY CHRISOS, HERBERT F. IMHOFF, JR., AND KIM CULLEN, | ) ) ) ) ) ) |
| Defendants. | ) ) |

## ANSWER OF GREGORY CHRISOS

Gregory Chrisos ("Chrisos") hereby responds to the Complaint of Lisa Riley ("Riley"), Lisa Marie Catalano ("Catalano"), Sandy Panarello ("Panarello"), and Amanda Medina ("Medina"). Chrisos denies all allegations of discrimination, harassment, and retaliation and all allegations as to him in the two paragraphs titled "Introduction" in the Complaint. Chrisos responds to the numbered paragraphs of the Complaint as follows:

1.    Chrisos is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

2.    Chrisos is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

3.    Chrisos is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

1

4.    Chrisos is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

5.    Admitted.

6.    Chrisos is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

7.    Denied.

8.    Admitted as to the first sentence, denied as to the second sentence.

9.    Chrisos is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

10.    As to sentences 1 and 4, Chrisos is without knowledge or information sufficient to form a belief as to the truth of their allegations.  The allegations of sentence 2 are denied. Chrisos states that the allegations in the Complaint are similar to the allegations in complaints filed in the MCAD and denies the remaining allegations of this paragraph.

11.    Chrisos is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

12.    Chrisos is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

13.    Chrisos denies that he promoted Panarello and states that General Employment Enterprises ("GEE") promoted her.  Chrisos admits that Panarello worked in Woburn and reported to Chrisos.  Chrisos states that he is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph.

14.    Denied.

15.    Chrisos admits the first two sentences of paragraph 15 and is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations.

16.    Chrisos admits the first sentence of paragraph 16 and is without information or knowledge sufficient to form a belief as to the truth of the allegations of this paragraph.

17.    Chrisos denies that Triad personnel were forced to take in General Employment personnel and admits the other allegations of this paragraph.

18.    Admitted.

19.    Chrisos is without information or knowledge sufficient to form a belief as to the truth of the allegations of this paragraph.

20.    Chrisos admits the allegations of the first sentence and that he had direct managerial authority over Riley, Panarello, and Catalano, and evaluated Medina, and is without information or knowledge sufficient to form a belief as to the truth of the remaining allegations of this paragraph.

21.    Denied.

22.    Chrisos is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

23.    Chrisos is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

24.    Chrisos admits that Catalano became assistant branch manager in 2000 and won an award for her performance; Chrisos also admits that he discussed with Catalano the possibility of her being a manager of the proposed Boston office, possible rented space, and a lease.  Chrisos denies any remaining allegations of this paragraph.

25.    Admitted. Chrisos adds that the commission was small, approximately a .5 or 1 percent commission on the margin in the Boston office.

26.    Chrisos admits that Catalano attended the annual manager's meeting to receive a personal achievement award but denies all of the other allegations in this paragraph.

27.    Denied. Chrisos further states that Panarello struggled from the time she started in the Tampa, Florida office, and her office was far from profitable for GEE.

28.    Denied.

29.    Denied.

30.    Denied.

31.    Denied.

32.    Denied.

33.    Denied.

34.    Denied.

35.    Denied.

36.    Denied.

37.    Denied.

38.    Chrisos admits that he discussed with Riley the possibility of making her a regional manager, but denies any remaining allegations of this paragraph, including that he promised her any specific increased compensation.

39.    Denied.

40.    Denied.

41.    Denied.

42.   Chrisos admits that he and Kenneth Yeoh ("Yeoh") came to the region to visit in May 2002 and denies the remaining allegations of this paragraph.

43.   Denied.

44.   Admitted.

45.   Chrisos is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

46.   Denied.

47.   Denied.

48.   Denied.

49.   Chrisos admits the first sentence of this paragraph and denies the second sentence.

50.   Denied.

51.   Denied.

52.   Denied.

53.   Denied.

54.   Denied.

55.   Admitted.

56.   Denied.

57.   Chrisos admits the first and third sentences, but does not have knowledge or information sufficient to form a belief as to the truth of the allegations of the rest of this paragraph.

58.   Chrisos admits that Amanda Medina ("Medina") took a leave of absence for personal reasons in March 2003. Chrisos states that he asked Dawn Bernadino ("Bernadino") of Medina's office for Medina's email because he wanted to send her a