brief note to wish her well and a speedy return to work. Chrisos denies the remaining allegations of this paragraph.

59. Denied.

60. Denied.

61. Denied.

62. Chrisos admits that Peter Ernst ("Ernst") was terminated for performance reasons in February 2003 and received a severance of approximately 8-10 weeks' pay, which was charged to that office, and denies any remaining allegations of this paragraph.

63. Chrisos denies the allegations contained in the first and third sentences of this paragraph and does not have sufficient knowledge or information to form a belief as to the truth of the allegations of the second sentence.

64. Denied.

65. Admitted.

66. Denied.

67. Denied, except for the allegations of the last sentence, for which Chrisos does not have sufficient knowledge or information so as to form a belief as to their truth.

68. Denied.

69. Denied.

70. Chrisos admits to sending an email to Monica Friedman ("Friedman") in May 2003, but denies that it was "a harassing email." Chrisos is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph.

71. Denied.

72.    Denied.

73.    Denied.

74.    Chrisos admits the allegations of the first sentence of this paragraph and denies the allegations of the second sentence of this paragraph.

75.    Chrisos denies that he pressured Riley to terminate Catalano, but admits that Catalano was terminated in May 2003. Chrisos has no knowledge or information sufficient to form a belief as to the truth of the allegations of the second sentence of this paragraph.

76.    Denied.

77.    Admitted.

78.    Chrisos is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

79.    Denied.

80.    Denied. Chrisos states that Panarello's office in Tampa, Florida, was closed solely for poor performance.

81.    Denied.

82.    Denied.

83.    Denied.

84.    Denied.

85.    Chrisos is without sufficient knowledge or information to form a belief as to the the allegations in this paragraph.

86.    Admitted. Chrisos states that women with performance issues were not berated, humiliated or demeaned either.

87.    Denied.

88.    Denied.

89.    Denied.

90.    Chrisos is without sufficient knowledge or information to form a belief as to the allegations in this paragraph.

91.    Denied.

92.    Denied.

93.    Denied.

94.    Denied.

95.    Denied.

96.    Denied.

97.    Denied.

98.    Denied.

99.    Denied.

100.    Chrisos is without sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph.

101.    Chrisos admits that he called Riley on July 14, 2003 and Riley refused to talk with him. Chrisos is without knowledge or information sufficient to form a belief as to the remaining allegations of this paragraph.

102.    Chrisos admits that Imhoff or one of his staff told Chrisos that Riley had called him about allegations and denies the remaining allegations of this paragraph.

103.    Chrisos is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

104.   Chrisos is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

105.   Chrisos admits there was an investigation and is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

106.   Chrisos denies the allegations as to himself and is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph.

## COUNT I

106.[sic]  Chrisos reasserts and realleges his responses to paragraphs 1-106 as if fully set forth herein.

107.   Denied.

108.   Denied.

## COUNT II

109.   Chrisos reasserts and realleges his responses to paragraphs 1-108 as if fully set forth herein.

110.   Denied.

111.   Denied.

## COUNT III

112.   Chrisos reasserts and realleges his responses to paragraphs 1-111 as if fully set forth herein, but denies any knowledge as to a Ms. Hoffman.

113.   Denied, and Chrisos further states that he has no knowledge as to a Ms. Hoffman.

114.   Denied, and Chrisos further states that he has no knowledge as to a Ms. Hoffman.

## COUNT IV

115.    Chrisos reasserts and realleges his responses to paragraphs 1-114 as if fully set forth herein.

116.    Chrisos is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

117.    Denied.

118.    Denied.

## COUNT IV [sic]

119.    Chrisos reasserts and realleges his responses to paragraphs 1-118 as if fully set forth herein.

120.    Chrisos is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

121.    Chrisos is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

122.    Chrisos is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

## COUNT V

123.    Chrisos reasserts and realleges his responses to paragraphs 1-122 as if fully set forth herein.

124.    Denied.

125.    Denied.

126.    Denied.

127.    Denied.

## COUNT VI

128.    Chrisos reasserts and realleges his responses to paragraphs 1-127 as if fully set forth herein.

129.    Chrisos is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

130.    Chrisos is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

131.    Chrisos denies the allegations as to him and is without knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in this paragraph.

132.    Chrisos is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

133.    Denied.

### AFFIRMATIVE DEFENSES

Chrisos asserts the following affirmative defenses:

### FIRST AFFIRMATIVE DEFENSE

All of the actions taken by Chrisos were justified by legitimate business reasons.

### SECOND AFFIRMATIVE DEFENSE

All of Chrisos actions and conduct were lawful and justified.

### THIRD AFFIRMATIVE DEFENSE

The Complaint should be dismissed for failure to state a claim upon which relief can be granted.

## FOURTH AFFIRMATIVE DEFENSE

The claims of the plaintiffs are barred by the applicable statutes of limitations.

## FIFTH AFFIRMATIVE DEFENSE

The claims fail for lack of jurisdiction.

## SIXTH AFFIRMATIVE DEFENSE

If the plaintiffs have been damaged as alleged in the Complaint, any such damage was a result of acts and/or omissions of persons or entities over whom Chrisos had no control and for whose conduct Chrisos is not legally responsible.

## SEVENTH AFFIRMATIVE DEFENSE

If the plaintiffs have suffered any damages, which Chrisos denies, their claims to relief are barred, in whole or in part, because such damages are a result of the plaintiffs' own conduct.

## EIGHTH AFFIRMATIVE DEFENSE

The plaintiffs have failed to mitigate their damages.

## NINTH AFFIRMATIVE DEFENSE

Chrisos did not discriminate in violation of G. L. c. 151B.

## TENTH AFFIRMATIVE DEFENSE

The plaintiffs were not subject to verbal or physical conduct that would be reasonably perceived to be sexual harassment or gender harassment.

## ELEVENTH AFFIRMATIVE DEFENSE

Chrisos' conduct was proper, not discriminatory, and not unwelcome to the plaintiffs.

## TWELFTH AFFIRMATIVE DEFENSE

If any unwelcome conduct occurred, which Chrisos denies, it was not sufficiently severe or pervasive to create a hostile work environment.

## THIRTEENTH AFFIRMATIVE DEFENSE

Plaintiffs are equitably estopped, in whole or in part, from asserting a claim in the Complaint.

## FOURTEENTH AFFIRMATIVE DEFENSE

Plaintiffs have, by their conduct, waived, in whole or in part, their claims.

## FIFTEENTH AFFIRMATIVE DEFENSE

The claims are barred by laches.

## SIXTEENTH AFFIRMATIVE DEFENSE

The relief requested is barred by the plaintiffs' unclean hands.

## SEVENTEENTH AFFIRMATIVE DEFENSE

Defendant Chrisos did not discriminate, harass, or retaliate against the plaintiffs.

## EIGHTEENTH AFFIRMATIVE DEFENSE

Any terminations of the plaintiffs were for legitimate business reasons.

## NINETEENTH AFFIRMATIVE DEFENSE

Chrisos did not make any material misstatements to the plaintiffs.

## TWENTIETH AFFIRMATIVE DEFENSE

Chrisos never entered into any agreements with the plaintiffs.

## TWENTY-FIRST AFFIRMATIVE DEFENSE

The plaintiffs failed to avail themselves of procedures and measures to prevent, correct, or avoid any alleged harm.

13

## TWENTY-SECOND AFFIRMATIVE DEFENSE

Chrisos adopts herein any and all affirmative defenses asserted by the other defendants in this action.

## TWENTY-THIRD AFFIRMATIVE DEFENSE

Chrisos reserves the right to supplement his affirmative defenses based on discovery in this action.

Respectfully submitted,
GREGORY CHRISOS,
By his attorneys,

Cheryl A. Waterhouse, BBO #547058
Christian G. Samito, BBO #639825
Donovan Hatem LLP
Two Seaport Lane
Boston, MA 02210
(617) 406-4500

Dated: October 18, 2004

## CERTIFICATE OF SERVICE

I, Christian G. Samito, hereby certify that on this 18th day of October, 2004, I served the foregoing *Answer of Gregory Chrisos* upon the other parties to this action by causing a copy thereof to be delivered by hand, postage pre-paid, to Elizabeth A. Rodgers, Esq., Rodgers, Powers & Schwartz, 18 Tremont Street, Boston, MA 02108 and by first class mail to Julie Trester, Esq., Meckler Bulger & Tilson, 123 North Wacker Drive, Chicago, Ill 60606 and to Jeffrey S. Brody, Esq., Jackson Lewis LLP, 75 Park Plaza, 4th Floor, Boston, MA 02116.

_Christ S. S_

Christian G. Samito

00861398

## COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.                                        SUPERIOR COURT

-------------------------------------------------

LISA RILEY, LISA MARIE CATALANO,
SANDY PANARELLO and AMANDA
MEDINA

                          Plaintiffs

            vs.

GENERAL EMPLOYMENT                       Civil Action No. 04-3270
ENTERPRISES, TRIAD PERSONNEL
SERVICES INC, GREGRORY CHRISOS,
HERBERT IMHOFF and KIM CULLEN

                          Defendants.

-------------------------------------------------

### NOTICE OF FILING OF NOTICE OF REMOVAL

To:    Civil Clerk's Office
       Middlesex County Superior Court
       40 Thorndike Street
       Cambridge, MA  02141

       PLEASE TAKE NOTICE that a Notice of Removal in the above action from the Superior

Court, Middlesex County, has been duly filed in the U.S. District Court for the District of

Massachusetts.  Attached hereto as Exhibit A is a certified copy of that Notice of Removal.

                          Respectfully submitted,

                          HERBERT IMHOFF

                          By his attorney,

                          _____
                          Jeffrey S. Brody, BBO #566032
                          JACKSON LEWIS LLP
                          75 Park Plaza
Dated: November __, 2004   Boston, Massachusetts  02116
                          (617) 367-0025

## CERTIFICATE OF SERVICE

This is to certify that on November ___, 2004, a copy of the foregoing document was served upon Plaintiffs' attorney, Elizabeth A. Rodgers, Rodgers, Powers & Schwartz LLP, 18 Tremont Street, Boston, MA 02108, and Defendant Gregory Chrisos's attorney, Cheryl Waterhouse, Donovan Hatem LLP, Two Seaport Lane, Boston, MA 02210, by first-class mail, postage prepaid.

_____
Jackson Lewis LLP

| CIVIL ACTION COVER SHEET | Trial Court of Massachusetts SUPERIOR COURT DEPARTMENT County: Middlesex | Docket Number 04-3270 |
|---|---|---|

| PLAINTIFF(S) Lisa Riley, Lisa Marie Catalano, Sandy Panarelli, and Amanda Madina | DEFENDANT(S) General Employment Enterprises, Triad Personnel Srvs., Inc., Gregory Chrisos, Herbert Imhoff, and Kim Cullen. |
|---|---|
| ATTORNEY, FIRM NAME, ADDRESS AND TELEPHONE Elizabeth A. Rodgers, Rodgers, Powers & Schwartz 18 Tremont Street, Boston, MA 02108 Board of Bar Overseers number: 617-742-7010 | ATTORNEY (if known) Julie Trester, Meckler, Bulger & Tilson 123 North Wacker Drive, Chicago, IL 60606 312-474-4482 |

Origin code and track designation

Place an x in one box only:
[X] 1. F01 Original Complaint
[ ] 2. F02 Removal to Sup.Ct. c. 231, s.104 (Before trial) (F)
[ ] 3. F03 Retransfer to Sup.Ct. C.231,s.102C (X)

[ ] 4. F04 District Court Appeal c.231, s. 97 &104 (After trial) (X)
[ ] 5. F05 Reactivated after rescript;relief from judgment/ Order (Mass.R.Civ.P. 60) (X)
[ ] 6. E10 Summary Process Appeal (X)

| TYPE OF ACTION AND TRACK DESIGNATION (See reverse side) | | | |
|---|---|---|---|
| CODE NO. | TYPE OF ACTION (specify) | TRACK | IS THIS A JURY CASE? |
| B22 | Employment Discrimination (F) | (X) Yes   ( ) No | |

The following is a full, itemized and detailed statement of the facts on which plaintiff relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.

**TORT CLAIMS**
**(Attach additional sheets as necessary)**

A. Documented medical expenses to date:
  1. Total hospital expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . $. . . . . . . . . . .
  2. Total Doctor expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . $. . . . . . . . . . .
  3. Total chiropractic expenses . . . . . . . . . . . . . . . . . . . . . . . . $. . . . . . . . . . .
  4. Total physical therapy expenses . . . . . . . . . . . . . . . . . . . . . $. . . . . . . . . . .
  5. Total other expenses (describe) . . . . . . . . . . . . . . . . . . . . Subtotal $. . . . . . . . . . .
B. Documented lost wages and compensation to date . . . . . . . . . . . $. . . . . . . . . . .
C. Documented property damages to date . . . . . . . . . . . . . . . . . . $. . . . . . . . . . .
D. Reasonably anticipated future medical and hospital expenses . . . . $. . . . . . . . . . .
E. Reasonably anticipated lost wages . . . . . . . . . . . . . . . . . . . . . $. . . . . . . . . . .
F. Other documented items of damages (describe) $. . . . . . . . . . .

G. Brief description of plaintiff's injury, including nature and extent of injury (describe)

$. . . . . . . . . . .
TOTAL: $. . . N/A . . .

FILED
IN THE OFFICE OF THE
CLERK OF THE COURTS
FOR THE COUNTY OF MIDDLESEX
AUG. 19. 2004
Edward J. Sullivan
CLERK

**CONTRACT CLAIMS**
**(Attach additional sheets as necessary)**
Provide a detailed description of claim(s):

TOTAL $. . . N/A . . .

PLEASE IDENTIFY, BY CASE NUMBER, NAME AND COUNTY, ANY RELATED ACTION PENDING IN THE SUPERIOR COURT DEPARTMENT

NONE

"I hereby certify that I have complied with the requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods."
Signature of Attorney of Record Elizabeth A. Rodgers   DATE: 8/19/04

A.O.S.C. 2003

THE COMMONWEALTH OF MASSACHUSETTS

Middlesex SS.

Superior Court
C.A. No.



**04-3270**

LISA RILEY, LISA MARIE CATALANO,    )
SANDY PANARELLO AND    )
AMANDA MEDINA    )
      Plaintiffs    )
    )
    )
v.    )
    )
    )
GENERAL EMPLOYMENT ENTERPRISES,    )
TRIAD    )
PERSONNEL SERVICES INC    )
GREGRORY CHRISOS, HERBERT IMHOFF    )
AND    )
KIM CULLEN    )
    Defendants    )

FILED
OFFICE OF THE
COURTS
MIDDLESEX
AUG 19 2004
CLERK

9608C000008/23/04CIVIL   960.00
9608C000008/2370/04SUR CHARGE  15.00
9608C000008/23/04SUMMONS  25.00
9608C000008/23/04SECC  20.00

## COMPLAINT

### I.    Introduction

Lisa Riley, Lisa Marie Catalano, and Amanda Medina file this complaint of quid pro quo harassment and retaliation arising from the sexual advances of Gregory Chrisos, the Vice President with responsibility for their offices, and the condoning of his conduct by the defendant Imhoff and the corporation General Employment Enterprises. The defendants failed to create an environment free from sexual harassment, negligently and/or intentionally permitted on its premises a person known to be sexually harassing women, failed to heed increasing signs of offensive and hostile behavior towards women, condoned a retaliatory atmosphere and retaliatory acts of employees of the defendant General Employment , and recklessly disregarded the retaliation and harassment of the plaintiffs who opposed the hostile and retaliatory environment, and failed to take adequate steps to investigate or remedy or prevent the harassment or retaliation.

In July, 2003, the plaintiffs discovered that Chrisos had a pattern of approaching women in the company, with requests for sexual intercourse and relationships and of marriage and of protecting those who complied, and punishing those who denied him his continued sexual liaisons. In the case of Sandy Panarello, she was promised a branch manager position in Tampa Florida, which she accepted understanding that she could aggressively seek to expand her branch. Chrisos began a consensual secret affair and he protected the Orlando office, preventing Panarello from doing business there. Chrisos propositioned Lisa Riley, who succumbed to his advances at a managers' conference, but found them unwelcome and immediately demanded that they not

continue. Riley found her authority and Regional Manager compensation undermined and ultimately denied. Lisa Marie Catalano was propositioned at a Managers' meeting and refused, and soon found her authority undermined, her new office delayed and she was terminated. In July, 2003, Riley and Catalano revealed to each other the similar experiences of Chrisos demanding sexual favors of them at the Managers' Conference. Shortly after that, Chrisos targeted Amanda Medina, a teenage employee in Riley's office, soliciting her physically in front of Riley. Riley confronted him and demanded he stop. She revealed her knowledge of the other women he had harassed, and he admitted his conduct, and begged her forgiveness, in an email. Riley, Catalano and Medina filed discrimination charges internally with the company and thereafter at the MCAD, alleging continued discrimination and retaliation. Although Chrisos was fired, the women were harassed and retaliated against as a result of their complaints, ultimately leading to the dismissal of Riley, and severe emotional distress to the others.

## II.    Parties

1)    Plaintiff Lisa Riley is an individual, is a female, and resides at 49 Buffum Street, Salem MA, in the county of Essex.

2)    Plaintiff Lisa Marie Catalano is an individual, is a female, and resides at 400 Charles Street Malden, MA 02148, in the county of Middlesex.

3)    Plaintiff Amanda Medina is an individual, is a female, and resides in Florida.

4)    Plaintiff Sandy Panarello is an individual, is a female, and resides at 18838 Duquensne Drive, Tampa, FL 33647.

5)    Defendant General Employment Enterprises is a corporation with a principal place of business of One Tower Lane, Suite 2100, Oakbrook Terrace, Ill 60181. General Employment is the parent company to TRIAD Personnel Services Inc, d/b/a Generation Technologies, Inc. and has done business in Massachusetts as Triad Personnel Services and or Generation Technologies Inc. at 599 North Avenue, Door 8, Wakefield, MA 01880, and at 99 Summer Street Suite L1100 Boston, MA, and as General Employment Enterprises at 200 Unicorn Park, Third Floor Woburn MA.

6.    TRIAD Personnel Services Inc. is the wholly owned subsidiary of General Employment Enterprises with a principal place of business of One Tower Lane, Suite 2100, Oakbrook Terrace, Ill 60181, and has done business in Massachusetts as Triad Personnel Services and or Generation Technologies Inc. at 599 North Avenue, Door 8, Wakefield, MA 01880, and at 99 Summer Street Suite L1100 Boston, MA,

7.      Defendant Greg Chrisos is upon information and belief, residing at 20 Gateway Lane in Lynn, MA. During the Plaintiffs' employment, Defendant Chrisos was Vice President of General Employment until his termination in 2003 and was an apparent and or authorized agent of General Employment and aided or abetted the discrimination and retaliation herein.

8.      Defendant Herbert Imhoff was at all times an officer, and or CEO of Defendant General Employment, and or Triad Personnel Services Inc. He participated in the defendants' defense of the matter and knew or should have known of plaintiff's terms and conditions of employment, and aided and abetted in the hostile and retaliatory environment and or negligently failed to investigate or remedy the terms and conditions of employment alleged below, and defamed the plaintiffs in their place of employment.

9.      Defendant Kim Cullen of New Hampshire was at all times an employee of GEE.

## III.    Administrative Exhaustion

10.     Plaintiffs Riley, Catalano and Medina have met all of the administrative requirements of G.L. c. 151B, including the timely filing of a charge of discrimination at the Massachusetts Commission Against Discrimination ("MCAD"), which includes a claim of continuing retaliation. Since the filing of that complaint, retaliation has continued, causing the termination of Ms. Riley, which is included within the scope of the reasonable investigation likely to have arisen at the MCAD. More than ninety (90) days have expired since the date of the filing of each charge with the MCAD and each has informed the MCAD of her intent to bring this action. The facts in this complaint are contained in, or related to the scope of the complaint and investigation at the MCAD.

## IV.    Factual Background

11.     General Employment hired Lisa Riley as a Personnel Consultant in or about July 6, 1994. After interim successes and promotion, on November 1, 1997, Riley was promoted to the position of Branch Manager of the Triad office in Reading, which moved later to Wakefield MA.  Riley has won a total of 10 awards or trophies, including the 2002 Chairman's Pinnacle Award for Outstanding Managerial Achievement.

12.     Lisa Marie Catalano was hired by General Employment in the Triad office in Reading, MA in February 1997 which office later moved to Wakefield. She was promoted to the position of Assistant Branch Manager of the Triad Wakefield Branch office on about March 29, 1999, and to the

Branch Manager of the Boston Triad office in the summer of 2001. She left her employment and was rehired on September 30, 2002, working for Riley as a Recruiter in the Triad Wakefield office. Lisa Marie Catalano won a over 5 awards including a 1999 award for being the top producer in Triad Personnel, while Riley won the Top Producing Manager's award.

13.    Sandy Panarello was working in Woburn from 1994-1999, reporting to Chrisos as Woburn Manager, then to Peter Ernst, a male manager in the Woburn, MA office; Panarello won a trip to Hawaii because of her outstanding sales. Chrisos promoted Panarello to the position of manager of Triad branch office in Tampa Florida in 2000, which was changed to a General Employment office at the time of her transfer.

14.    When Panarello was offered the Tampa branch, Chrisos led her to believe she would be able to develop business or placements in the Maitland/Orlando Florida, area.

15.    Amanda Medina was hired as an administrative assistant for the Triad Wakefield Office on May 14, 2002. She reported to Lisa Riley. On July 8, 2002, she was promoted to Recruiter, based upon her excellent performance.

16.    General Employment provides placement and contract staffing services for business and industry, specializing in the placement of professional information technology, engineering and accounting professionals. As of September 30, 2002, the Company operated 32 offices located in major metropolitan business centers in 12 states. General Employment acquired Generation Technologies, ("Gen Tech") in 2001. As of June 30, 2003, the Company operated 25 branch offices

17.    Personnel in both divisions are comparable and similarly situated to a large degree: Employees retained the seniority date from date of hire with either division, Triad or General Employment; the same Chief Executive Officer and Chief Financial Officer ran both divisions; the same human resources personnel and policies and manual applied to both divisions; managers meetings for both were held at the same time. General Employment offices could contract and bill temporary placements under the Triad name, doing business as Triad. The same payroll people processed the payroll checks. Hiring and firing was under the control of the same people, and Triad personnel were forced to take in General Employment personnel from time to time.

18.    Herbert F. Imhoff, Jr. ("Imhoff") was at all times relevant an officer of General Employment and since 2001 has been Chairman of the Board and Chief Executive Officer. He is an attorney.

4

19.   Matt Zaccarelli was at all times relevant counsel to General Employment and acted as collection officer.

20.   Greg Chrisos was the Woburn manager for General Employment in 1994, and then became TRIAD Vice President in approximately 1996 and had become Vice President for the entire East Coast, General Employment and TRIAD offices by 1999. Chrisos had direct managerial authority over Riley, Panarello, and Catalano, and Medina, reported to Riley and he met with and evaluated Medina as part of his duties.

21.   Chrisos created a hostile environment which was both severe and pervasive throughout the offices which he managed, from at least 2000 to 2003. General Employment and or Triad continuously, from at least 2000 to the present, engaged in a practice and policy of tolerance of sexual harassment of females by Chrisos, a high level manager, and others, while the company knew or should have known of the conduct, and the company failed to take reasonable steps to remedy, investigate and deter such conduct.

22.   Repeatedly, at sexual harassment training, Imhoff, the President / CEO minimized sexual harassment complaints, and disparaged investigations of sexual harassment. He referred to business problems caused by sexual harassment complaints, labeled complainants as troublemakers and described the lack of merit of exemplar claims.

23.   Riley reasonably believed the company viewed complainants of sexual harassment as troublemakers.

24.   In 2000, Lisa Marie Catalano became Assistant Branch Manager in Lisa Riley's office. Catalano won another award for being top producer in Triad Personnel. Vice President Chrisos began discussing with her assigning her to be manager of a proposed Boston Office, to start in October 2000. In Approximately August 2000, Chrisos came to Boston and identified office space with Catalano for the Boston office. He described a five-year lease.

25.   On about September of 2000, Chrisos offered Riley an override (commission) on the new Boston Branch, to mentor Catalano and to make sure she did well.

26.   In October 2000, Chrisos invited Catalano to be his personal guest at an annual manager's meeting to receive her personal achievement award. Chrisos told Catalano he had invited a group to his room, but she found herself to be the only invited guest. Chrisos propositioned Catalano

sexually. She rejected him, but did not turn him in for fear of losing her promotion and her Boston Office assignment.

27.    In October 2000, Sandy Panarello in Florida won numerous contests for a General Employment office and was No. 3 most profitable office in the country, from the office in Tampa Florida.

28.    Following Catalano's rejection of Chrisos in October 2000, Chrisos delayed her branch manager position, for three months, and there was an abrupt stop to the completion of the office.

29.    In about January, 2001, Catalano became a branch manager, and Chrisos attempted to control her, telling Riley that she should not give Catalano any advice, that Catalano should learn to come to him and not Riley.

30.    In approximately January 2001, Chrisos made sexual advances to, and became sexually involved with a recruiter in the Maitland (near Orlando Florida) office, through April 2001. He sent her sexual emails, suggested techniques for using private emails and paid for leather coats and trips for her. During that period, he repeatedly visited Florida and flew the employee/sexual partner on trips with him, and opposed adverse action against her by her manager, who found her deficient.

31.    In approximately April 2001, the Maitland, Florida manager finally fired the under performing employee/sexual partner. The manager confronted Chrisos with the emails and he sorrowfully admitted the conduct, apologized and asked her to spare his family. He told her he had been blackmailed by the woman into giving her severance pay to keep her quiet. Upon information and belief, the other defendants knew or should have known of his payment to the employee in Florida for Chrisos' sexual advances.

32.    At the Junior Managers' meeting at the time of his sexual activities with the woman in Maitland, Chrisos limited the business of Sandy Panarello and barred her from competing in the Orlando area, a much larger market where she had developed business client contacts.

33.    Chrisos placed false criticism in the file of the manager in Orlando who had discovered his misconduct.

34.    Male offices were not restricted from placements by geographic areas. This restriction was not a legitimate business decision as Panarello was an award winning business developer and the company needed increased revenues. Panarello had established client relationships with companies in Orlando that she was now required to relinquish.

6

35. By June 2001, the Boston office was at an all time high and was extremely successful under Lisa Marie Catalano, who had rejected Chrisos' sexual demand.

36. Chrisos sent a male, Ken Yeoh, with less experience, education and training to the Boston office and to the Panarello office, and to the office of other female managers, where he interfered with personnel and procedures, and undermined the female branch manager's authority, in a manner not similarly done with males.

37. During 2001-2002 Chrisos sent Ken Yeoh to offices headed by females where he interfered with authority over personnel, and changed policy or procedure including, offices headed by, but not limited to Marie Catalano, Stacy Bohn, Tanya Lynam, and Sandy Panarello. All four have been fired or forced out of the company, while men's offices which were less profitable were not similarly targeted for Yeoh's interference, or termination of business.

38. In the January, 2002, period, as a result of Riley's continued award winning success, Chrisos began discussing making Riley, the Wakefield MA branch manager into a regional branch manager, with Boston and Woburn to report to her. In April 2002, he discussed increasing the base salary immediately, with a six-month increase thereafter, and a bonus structure to increase her pay by $5,000 per quarter, to a total increase of at least $30,000 per year over the branch manager pay. The details were not finalized.

39. On about April 12, 2002 in Chicago while attending a manager's conference, Vice President Chrisos solicited Riley for sex after requesting her to come to his room to discuss compensation. Riley viewed his sexual proposition to her as unwelcome, and as a veiled threat to her job. She felt emotionally unequipped to deal with potential job consequences if she refused due to family problems of which Chrisos was aware. Riley slept with him that weekend, feeling coerced because of economic fear at a vulnerable time.

40. The second night of that weekend, Riley tried to avoid him but Chrisos came to her room. Again, Riley was fearful she would lose job if she didn't sleep with him, and after protesting, was intimidated into sleeping with him.

41. During May 2002, Chrisos continued to make requests to accompany him in traveling to the offices of other managers, and she avoided him.

42. On May 8, 2002, Chrisos and Ken Yeoh came to the region to visit. Chrisos told Riley that she would be getting a $6,000 raise to base salary

immediately and another raise in the same amount within 6 months. He told her he expected her promotion to Regional Manager to be official "any day" and that when it was official, the bonus structure would also be completed and in effect.

43. In about the week of May 8, 2002, Chrisos propositioned Riley again to go to his hotel room, and Riley refused him.

44. In May of 2002, Amanda Medina, an 18 year old, started at General Employment, d/b/a Generation Technology in Wakefield, reporting to Riley.

45. On July 8, 2002, Riley still expected to be promoted to regional manager with the Boston and Woburn managers reporting to her.

46. Chrisos delayed the promotion and raise after being rejected and told Riley that she would just have the Boston manager reporting to her, "for now" as a step toward the promised Regional Manager position, but withheld the promised authority over the Woburn office. This conduct held out the prospect that if she consented to continued trips with him, the Regional Manager position was still on the horizon.

47. Chrisos called Riley and told her to go to the Boston office and that while Riley was enroute he would inform Marie Catalano that she now reported to her. Simultaneously, Chrisos told Marie Catalano, who had rejected him outright, that he was eliminating the Boston Manager position effective immediately, but she could return to a lower position of recruiter, in Wakefield, under Riley. Catalano did not accept the demotion. Chrisos did not tell Riley that Catalano's position had been abolished, and led Riley to believe that Catalano had quit.

48. Although the defendants had removed Catalano's managerial authority, they maliciously opposed Marie Catalano's unemployment benefits by leading Riley to believe she had quit, causing them to be delayed for more than 6 weeks.

49. Chrisos told Riley the delay in regional manager status was due to defendant Imhoff. Riley reasonably requested to speak to Imhoff.

50. Upon information and belief, Imhoff knew or should have known that Chrisos was limiting, segregating or overloading Riley so as to adversely affect her pay and knew or should have known that he was retaliating for her refusal of his sexual favors

8

51.    In September 2002, five months after her promotion had been promised, Chrisos told Riley that she was officially the Regional Manager, and that Mike Coleman, the new manager in the Woburn office was to report to her, but he didn't tell Mike Coleman he was to report directly to her and didn't give her the promised pay raise. Riley had now been given the Wakefield, Boston and Woburn offices, with three times the responsibility and more direct reports than Chrisos had, which detracted from her ability to make her own commission sales, with no increase in either base salary or bonus structure.

52.    The combination of the base salary increases and the bonus structure was supposed to increase her pay by at least $30,000 per year and none of it had become effective.

53.    A male Peter Ernst, had been Woburn manager and was retained despite misconduct, failure to perform, and sleeping in the manager's office on the floor all day and making his subordinates responsible for all the management work including the hiring and training of new employees. Chrisos did not interfere with or harass or encourage her to fire the male, Peter Ernst.

54.    Chrisos burdened women managers with burdened with personnel and administrative decisions adverse to their profitability and required Riley to retain Ernst rather than fire him, while he pressured Catalano to leave by demoting her.

55.    In September 2002, Riley persuaded Catalano to return to work, reporting to her.

56.    Chrisos opposed the rehiring of Catalano. Riley did not understand why Chrisos opposed Catalano as he had supported the return of others who had left, and had forced her to keep a male, Ernst who was significantly under performing.

57.    In November, 2002, CEO Imhoff, and Chrisos flew east to give Riley a coveted national award which had been given only three times in the one hundred year history of the company. Imhoff proclaimed in front of all subordinates something to the effect that it was a big surprise that "a girl" could achieve something like this and "beat out the big boys." Imhoff also acknowledged Marcea Taylor in Riley's office for her performance. The award led Riley to believe she would be given the promised increase in compensation at her annual review.

58.    Chrisos began emailing the teen aged recruiter, Amanda Medina, requesting her home email and called her at home allegedly to compliment her on her good work, using access to her employment records to acquire her personal number.

59.    In every paycheck, from November 2002 to January, 2003, Chrisos, Imhoff and General Employment continued to fail to give Riley the promised increase in pay, but she believed the increase was coming.

60.    From December 2002 to spring, 2003, week after week, Chrisos pressured Riley to harass Catalano about her performance, which Riley did not believe deserved reprimand or discipline, especially where Chrisos did not similarly harass Ernst, the under performing male who had actively engaged in misconduct.

61.    In January 2003, when Chrisos finally gave Riley a salary increase, he failed to give her promised pay which was to have been raised by $12,000 and her bonus structure should have been effective for more than 6 months. The reduced pay, below that promised for her position as Regional Manager, continued in every pay check to the present.

62.    In February 2003, Riley terminated the under performing male, Ernst, and despite severe misconduct and underperformance, Chrisos gave him a severance package, taking it out of her profit and loss figures.

63.    From the summer of 2002, to February, 2003, Chrisos repeatedly interfered with her direction of Coleman, unlike his treatment of other male branch managers.  In March 2003, Coleman, manager of the Woburn office informed Riley that he "did not understand the reporting structure," and "had not realized I was direct line to you and dotted line to Chrisos. When Riley took this up with Chrisos, Chrisos told her to calm down and asked if she had "PMS".

64.    From November 2002 to March 2003, Chrisos had continued to solicit the teenager Amanda Medina to give him her private email, while she avoided his attention.

65.    In March 2003, Amanda Medina took a leave of absence for personal medical reasons.

66.    From December 2002 through April 2003, Chrisos continued to pressure Riley to terminate Catalano, constantly called Marie Catalano a "drain on the payroll" and began referring to as "payroll problem" despite the fact that she had been asked to build a new market, Accounting/Finance, and he had protected males and others hired to build a new market for a

reasonable time, and had protected the male former branch manager who was under performing.

67.  At one point in about March 2003, Chrisos came to visit Riley's office supposedly to see how Riley was handling things but spent almost no time in the branch Riley was in. He appeared to stalk Catalano, or subject her to excessive personal evaluation and intimidation. She changed her schedule to avoid him and he changed his schedule to be in Woburn, Boston, or Wakefield at the last minute more than once, which was unlike him. He had been in the same office as Catalano on every day of his trip except the first day when he arrived, choosing to sit right across from her and making leading comments about how she was doing. Catalano felt he did so to intimidate her.

68.  Chrisos created a hostile environment by cumulative conduct and the totality of circumstances including work sabotage, exclusion, denial of support, humiliation, the abolition of the Boston office the prior summer, her forced choice of demotion or termination, the sexist remarks of CEO/President Imhoff in November, and the continued pressure on her in her new area while males with new areas or lagging areas were not similarly harassed.

69.  The hostile environment affected Catalano's performance.

70.  In May 2003, upon information and belief, Chrisos sent a harassing email to Monica Friedman, formerly of the Wakefield office, who had abruptly transferred to California. Her vice president reported it to Imhoff. Human Resources never called to investigate.

71.  Upon information and belief, Imhoff knew of complaints of sexual harassment and had condoned a pattern of severe and pervasive harassment, had trivialized them and/or had failed to investigate, remedy or deter such conduct, allowing an increasingly harassing and hostile environment to penalize women who would not provide sexual favors to a manager.

72.  Chrisos combined sexual stereotypic comments with adverse action, attributing the woman's motivation to her pregnancy and that she wasn't thinking right. A day or two later he told Riley that Imhoff had handled the matter and that Imhoff believed "Monica just had an axe to grind" because Chrisos did not follow through on a promise to Monica involving compensation. This message further created the impression that Imhoff would rely upon stereotypical derogatory views of women and would not conduct a full and fair investigation.

73.  Upon information and belief, if a fair and unbiased investigation of sexual harassment complaints had occurred, a pattern of severe sexual harassment

would have been discovered, in which women who rejected Chrisos and or Imhoff were penalized, subjected to sexist or false or stereotypic attacks and where women were targeted, limited and segregated in ways men were not.

74.    In May 2003, the Maitland, Florida manager left, and Chrisos immediately allowed Panarello to begin doing business in the Maitland/Orlando Area. Panarello's office in Tampa had been severely affected by the limitation excluding Orlando, as Tampa had lost considerable business after 9/11/2001.

75.    In May 2003, succumbing to continued pressure from Chrisos regarding her "payroll problem," Riley informed Catalano she would be laid off. CEO Imhoff, who had not called her on any other hire or fire, called her, congratulating her on "getting rid of her payroll problem", without having been told by Riley.

76.    Based on the totality of the circumstances, it is permissible to infer that Imhoff knew that Chrisos wanted to get rid of Catalano for failure to engage in sexual relations.

77.    In May 2003, Amanda Medina returned to the Wakefield office on a reduced schedule.

78.    From April through June 2003, Panarello had been promised by Imhoff to have until August 2003, to rebuild the office. Anonymously, a fax was sent to her office from the Headquarters where Chrisos and Imhoff worked, informing her employees that the office would be closed, and many of her staff chose to leave.

79.    During the week of July 1, 2003, Riley became aware for the first time that Chrisos had sexually propositioned Lisa Marie Catalano, and when she turned him down, he had delayed her promotion to branch manager, had systematically undermined her authority and subjected her to rules and conditions in running branch office which led to low profitability and termination of her position. Catalano learned for the first time that Chrisos had propositioned and coerced Riley into having relations and after her refusal to continue, had delayed, and denied her pay and limited or segregated her opportunities.

80.    About July 4, 2003, Riley became aware that the company was closing the office of Sandy Panarello, who had outperformed many male branch managers but denied equal opportunity because of her sex, with limitations and interference on territory, not imposed upon the male managers.

81.    General Employment, as an employment agency, has, by its agents Chrisos, and Zaccarelli made statements which express, directly or indirectly, limitation, or discrimination based on national origin, sex and race. To the plaintiff's knowledge, beginning on July 10, 2003, the headquarters collection officer, Matt Zaccarelli began targeting Riley's customers in the Wakefield office, targeting their women and minority employees, such as making fun of the client's foreign-sounding name and making other sarcastic and taunting comments about the sound of his name, and by saying "Get off your useless ass and get the President on the phone". This had the effect of enraging clients and causing at least one General Employment employee to quit.

82.    Despite knowledge of Zaccarelli's conduct and corroboration that Zaccarelli taunted women and minorities, Chrisos, Imhoff and Zaccarelli failed to act to stop using tactics against women and minorities like this and have deliberately used or condoned sexist and derogatory and racist tactics to intimidate threaten or interfere with employees and customers creating a hostile and offensive environment in Riley's office after both Riley and Catalano rejected Chrisos, and all defendants have failed to remedy it.

83.    Chrisos pressured Medina herself and other employees, for Ms. Medina's private email address to sexually proposition her, sent her a private, suggestive email, in July 2003, and referring to forthcoming drinking during his visit, despite her being under age.

84.    Chrisos made sexually stereotypical comments to and about women including, describing a woman as a "crusty old broad", referring to Amanda Medina as a "tart," attributing success to an Atlanta manager because she was "an attractive woman, " asking if Riley's absence was due to "have a hot date." Chrisos referred to Marie Catalano after her rejection of him as "neurotic", a "high-maintenance girl" and had "constant PMS". He questioned another who complained of harassment by asking "if it was because s(Monica) is pregnant that she "isn't thinking right", and claimed a woman he had had sex with had blackmailed him into a severance pay. "

85.    Imhoff similarly made stereotypic statements, proclaiming in front of all subordinates something to the effect that it was a big surprise that "a girl" could achieve the Presidential Award and "beat out the big boys."

86.    Men who had performance issues were not berated, humiliated and demeaned.

87.    The hostile environment interfered with the performance, and caused the termination of Catalano, Medina, Riley, and Gadoury, another employee who quit because of it.

88.    General Employment managers were far more likely to be male, while the managers of the Triad/GenTech offices likely to be female. Upon information and belief, Zaccarelli engaged in discriminatory and hostile collection practices with the clients of the Triad/Gen Tech offices headed by females more than for the offices headed by males.

89.    In July, 2003, after sending Medina the suggestive email calling her a tart, Chrisos harassed Amanda Medina by departing from normal procedure by meeting with her individually, instead of in the open office for an inordinate time compared to other employees, grilled a co-worker about Medina's personal problems, and, taking them out for drinks, despite Medina being under age, had his hands all over Ms. Medina, looked down her shirt, and gave her his phone number or room number. When a co worker noticed Chrisos rubbing Medina's leg, and told him she saw what he was doing, Chrisos told her there might be a space open for her as manager of the Boston office.

90.    Medina felt the conduct of his hand on her leg unwelcome, and froze. Ms. Medina, who made a gesture indicating that she didn't know what to do.

91.    Riley confronted Chrisos and said "What are you doing, stopped the conduct and sent Medina outside with others.

92.    Chrisos smiled and said "Come on, it was harmless." Riley said "Chrisos, she is 19 years old – how can you say that?" He replied, "Come on, how often do I get to touch a 19 year-old girl?"

93.    Riley asked him, "What did you do to Marie Catalano? He at first admitted kissing her only, Riley told him "You did same thing to her that you did to me. Who else have you done this to? What about those other girls you just got rid of when it made no sense--Tonya [Lynam] and Stacy [Bohn]" He replied, "I never slept with them. I only slept with Lauren Grub and a consultant in Maitland office". [Lauren had been a manager and the Maitland office is in Orlando area]. Despite this confrontation Chrisos called Medina's home and left a message on their voicemail asking Ms. Medina to call him

94.    Riley, who had been asked to travel with Chrisos allegedly to improve other branches, had identified Lynam and Bohn as potential leaders. Lynam, Bohn Catalano and Panarello had been interfered with by Ken Yeoh and had all been top producers before, and were driven into the

14

ground. There were other, more logical offices to close when their offices were closed, which were headed by men.

95.    Chrisos had given the Maitland office a protected territory, the only office in the country to have that right, which prohibited equal opportunity for Sandy Panarello.

96.    On July 12, 2003, Riley confronted Chrisos, saying she couldn't believe he was doing to Ms. Medina what he had done to her, and he said, "You wanted to." Riley told him he knew his advances were unwelcome and that she had not wanted to.

97.    Riley realized that the raise issue was hopeless and that there would be no remedy. Riley said, "Is this why you haven't paid me for my work in a year?" Riley left.

98.    Chrisos followed her to the parking lot and put his hand on Riley's back, rubbing up and down. Riley was very upset and made it clear his contact was unwelcome, saying, "You need to go now," and he left.

99.    July 12, 2003 Chrisos sent an email to Riley, admitting that everything Riley accused him of was true and asking her to forgive him and making reference to his family.

100.    Over the weekend of July 12, 2003, and again on July 14, 2003, Riley informed Human Resources, and Imhoff of the need for immediate contact from them.

101.    On July 14, 2003, about an hour later, Chrisos called Riley's office. He said, "This is Greg…" and Riley cut him off and said, "I don't want to talk to you." He said, "We wanted to let you know what we are doing…" and Riley cut him off again and said, "I don't want to talk to you. I can't believe you are calling me." And then Riley hung up. Marcea Taylor was sitting across from her at the time and heard her conversation with him.

102.    Upon information and belief, Imhoff or his staff informed Chrisos of Riley's confidential request for assistance on sexual harassment and despite a request that the investigation be made by an unbiased person, placed Chrisos in a position to manage the complaint about his own misbehavior.

103.    July 14, 2003, Riley was informed that Imhoff had been informed.

104.   July 14, 2003. Zaccarelli called repeatedly throughout the day about the harassing collection calls, despite prior commitments by Imhoff and Chrisos to prevent his involvement, and therefore his conduct appeared to be deliberate attempts at harassment.

105.   General Employment then conducted an investigation which was intimidating and threatening to the employees, under the totality of the circumstances, insisting initially on un-represented complainants meeting immediately with a trained human resources manager under the direction of outside counsel.

106.   Since Riley, Medina, Taylor and Catalano made a complaint of what they believed to be unlawful sexual harassment and hostile environment and disparate treatment of women, to Human Resources director Sherry Hubacek, Riley, the complainants, her other employees and her clients have experienced an unprecedented, retaliatory attack on their tangible and intangible economic opportunities, in retaliation, including but not limited to:

a.   Completely unprecedented rejection of contract language with key customers, failure to follow precedent of compromising to get deals done, and obstruction of pre-approved language, causing loss of deals.

b.   Delay of necessary business tools and abandoning of "urgency" which was part of normal training, practice and client retention and the resulting loss client accounts and or revenue.

c.   Increased interference with business opportunity by Zaccarelli using extremely aggressive and unwarranted attacks on her clients in collection, interfering with business to the detriment of her and her staff.

d.   Continued and intensified harassment of female and minority employees of clients, which Imhoff had promised would be stopped.

e.   Harassment of clients in the region despite request to have no contact; harassment of clients who are not delinquent, despite notice.

f.   Denial of Riley's status as regional manager; failure to confirm the apparent authority since November, 2002 when public announcement had been made by Imhoff and Chrisos, effectively demoting her from authority over three branches, to branch manager of one branch.

g.   Investigation of complaint which is not fair and impartial, but which seeks to intimidate her subordinates and dig up adverse information about Riley and the other complainants.

h.   Finding cause to believe Chrisos harassed the females and engaged in inappropriate conduct, but then demoting Riley from Regional Manager in charge of Boston, Woburn and Wakefield and closing the Boston office for pretextual reasons.