UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

LISA RILEY, LISA MARIE CATALANO,
SANDY PANARELLO and
AMANDA MEDINA,
              Plaintiffs

v.

GENERAL EMPLOYMENT
ENTERPRISES, TRIAD PERSONNEL
SERVICES INC, GREGRORY CHRISOS,
HERBERT IMHOFF and KIM CULLEN,
              Defendants

Civil Action No. 04-12318-RWZ

---

**PLAINTIFF'S SETTLEMENT PROPOSAL**
**PURSUANT TO LOCAL RULE 16.1(C)**

**Introduction**

    Four plaintiffs, all initially from the Triad office in Wakefield, MA, have combined to present this case: three establish a case of pervasive and repeated quid pro quo sexual harassment and disparate treatment on the basis of gender; one plaintiff has a claim of promissory estoppel for Defendants' unprecedented curtailment of her territory, which resulted in a business relationship that was to her detriment. Greg Chrisos, a married Vice President of GEE and Triad (The Companies), overseeing all Triad offices, repeatedly abused his position by interspersing promises of advancement or concern for a woman's work performance with demands for sexual favors and relations, in a classic case of sexual harassment. Defendant Chrisos serially targeted women in the Wakefield Triad office in particular. In October 2000, Chrisos sexually propositioned a successful Assistant Branch Manager, Lisa Marie Catalano; in April and May 2002, he propositioned a successful Branch Manager, Lisa Riley; and in July 2003, he began physical and email advances to a teenage administrative assistant, Amanda Medina. Chrisos also entered into an affair with a Stevie Schlintz, in Orlando/Maitland Florida (in January 2001), protected her from appropriate discipline for non- performance and showered her with gifts and trips. When Schlintz was ultimately fired for express misconduct and her affair with Chrisos was discovered, Chrisos paid Schlintz some kind of settlement and then, in order to keep his affair and settlement quiet, provided the Orlando/Maitland Florida office with unprecedented territorial protection for its accounts, which deprived the fourth plaintiff, Sandy Panarello, of the promises made to her to induce her to leave the Wakefield office and to start a new office in Tampa, Florida. In July 2003, Riley and Catalano discovered Chrisos's pattern of behavior and put a stop to it when Chrisos initiated physical contact with a minor employee, Amanda Medina. Chrisos then admitted his conduct towards Riley, Catalano and Schlintz and disclosed at least one additional affair with another manager.

Riley was privy to branch manager performances and rankings and to information about branch closings and discovered a pattern of gender discrimination in assignment of opportunities and termination of opportunities, all favoring male branch managers across the country. There was also a pattern of women succeeding and winning awards, but the male bosses openly making stereotypical, offensive comments about women including contempt toward sexual harassment complaints.

Although the Companies' investigation of the sexual harassment complaints of the three plaintiffs from Wakefield resulted in Chrisos's termination, the Companies failed to investigate or remedy the territorial limitations imposed by Chrisos on Panarello, failed to adjust the branch manager compensation and office closings which hindered women's advancement, and launched a barrage of retaliatory measures to discredit and discourage Riley and her office. This sequence of sexual harassment, coerced termination of Catalano, and the Companies' retaliatory conduct led Riley to begin contemplating contingency plans in the event of her termination. Sure enough, by February 2004, she was abruptly fired, and Medina resigned shortly thereafter. Pursuant to Local Rule 16.1 (C), I have been authorized by my clients to settle this matter on the terms discussed at the end of this demand letter.

**Facts**
Lisa Marie Catalano:
1. In August 2000, Lisa Marie Catalano, at the time a single female, was a rising star in the Woburn Branch of the Company's Triad division, placing temporary employees with contract employers. Catalano had won an award for being the top national producer in Triad, and had been promoted to Assistant Branch Manager. Her manager, Defendant Chrisos, promised her a promotion to Boston Branch manager, and indicated that the Company planned to undertake a five-year lease for the office space. Chrisos invited Catalano to be his personal guest at the annual manager's meeting, in Chicago in October 2000, where Catalano would be given the award and promotion. Thinking she was being recognized for her achievement, Catalano accepted, and to her surprise, at the hotel, Chrisos summonsed her to his room and propositioned her sexually. Catalano turned Chrisos down flatly and completely, but did not report him, for fear of reprisal. Suddenly, Catalano's promised promotion to the Boston Branch position stalled, and was not effected until January 2001. Chrisos lost interest in solving problems or finding money to fit out the office. Before Catalano had become a branch manager, and before she had rejected Chrisos, in about September of 2000, Chrisos had offered the highly successful Woburn Branch Manager, Lisa Riley an override on her branch to "mentor" Catalano and make sure she did well as Boston Branch Manager. Riley had been one of the most successful Triad Branch managers and had won many awards. After Catalano rejected Chrisos sexually, Chrisos changed his position and told Riley that she should not give Catalano any advice, that Catalano "should learn to come to him" and not Riley. At that time Riley had no idea of the sexual advance by Chrisos on Catalano.
2. The Boston Branch opened in January 2001 under the direction of Catalano. It reached an all time high in June 2001, but Chrisos sent a male trainer, who had never run a branch, out to change and alter Catalano's procedures. This new trainer, less qualified than Lisa Riley would have been, undermined Catalano's authority with her staff. As will be shown, Chrisos moved on to another woman in Florida after Catalano spurned him, but in

2

the summer of 2002, when he began actively pursuing Catalano's boss, Riley, for sexual relations, he tried to eliminate Catalano by abruptly demoting her from Branch Manager and proposing a pay reduction of 30%, which caused Catalano to quit. After Riley rehired Catalano as a recruiter that fall, Chrisos kept pressure on Riley to terminate Catalano, especially as he began actively pursuing the teenage co-worker, Amanda Medina in Fall 2002 and Spring 2003. Riley finally terminated Catalano in the Spring 2003, under pressure from her superiors, including Chrisos, to do so.

The Stevie Schlintz Affair:
3. Shortly after Catalano rejected Chrisos in October 2000, in about January 2001, Stevie Schlintz, a woman, was hired in the Orlando Office which Chrisos also oversaw. Chrisos began an affair with Schlintz. She failed to perform in her position, had unexcused absences, lied about her whereabouts, and her manager wished to discipline her. However, Chrisos repeatedly intervened to get Schlintz another chance and to prevent her firing. Chrisos would tell Schlintz to tell the manager sales were coming in, or other statements to prevent her firing. Thus Shclintz's acceptance of Chrisos's sexual overtures became an implicit term of her employment, securing her continued employment when she would have been terminated. When, in March 2001, the manager finally fired Schlintz after catching her in an overt lie, the manager discovered, on the computer, emails from Chrisos to Schlintz to the effect of "Hi Sweetie," followed by references to work, and how to increase her job order activity. These work comments would be interspersed with explicit sexual inquiries, such as, "How do you feel about phone sex? How did that get in there?" followed by more references to work .This was then followed by, "We'll have to get you private email, don't want whole office to see this. Hi Heather [the manager], ha ha." When the manager confronted Chrisos about the matter, he begged her not to report it in order to protect his family. The manager found evidence of gifts, trips and expenses being showered on Schlintz by Chrisos.
   a. About that time, Chrisos wrote up the manager for completely false allegations regarding alleged deficiencies, absences or problems. He later claimed that the information was from Schlintz and agreed to take it out of the manager's file.
   b. Chrisos indicated that after Schlintz was fired, Schlintz demanded severance, termed it "blackmail" and Chrisos agreed to pay it, and showed the manager a document he had signed, forging an attorney's name on the document. The severance had to come out of the Orlando/Maitland office budget, and Chrisos gave the Orlando/Maitland office territorial protection which no other office was given, which then affected the ability of Sandy Panarello to make a living in the new Tampa Office when she was barred from lucrative contracts in the Orlando area.

Lisa Riley:
4. In early 2002, Lisa Riley was a recognized star and an important engine of the company's success as Branch Manager of the Wakefield Triad office. In that position, Riley reported to Chrisos. Riley had won each of the contests the company had given in several consecutive years, with a total of 9 awards or trophies. Prior to April 2002, Riley had not experienced any sexual harassment herself and was unaware of Chrisos's advances on Catalano. Riley was aware, however, of a series of meetings in which the CEO, Corky

Imhoff, had disparaged sexual harassment training, complained of the expense of sexual harassment suits and had suggested that people complaining of sexual harassment were complaining over nothing, robbing the company of productivity and profits, with an example of a complaint having cost the company $250,000 for a trivial comment which he characterized as saying "Bing." This had become a joke among managers.

5. Over time, seeing her excellent performance, Chrisos had given Riley opportunities, although she did not have a degree, and knowing that she was a single mother, had given her flexibility with respect to her hours when she had problems with her autistic son. Chrisos had an autistic son as well and seemed very understanding. Riley had been to Chrisos's family home, and had met his wife. In Spring 2001, Riley suddenly lost money in the stock market dip when she had been on the eve of purchasing a house, and Chrisos arranged for a company loan. In Spring 2002, Riley revealed to Chrisos the particularly acute condition of her son.

6. In Spring 2002, Chrisos began dangling before Riley the creation of a Regional Manager position to increase profitability and appropriate staffing in the Boston region, a plan the Companies intended to use as a model nationwide. After exchanging emails and proposals, in about April 2002, Chrisos promised Riley a promotion to Regional Manager, a new position with duties overseeing three branch offices. Chrisos discussed increasing Riley's annual salary from $136,000 and a quarterly bonus expected to bring her at least an additional $30,000 per year.

7. Using the same modus operandi he had previously used on Catalano, Chrisos, at the managers' conference in 2002, demanded that Riley come to his hotel room late at night. "He left the voice mail in my room, *said we forgot to talk about your compensation* [for the regional position]; why not come up and we'll talk about it now. I thought it was a meeting regarding a pending promotion to regional manager. I went upstairs and he propositioned me, and did not want to talk about compensation. *I was completely shocked. I was sitting in a chair when he asked me if I thought it would 'screw up our relationship if we slept together.' I stood up abruptly and he moved closer and began stroking his hands up and down my arms saying 'you know how to be smart about this.'*" Riley considered that a threat. She said, "*'I don't think this is a good idea,' and he said he had done this before and that everything had worked out fine. He then said, 'I wouldn't want anything to interfere with our working relationship.'*" (Riley Statement and Riley transcript to Hubacek).

8. Riley's life had been on a razor's edge, except for her extraordinary success at work. In April 2002, her son was seriously ill and acutely in need of stability, and as a single parent, she needed to keep the tangible and non tangible benefits of her employment, including her income and her health benefits. Riley was indebted to the company because they lent her money for the mortgage on her home; she was convinced that she would lose her house if she lost her job at that point. She didn't have a college degree and she was trying to keep herself in a career that was upwardly mobile in an economy which was going down. Riley believed Chrisos had fostered her career and assisted her in earning a six figure income. Riley had no idea that Chrisos had propositioned Catalano and then undermined Catalano as Branch Manager after she refused him.

9. Riley reflected on the hostility of the company, expressed at the highest levels, toward those who had complained of sexual harassment, and she felt threatened into sleeping with Chrisos that weekend. (He again coerced her the next night to sleep with him,

coming to her hotel room at 10 p.m. after she had avoided him). Within the next four weeks Chrisos again requested that Riley travel with him and she refused. Upon his next trip to Boston in early May 2005, Chrisos renewed the promise for an immediate pay raise of $6,000, $6,000 in six months, and bonuses estimated at $5,000 per quarter to begin immediately. (Total expected to be at least $32,000). Riley has Regional Manager spread sheets with proposals for supervision and measurement of success and quarterly bonus models, continued into May 2005. Chrisos again had dinner with Riley and asked her to go to his room, and Riley refused, explaining it was not a good idea.

10. After Riley's refusal of sexual relations, Chrisos's offer of the Regional Manager promotion with embellished compensation and title were dropped, and Chrisos told Riley that Imhoff objected to her being "overloaded." Riley continued to demonstrate that the proposal would increase productivity and profitability as previously discussed, and sought explanation for why she could not supervise Catalano in Boston and Coleman in a third office, with enhanced bonus and salary pay.

11. In July 2002, after Riley had rejected him, Chrisos abruptly demoted Catalano from Branch Manager in Boston, to recruiter, causing her to quit. Riley was then burdened with supervising the Boston Staff without a Boston Manager, with no increase in compensation. Plaintiffs believe the records will demonstrate that Catalano out-performed males who were not demoted at the same time.

12. With Catalano out of the picture, in approximately mid-August 2002, Chrisos indicated to Riley that he had gotten the go-ahead for the Regional Manager position, and in September 2002 he told her she was now officially the Regional Manager with newly promoted Woburn Branch Manager, Mike Coleman, reporting to her. Riley reasonably believed her pay increase and bonuses would be forthcoming. However, the $6,000 pay raise was not granted and the Companies required Riley to absorb the demoted male, a former Woburn Branch Manager, Peter Ernst, who had been found seriously deficient, rather than terminating him or leaving him with Coleman. These moves had the effect of increasing Riley's management time, increasing her office expenses, adding an unproductive worker, and reducing her time for direct sales commissions for herself. Chrisos led Riley to believe that the pay issue would be addressed shortly.

13. In November 2002, the Companies' CEO, Corky Imhoff, and Chrisos flew east to give Riley a 10th award, this time the 2002 Chairman's Pinnacle Award for Outstanding Achievement, which had been given *only three times in the one hundred year history of the company* and proclaimed in front of all her subordinates something to the effect that it was a big surprise that "a girl" could achieve something like this and "beat out the big boys." They announced that Riley would be the Regional Manager at that time. Riley believed the pay increase would be imminent. Riley, not knowing about Chrisos's harassment of Catalano, re-hired Catalano because she had been highly productive and assigned her to develop a new line of recruiting in Accounting.

14. To her dismay, in January 2003, Riley received only a small raise, which was not made retroactive, and no bonus plan. Despite her national award, Riley had been saddled with supervision of the Boston Staff, the Woburn Branch and the Wakefiled Branch, an underperforming male who was being protected, and Chrisos continually dealt directly with the Woburn manager and never told Coleman that he was to report directly to Riley; Chrisos attributed Riley's complaints about the situation to "PMS."

5

15. Escalating his behavior from 2001, when he had told Riley that Catalano "had to learn to come to him," had instructed Riley not to mentor Catalano, and had coerced her resignation in the summer of 2002, Chrisos was not happy with Catalano back on staff.
16. Throughout Fall 2002 and Spring 2003, Chrisos and Imhoff pressured Riley to terminate Catalano, while tolerating Ernst, a documented, non-performing male.
    a. Chrisos made many comments to Riley that he thought Catalano was "*neurotic,*" a "*high-maintenance girl*" and had "*constant PMS.*"
    b. In March 2003, Chrisos came to Boston and virtually stalked Catalano all day, contrary to normal practice and without explanation to her manager, Riley.
    c. Imhoff and Chrisos continually called Catalano Riley's "payroll problem" while having protected the poorly performing male, Peter Ernst. Finally, Riley terminated Catalano, and was immediately praised by Imhoff and Chrisos.
17. In about May or June 2003 Riley learned that Chrisos had sent Monica Friedman, a woman in a California office who had previously worked for her in Wakefield, a harassing email. Friedman's manager noticed it and took it to Marilyn White, the Vice President of the Western Region, Chrisos's counterpart. Plaintiffs understand that the e-mail was taken to Imhoff, and the complaint was trivialized as a disgruntled compensation issue. Chrisos alluded to Friedman's pregnancy as a possible explanation.
18. On about July 4, 2003, Riley discovered that Chrisos had propositioned Catalano before squeezing her out after she rejected him, and revealed to Catalano that Chrisos had sexually coerced her, that she had thereafter rejected him, and that the incident also occurred at a Chicago hotel conference.

Gender bias in compensation, oversight and office closings:
19. Riley also had access to branch ratings and rankings, and observed a pattern of closing offices headed by women and not those headed by men with lower productivity. Tonya Lynam, Stacy Bohn, Catalano and Sandy Panarello were all female branch managers whom Riley had seen as potential leaders. Chrisos had sent the male, less-qualified trainer, Ken Yeoh to alter the women's office procedures; all had been top producers before, and were driven into the ground. There were other more logical offices, headed by men, to close when the offices headed by women were closed. Riley was unaware of Ken Yeoh being sent to alter the procedures of any office headed by a man. Riley also observed that female branch managers were kept in the Triad offices, with lower compensation packages, and male branch managers were predominantly in GEE offices, with permanent contracts and larger compensation packages.

Amanda Medina:
20. In November 2002, Chrisos picked out a newly-hired administrative assistant, Amanda Medina, then a teenager, working for Riley in the Wakefield office, to approach for sex. Chrisos sought Medina's personal email from November 2002 through March 2003. Chrisos knew that Medina was particularly vulnerable and was hospitalized from March 2003 to approximately May 2003. After Medina's return to work, Chrisos hounded the young woman for her personal e-mail and finally received it in July 2003. Chrisos described his interest in her, referred to her suggestively as a "tart," and indicated that she would be invited, despite being underage, to go out for drinks. The weekend of July 11-13, 2003, Chrisos came to Boston for a meeting and evaluation. He spent time with a co-

worker, Marcea Taylor, and grilled Taylor about Medina's condition; he then spent three times the normal time with the administrative assistant, Medina, and thereafter took everyone out for drinks. Medina had shared her concerns with her co-worker, Taylor, that Chrisos was inappropriately suggestive with her and pursuing her for her e-mail. At the restaurant, Chrisos put his hands all over Medina, and pressed her to agree to meet him after the office co-workers left. When Riley took a break from the table, Riley's assistant followed her outside, asking Riley to do something.

21. Riley returned to the table and confronted Chrisos: she asked, "What are you doing??" He smiled and said "Come on; it was harmless." Riley said, "Greg, she is 19 years old – how can you say that?" He replied, "*Come on, how often do I get to touch a 19 year-old girl?*"

22. Riley then asked him, "What did you do to Marie [Catalano]?." He said, "Nothing." Riley replied, "Don't tell me nothing." Greg replied, "I just kissed her. It was no big deal."

23. Riley was now objectively and subjectively irate: She replied, "You did the same thing to her that you did to me. Who else have you done this to? What about those other girls you just got rid of when it made no sense--Tonya [Lynam] and Stacy [Bohn]?" He replied, "I never slept with them. I only slept with Lauren Grub (a manager) and a consultant in the Maitland office." (The Maitland office is in the Orlando area). Chrisos then followed Riley out to the car and attempted to placate her, rubbing her back.

24. That weekend, however, Chrisos sent Riley an e-mail admitting that everything she accused him of was true and asking her to forgive him. Riley put a call into Sherry Hubacek, the Company's Human Resources Manager, over this same weekend and sent an e-mail so as to be sure Hubacek got the message right away when she got in the office. Riley had heard from Medina and Medina's mother over the weekend and they were very concerned that Chrisos had called and left a message on their voicemail asking Medina to call him. They did not know how Greg came to be in possession of Medina's phone number and were deeply concerned.

Sandy Panarello:

25. In July 2003, Chrisos and Imhoff were also closing the office of the fourth plaintiff, Sandy Panarello, in Florida. In Boston Panarello had worked with Riley, where she had been an outstanding producer, also winning awards and annual compensation of from $120,000 to $140,000 annually. In 2000, Panarello had been lured to Florida by Chrisos with promises of building a lucrative branch there, and in reliance on those promises, had given up her highly successful commission practice in Woburn. By October 2000 she was number three in the country for sales. However, in early 2001, Chrisos had begun the affair with Stevie Schlintz, which was discovered by March 2001. At the Spring 2001 managers' meeting, Chrisos limited Panarello's territory while no other Branch Manger in the country was limited by territory. Panarello had initially made sales in the more developed and lucrative Orlando area, and a male broker in her Tampa office had received commissions for the contracts. But after the affair with Schlintz was discovered and the severance pay taken out of the Orlando office's budget, it appears that Chrisos protected that office in return for keeping the matter quiet. As a result of being unable to solicit clients in Orlando after the Fall 2001 collapse of the "dot-com" which hit Tampa businesses hard, Panarello's income fell to $60,000, $50,000 and $35,000. Compared to the salary of $120,000 for three years which she expected to be able to earn, based on her

past history in Wakefield, MA, she had lost $214,000 at the time the office closed in Tampa in July 2003. Instead of being given time to discuss options, her staff was advised by FAX from company headquarters that her office was being closed, causing some to leave, further lowering Panarello's compensation and ability to keep the office in business. Panarello told Imhoff at the time of the office closing of the restricted territory, and he maintained he had been completely ignorant of the restriction. Panarello is seeking compensation under promissory estoppel for the failure to honor promises made to her in Massachusetts, inducing her to forego opportunities in the highly lucrative Massachusetts market, while tying her hands in the Florida market.

Sexist Humiliation:

26. At the home office, Chrisos and Imhoff and the collection officer, who had offices adjacent to each other, routinely laughed about and enjoyed humiliating secretaries and minorities on the basis of gender and race, threatening customers with lawsuits, and/or setting up the secretary of a company to call the president of a company by humiliating her on the basis of gender, and provoking her into action. Third-party telephone listening confirmed this conduct, even after Riley had protested. Chrisos condoned the conduct to Riley. A responsible employee quit over reports from his accounts of such conduct, which he then listened in on. Riley believed and will prove that the three at headquarters worked together to force others to do their will and to create a hostile environment when they chose to do so.

27. Once Riley realized that Chrisos and Imhoff had hounded her to fire Catalano only after Catalano had rejected Chrisos, that Chrisos had delayed her raise and compensation after she herslef had rejected Chrisos, that Chrisos had brought false charges against the Orlando manager who had fired his girlfriend, and that Panarello's office had been closed after she had been limited as no male had been limited, Riley reasonably believed that she would be driven-out or terminated after she complained of Chrisos's harassment. Riley had access to branch manager performance numbers, and was convinced that, had Panaerello been a male, her office would not have been closed. Riley reasonably feared that she too would be terminated because of pervasive gender bias throughout the company or because of retaliation. Riley began discussing a contingency business plan with Catalano and Panarello, to provide human resources assistance to companies (not a competitive recruiting business), and assured the support staff that if anything happened to them because of their coming forward, she would offer them a position in a new company. At the time, a male employee of the Companies was actively pursuing his own business plan and conducting business on the web, but he suffered no repercussions. There was no non-competition agreement that forbade such contingency planning. However, although she began planning an alternative scenario, Riley worked within the Companies, to report and correct and deter the problem.

Retaliation and Failure to Conduct Unbiased Investigation:

28. It is undisputed that three of the plaintiffs came forward to give remarkably consistent reports of Chrisos's *modus operandi*, which, until July 2004, they had not known was happening to each other, and that Chrisos admitted to Riley including admissions of sexual conduct with a fourth female employee in Florida and a fifth female employee elsewhere. There is no doubt that in the known cases Chrisos consistently linked

8

promises of advancement or interest in his victim's performance with sexual advances. There is no doubt that after an investigation, Chrisos was terminated. However, the Companies' investigation of Chrisos was conducted in an intimidating and coercive manner. Chrisos was immediately given notice of the charge, despite requests for confidentiality. People were brought in and subjected to interrogation without attorneys present despite request for attorneys to be present. A barrage of retaliation against Riley's office immediately ensued. Riley's contract accounts were suddenly subjected to unprecedented language rejection, billing errors, hounded for amounts already paid, and her office received delays in credits, suppressing her commissions and bonuses. Pay to her staff was interfered with in unprecedented ways, contrary to longstanding smooth running policies. More astonishingly, the company professed no knowledge of her promotion to Regional Manager and denied her that title, or the promised wage increase. Her contracts were interfered with, the Boston office was closed prematurely at great alleged cost to her budget ($188,000) and Woburn staff were not selected for awards. This immediate and dramatic series of events were all intended to cause Riley, Medina, and another initial complainant, Taylor, to quit. In fact, the Chicago office had enjoyed upsetting secretaries to get a client's president to act or cave on disputed issues; they similarly acted to upset the staff and clients in Riley's office, to get them to quit and to undermine Riley who had been a superstar while employed at the Companies. Suddenly, Riley was fired in February 2004, upon false allegations that she was setting up a competing business with company resources; the chief accuser obtained her position; Riley was given no opportunity to rebut the charges which she can and will do. Taylor withdrew her complaint and kept her job, and Medina, no longer able to tolerate the environment and with no ride from Riley to work, left soon thereafter. Utterly without basis, the company then brought suit against Riley, and Panarello in Chicago, to dissuade them from pursuing their lawful, non-competing business and to retaliate against them for their complaints of discrimination. A lawyer who also represented the defendants in other matters called the plaintiffs to advise them that the case was filed. This caused them to hire an attorney, who advised them that the suit had no merit; and shortly before the first hearing the defendants had the case voluntarily dismissed in Chicago.

**Legal Argument**
Quid pro quo Harassment

Riley, Catalano and Medina have clear cases of quid pro quo harassment. To prove a claim for quid pro quo sexual harassment, each plaintiff must show that Chrisos made sexual advances, sexual requests or engaged in conduct of a sexual nature, which in this case is admitted by Chrisos in his email, telling Riley that what she had said was true, and begging her forgiveness. He also admitted to the Orlando Manager that he had made sexual advances to Stevie Schlintz in Orlando, overriding the manager's desire to discipline her. He also was found pressing her for her personal email, he sent Amanda Medina an email referring to her as a tart, plied the minor with liquor, put his hands on the her thigh, asked her to join him later and pursued her by using his access to company records to obtain her personal phone number. In light of the serial predator nature of his conduct, no reasonable jury would doubt that Chrisos' advances in each case were sexual in nature for sexual favors later that night. Chrisos may defend that he was a harmless letch, as he said to Riley, "Come on, how often do I get to touch a 19 year-old girl?" But a jury will hear of the sexual coercion, consummated with at least three

9

other subordinates, and attempted on at least two others, will see him for a sexual predator, without boundaries, who believed he had such power that he could act in plain view of his subordinates with impunity, even where the victim was an emotionally vulnerable, underage employee.

Secondly, each must show submission or rejection to such advances. Catalano will prove that she rejected such advances in October 2000, when Chrisos invited her to be his guest, allegedly to receive an award. Riley will show that she submitted to the sexual coercion, in April 2002, when she was brought to his room, allegedly to discuss a promotion; Riley will establish that she rejected Chrisos's renewed requests in May 2002. Medina will prove that she rejected Chrisos with the help of Riley, Bernadino, and Taylor, who will all confirm that Medina signaled she wanted help and that, with the help of Riley, she rejected Chrisos that night and went off with Taylor, a co-worker. When Riley, outraged, confronted him, Chrisos admitted to all this conduct, and begged her forgiveness.

Thirdly, submission to Chrisos's requests became an implicit term of employment for each. In 2000, Chrisos the seducer initially told Riley to mentor Catalano when she was expected to become Boston Branch Manager. After Catalano's rejection of Chrisos, her immediate promotion to open a Boston Branch with a five year lease was delayed by four months and Chrisos the punisher told Riley not to give Catalano any advice because "she had to learn she had to come to him." In 2001, Chrisos became distracted by new prey in Orlando, but when Catalano began succeeding in the Boston office, he sent a male trainer to undermine Catalano's staff. As Orlando grew cold, in 2002, Chrisos began trying to seduce Riley, Catalano's branch manager, and Chrisos needed Catalano out of the way. He told Riley she could become Regional Manager, leading her to believe Catalano would remain Branch Manager, but told Catalano that she was being demoted to recruiter, thus leading to her quit. When Riley refused to sleep with Chrisos again, after Chicago, he punished her by giving her three offices to oversee, without significant increase in compensation, thus reducing her time to make commission sales herself; he told her he gave her the title of Regional Manager as a condition of her employment, but the company denies that he ever gave her the position initially promised. Thus Riley's rejection of Chrisos became a term and condition of her employment: she had to do the work without the increased status or pay. In the third case, in the fall of 2002, Chrisos spied the 19 year-old Amanda Medina. To his chagrin, Riley had hired Catalano back, without cutting her pay in the same office. Chrisos hounded Riley to get rid of Catalano, while he hounded Medina to give him her personal email and begin the kind of provocative seduction he had used in Orlando. Finally, Riley was pressured into terminating Catalano in early 2003, because Imhoff and Chrisos kept hounding her to get rid of her "payroll problem," Catalano. Riley did not know of the sexual coercion, but had argued that Catalano, in her business judgment, should be given time to develop an entirely new area of recruiting and that six months was insufficient. Chrisos's conduct in Orlando, which prevented the discharge of an unreliable employee, is proof that sexual relations with Chrisos was a condition of employment. Plaintiffs know that Chrisos admitted to one other affair with a manager and expect to discover many others, given the prevalence of the conduct admitted to date. Had Catalano or Riley or Medina agreed to sleep with Chrisos, we can believe he would have showered each with gifts and protected her performance, as he had with Stevie Shlintz in Orlando, and then forced them into demotions, reneged promotions, or adverse false charges if they opposed him or if they came to reject him.

Beaupre v. Cliff Smith Associates, 50 Mass. App. Ct. 480, 488 (2000) (affirming denial of directed verdict on quid pro quo and hostile environment where evidence showed that the sexual advances and other sexual conduct were unwelcome and either conditioned upon some aspect of employment).

Hostile environment:
Plaintiffs expect to establish through the same evidence that the conduct was of a sexual nature and was unwelcome. In the case of each, it had the effect of creating a hostile, humiliating or offensive work environment by July 2003. College Town Div. of Interco Inc. v. MCAD, 400 Mass. 156, 162, (1987). Such a history of sexual demands on the boss, a recruiter/branch manager and an administrative assistant, all within one office, can have the effect of creating a discriminatory work environment even in the absence of a specific adverse employment decision. Richards v. Bull HN Info Sys. Inc., 16 MDLR 1639, 1666 (1994). Humiliating comments about "broads", humiliation of female clients by the head office, shared ridicule by the highest officers in the company, stereotypic comments about "PMS" and hysteria and pregnancy, calling an employee a "tart," are all hostile and offensive, and were used to create power over women or to defend sexist pay practices; these can undermine an employee's ability to succeed and did so in these cases. O'Rourke v. City of Providence, 235 F. 3d 713, 729 (1st Cir. 2001).

> **Employment decisions that are made because of stereotypical thinking about a protected characteristic or members of a protected class, whether conscious or unconscious, are actionable under G.L. c. 151B. Stereotypical thinking, for example, involves categorizing people on the basis of broad generalizations, inaccurate or stigmatizing stereotypes and are not necessarily accompanied by deliberative reflection or conscious thought, are sufficient to satisfy the element of discriminatory motive.**

Lipchitz v. Raytheon Company, 434 Mass. 493, 503 (2001). Defendants may attempt to argue that the conduct by Riley or Medina was "voluntary." This will not succeed in defeating the claim. The jury will be instructed that the fact that sexual conduct may have been voluntary, even if that is raised as a defense by Chrisos despite his admissions and apologies, is not sufficient. The issue is whether the conduct was "welcome." Beaupre v. Cliff Smith & Assoc., 50 Mass App. Ct. 480, 489 n. 15 (2000) (Sexual harassment is present when a woman submits to conduct in order not to lose her lose her job).

Retaliation
The Defendants are liable for retaliation, for threats, intimidation, coercion or interference with rights protected by the statute, and for aiding, abetting inciting, compelling or coercing any of the acts forbidden by the statute. G.L. c. 151 B §4,(4), 4(4A) and 4(5). The failure to conduct a fair, unbiased investigation also violates these sections of the act. College Town Div. of Interco Inc. v. MCAD, 400 Mass. 156, 162 (1987). Here, Chrisos's conduct makes him individually liable under the statute. Morehouse v. Bershire Gas Co., 989 F. Supp 54 (D. Mass 1997). Similarly, the conduct of Imhoff denigrating sexual harassment complaints, complaining of their lack of basis, cost and interference with the company's business, coupled with his laughter over the demeaning of secretaries and his congratulations for firing Catalano all suggest that he was intimidating employees not to bring complaints or to reject managers, and

that he did authorize or condone the retaliation against the office of Riley, and Medina after their complaint. Riley found a lucrative contract killed by home office rejecting standard language; her staff was treated differently for pay purposes; her Boston Branch office was closed with a huge four year lease commitment charged to her, only to be reopened after she left. The final straw, of being terminated without any opportunity to defend herself from false charges, will give her a jury question, on which she will prevail, both on unfair and biased investigation and on discriminatory motive.

Promissory estoppel:

Panarello was promised the opportunity to open a branch in Florida, under the normal terms and conditions of the Companies, which at that time had uniform policies throughout the US, in which offices were free to compete with neighboring offices without territorial boundaries. Chrisos was the Vice President authorized to offer Panarello the terms and conditions of employment. Panarello reasonably had relied upon these promises of a superior with knowledge of the company, and relocated to Florida. She poured her own resources into the business to grow it, to her detriment. Thus she is entitled to the benefit of the bargain she was promised. "An offer which the offeror should reasonably expect to induce action or forbearance of a substantial character on the part of the offeree before acceptance and which does induce such action or forbearance is binding as an option contract to the extent necessary to avoid injustice." Loranger Constr. Corp. v. E.F. Hauserman Co., 376 Mass. 757, 760 (1978). The effective application of doctrine of equitable estoppel "requires: (1) '[a] representation or conduct amounting to a representation intended to induce a course of conduct on the part of the person to whom the representation is made[;] (2) [a]n act or omission resulting from the representation, whether actual or by conduct, by the person to whom the representation is made[;] (3) [and d]etriment to such person as a consequence of the act or omission." Boylston Dev. Group, Inc. v. 22 Boylston St. Corp., 412 Mass. 531, 542 (1992); Cellucci v. Sun Oil Co., 2 Mass. App. Ct. 722, 728 (1974). All three elements are present here. When Imhoff closed the office, in July 2003, Panarello made him aware of the unforeseen and unfair territorial restriction which Chrisos had imposed. Imhoff did not reinstate her and permit her to reopen the office, in the area where she now lived, with open territorial competition, as given to all other branch managers. Thus she suffered the detriment from the acts depriving her of the fair terms of the competition which had been promised and represented as the policy of the company.

Damages through the end of 2005:

Lisa Riley will have lost approximately $318,000 compared to what she would have earned had she obtained the Regional Manager bonus promised, and a 5% raise per year in total compensation. She suffered greatly emotionally, going from a star performer, to seeing three of her staff subjected to severe gender bias in pay and being fired after successfully stopping the harasser. A jury may award, conservatively, $100,000 in emotional distress damages, for compensatory damages of $418,000. She would settle the matter, if it settles within thirty days, for $250,000 plus fees.

Sandy Panarello will have lost approximately $214,000 in income compared to what she reasonably would have been expected to earn given that she was the Company's third highest performer and had an unprecedented limitation on her earning, which was not in the bargained-for conditions upon which she relinquished her Boston position. We believe that Chrisos

maliciously interfered with her advantageous relationship in order to cover up his affair, and thus she will be entitled to $100,000 in emotional distress damages for his conduct interfering with her contract with the Companies. Her compensatory damages will total at least $314,000. She would settle the matter, if it settles within thirty days, for $157,000 plus fees.

Lisa Marie Catalano will have lost $119,000 based on two terminations due to her having rejected Chrisos, and being present when he wanted to seduce another woman in her office/area. Chrisos began wanting to seduce the manager of her area, and then the young teenager in the same office, and wanted her out of the picture so that no past conduct would be revealed. We believe she would be entitled to at least $100,000 in emotional distress, for a total of at least $219,000. She would settle the matter, if it settles within thirty days for $109,500 plus fees.

Amanda Medina was earning $32,000 at the time of her termination, and from age 19 to 20 she was pursued, by a much older, married vice president and boss, who knew of her vulnerabilities and recent hospitalization. The environment was severely pervaded by unwanted sexual advances, to at least three women in her office, with adverse consequences for each who rejected him. She would be entitled to at least $100,000 in emotional distress, for a total of at least $132,000. She would settle the matter if it settles within thirty days, for $66,000.

**The total demand for all four plaintiffs is $583,300 plus fees of $36,000, to date, for a total demand of $619,300.** The exposure described above is conservative, and for settlement purposes only, as it does not include punitive damages or interest. In Beaupre a jury awarded $555,539 in damages to a single plaintiff for a sexual harassment claim after the end of a consensual affair. Beaupre v. Smith, 10 Mass. L. Rep. 528 (Mass. Super. Ct. 1999). There, as here, the wage damages were estimated by the amount that the plaintiff would have earned had she remained with the employer, and approximate two-year period of front pay. Beaupre v. Cliff Smith Associates, 50 Mass. App. Ct. 480, 496 (2000). In the event that litigation proceeds, the above conservative estimates of compensatory damages exceed $1,000,000, or an average of $250,000 per plaintiff. Costs and burden of litigation will be high; the defendants have proposed 15 depositions per side, and maintain that there are three sides, for a potential of 45 depositions. There are four distinct individuals with stories to tell, woven together; there is the nationwide treatment of branch managers, compensation on the basis of gender to be established; there is the entire series of retaliatory acts and the inadequacy of the investigation to discover. At $1,000 per deposition, and with travel to Florida and Chicago, costs alone could easily exceed $45,000 even if 45 depositions are not necessary. Attorneys' costs would likely exceed $120,000 for three sides.

     The plaintiffs are reasonably willing to discuss settlement, either with the court, in a meditative process within the court or in private mediation. They are also prepared to pursue the litigation vigorously. We encourage the defendants to discuss settlement but caution that the current demand will be withdrawn if the matter is not settled within thirty days.

 

Respectfully submitted
The Plaintiffs
By Their Attorney,

*Elizabeth A Rodgers*
Elizabeth A. Rodgers, BBO#424360
Rodgers, Powers & Schwartz LLP
18 Tremont Street, Suite 500
Boston, MA 02108
617-742-7010

**CERTIFICATE OF SERVICE**
I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by mail (by hand) on 8/31/05.

*Elizabeth A Rodgers*