UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

LISA RILEY, LISA MARIE CATALANO,
SANDY PANARELLO and
AMANDA MEDINA,
                Plaintiffs

v.

GENERAL EMPLOYMENT
ENTERPRISES, TRIAD PERSONNEL
SERVICES INC, GREGORY CHRISOS,
HERBERT IMHOFF and KIM CULLEN,
                Defendants

Civil Action No. 04-12318-RWZ

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### DEFENDANTS' OPPOSITION TO
### PLAINTIFFS' MOTION FOR PROTECTIVE ORDER

Defendants, General Employment Enterprises, Inc. ("General Employment"), Triad

Personnel Services, Inc. ("Triad"), Herbert Imhoff, Jr., Kim Cullen, and Gregory Chrisos

(collectively "Defendants"), hereby oppose Plaintiffs' Motion for Protective Order.  In their

motion, Plaintiffs seek a blanket order preventing the disclosure of information related to (1)

SmarteStaff, another staffing business Plaintiffs apparently founded while employed by

Defendants General Employment and Triad; (2) medical and mental health records of Plaintiff

Medina; and (3) medical and mental health records of Plaintiff Riley.

As set forth more fully below and in the accompanying Declarations of Sherry L.

Hubacek and Jeffrey S. Brody, the Court should deny Plaintiffs' motion as it seeks to deprive

Defendants of information critical to the defense of the case.  Specifically, contrary to Riley's

allegations of retaliatory discharge, Riley's employment was terminated because of her blatant

neglect of her job responsibilities while working, with several other Plaintiffs, on what appears to

be a competing staffing business, SmarteStaff.  Failure to provide information and documents

relating to this new business would significantly undermine Defendants' ability to prove its

legitimate non-discriminatory reason for taking adverse action against Riley. Such information is also relevant to the defense of other claims brought by Plaintiffs Riley and Panarello, including their claims of intentional interference with their new business venture, as well as their claims of lost wages and their duty to mitigate any such alleged losses.

Likewise, the Court should deny Plaintiffs' motion with regard to the medical and mental health records of Plaintiffs Medina and Riley because both have put their mental states squarely at issue in this case and seek excessive emotional distress awards. Medina and Riley have repeatedly made references in various court filings to their emotional states at the time of alleged wrongdoing by Defendant Chrisos. Defendants must be allowed to seek discovery of their alleged mental states to refute the specific allegations.

## CASE BACKGROUND

This action arises out of Plaintiffs' employment with General Employment and Triad (collectively referred to as the "Company").[1] General Employment and Triad are staffing companies which specialize in, among other things, the placement of information technology, engineering, and accounting professionals in direct hire, contract assignments, and contract-to-hire positions. (Hubacek Dec., ¶ 2). General Employment and Triad both have multiple offices throughout the United States. (Id.).

### Plaintiff Riley

During the relevant time period, Riley served as the Branch Manager of the Triad office located in Wakefield, Massachusetts. (Amended Complaint, ¶ 11). Riley alleges that Defendant Chrisos sexually propositioned her at a manager's meeting in April 2002 and that they had sexual relations twice during the weekend of that manager's meeting; that Chrisos subsequently delayed her promotion to Regional Manager when she rejected a subsequent proposition in May

---

[1] Triad Personnel Services, Inc. is a wholly-owned subsidiary of General Employment Enterprises. Triad operates as Generation Technologies, Inc. in Massachusetts.

2002; and that the Company retaliated against her by terminating her employment after she made a complaint against Chrisos in July 2003. (Id. at ¶¶ 39-40, 43, 45-46, 106). Defendants intend to establish that Riley was not sexually harassed or treated unlawfully during her employment. The Company legitimately terminated her employment in January 2004 because she was neglecting her management duties by working on establishing a new staffing business, SmarteStaff.

Plaintiff Panarello

Panarello served as the Branch Manager of the General Employment office located in Tampa, Florida. (Id. at ¶ 13). Panarello alleges that in approximately April 2001, Chrisos improperly limited the market within which the Tampa office could conduct business, preventing Panarello from conducting business in the Orlando area in violation of promises the Company allegedly made to her. (Id. at ¶¶ 30-32). Panarello also alleges that Defendants closed the Tampa office in or around June 2003 even though Defendants had promised that she would have until August 2003 to "rebuild the Tampa office." (Id. at ¶ 78). Defendants intend to establish that Panarello's employment ended in early July 2003 when the Company legitimately closed its Tampa office for compelling business reasons.

Plaintiff Catalano

Catalano served as the Branch Manager of the newly opened Triad office located in Boston, Massachusetts from approximately January 2001 to July 2002 and then as a Recruiter for accounting positions in the Wakefield office from approximately September 2002 to May 2003. (Id. at ¶¶ 12, 29, 47, 55, 75). Catalano alleges that Defendants created a hostile work environment, which affected her work performance. She claims that Chrisos sexually propositioned her in October 2000, delayed her promotion to Branch Manager in the Fall of 2000 by three months, eliminated the Boston office Branch Manager position in July 2002, and that Defendants pressured Riley to terminate Catalano between December 2002 and April 2003. (Id. at ¶¶ 26, 28, 60, 66, 68, 69, 75). Defendants intend to establish that Catalano was not treated

3

unlawfully during her employment and that Riley appropriately terminated Catalano's employment in May 2003 due to performance issues.

<u>Plaintiff Medina</u>

Riley hired Medina as an Administrative Assistant in May, 2002, and then promoted Medina to Recruiter approximately two months later.   (<u>Id</u>. at ¶ 15).  Plaintiffs allege that, on or about July 11, 2003, Chrisos invited employees from the Wakefield office and employees from the General Employment office located in Woburn, Massachusetts out for dinner and drinks at the Kowloon restaurant in Saugus, Massachusetts. (<u>Id</u>. at ¶ 89).  Plaintiffs allege that Chrisos inappropriately placed his hand on Medina's leg during the dinner.    (<u>Id</u>. at ¶¶ 89-90).  Riley subsequently complained to the Company about Chrisos's alleged actions that evening and the Company promptly began a thorough investigation of Riley's claims.   Defendants intend to establish that Medina was not subjected to unlawful sexual harassment and that Medina voluntarily resigned for transportation reasons in September 2003.

**PROCEDURAL BACKGROUND**

In their Amended Complaint, Plaintiffs Riley, Catalano, and Medina assert claims of sexual harassment (Count I), gender harassment/discrimination (Count II), discriminatory termination (Count IV), and retaliation (Count V).[2]  Plaintiffs Riley and Medina assert a claim of failure to adequately investigate or remedy a hostile work environment (Count III).  In addition, Plaintiffs Riley and Panarello assert a claim of intentional interference with advantageous relations (Count VII) and Panarello asserts a claim of promissory estoppel (Count VI).

At the September 7, 2005 Scheduling Conference, the Court indicated that the parties should engage in certain limited discovery until the end of December 2005, after which time the

---

[2] Plaintiffs misnumbered their claims in their Amended Complaint.  For purposes of this Opposition, Defendants will refer to the claims in the order listed in the Amended Complaint, specifically referring to the retaliation claim as Count V, the promissory estoppel claim as Count VI, and the intentional interference with advantageous relations claim as Count VII.

parties should explore mediation.[3]  On September 8, 2005, Defendant General Employment served interrogatories, document requests, and deposition notices upon each Plaintiff along with Defendants' initial disclosures.  (Brody Dec., ¶ 4).  In its discovery requests, General Employment sought, among other things, information about SmarteStaff, the company which Plaintiffs founded and which Riley worked on during Company time.  (See Exhibits A-D to Brody Dec.).  General Employment also sought information regarding Plaintiffs' medical and mental health treatment, which is repeatedly referenced by Plaintiffs in their court filings.  (Id.)

To date, in addition to refusing to provide the requested information regarding SmarteStaff and the mental health records, Plaintiffs have otherwise failed to provide adequate discovery responses and have requested numerous after-the-fact extensions to provide such responses.  Although Plaintiffs' discovery responses were due to be served on October 11, 2005, Plaintiff Medina, on October 12, 2005, served only an unsigned copy of her answers to interrogatories along with an uncategorized stack of documents.  (Brody Dec., ¶¶ 4, 6; Ex. F to Brody Dec.).  Plaintiffs failed to label the responsive documents by Plaintiff or categorize them by specific document request as required by Fed. R. Civ. P. 34(b).  (Brody Dec., ¶ 6).  To date, Medina has not served a written response to General Employment's request for documents, and Riley, Panarello, and Catalano have not served answers to interrogatories or a written response to General Employment's request for documents.  (Id. at ¶ 15).  Moreover, Plaintiffs have failed to produce numerous additional responsive documents, despite several extensions granted by Defendants for the production of such documents.  (Id. at ¶ 15).[4]

Plaintiffs' failure to adequately respond to discovery has caused the delay and rescheduling of multiple depositions.  (Id. at ¶ 9).  Defendants nevertheless agreed to proceed

---

[3] During this time, in addition to written discovery, the Court indicated that Defendants may take two days of deposition of each Plaintiff and Plaintiffs may take two days of deposition of Gregory Chrisos and may depose a Company representative.  (Brody Dec. ¶ 3).

[4] Plaintiffs now represent that that they will provide all outstanding discovery by November 9, 2005.

with the first day of Medina's deposition on October 25, 2005. (Id. at ¶ 9). In the middle of that deposition, Plaintiffs' counsel handed defense counsel a copy of Plaintiffs' motion for a protective order and supporting documents. During the deposition, Plaintiffs' counsel also instructed Medina not to answer numerous questions, including inquiries into Medina's criminal arrests, her application for and receipt of unemployment benefits, virtually <u>any</u> information relating to SmarteStaff, the length of time Medina and her counsel met to prepare for her deposition, and documents Medina reviewed without counsel in preparation for her deposition. (Medina Tr. pp. 8, 9, 38, 39, 63-64, 66-69, 109, 112-114).[5]

## ARGUMENT

Pursuant to Fed. R. Civ. P. 26(b), parties may generally obtain discovery "regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party . . ." In explaining this rule, federal courts have held that relevant information includes any matter that is or may become an issue in litigation. <u>See</u> <u>Multi-Core, Inc. v. Southern Water Treatment Co.</u>, 139 F.R.D. 262, 264 n.2 (D. Mass. 1991). Here, information relating to SmarteStaff, an apparently competing business founded by Plaintiffs during Riley's employment with the Company, is a primary issue in the litigation. Likewise, Plaintiffs Medina and Riley have put their emotional state at issue by seeking large emotional distress awards and by making specific allegations about their mental state during the allegedly unlawful conduct.

## I.    INFORMATION ABOUT SMARTeSTAFF IS CRITICAL TO THE DEFENSE OF PLAINTIFFS' CLAIMS AND ALLEGED DAMAGES

Defendants are entitled to information and documents relating to SmarteStaff in order to (1) establish the Company's legitimate non-discriminatory reason for terminating Riley's employment; (2) defend Riley and Panarello's claims of intentional interference with

---

[5] Relevant pages from the Amanda Medina deposition transcript are attached to the Brody Declaration as Exhibit G.

advantageous relations; and (3) explore Plaintiffs' claims of lost wages and whether Plaintiffs satisfied their duty to mitigate their alleged damages.

### A.    SmarteStaff Information Is Relevant and Necessary For The Defense of Riley's Claims of Discriminatory Termination and Retaliation

Documents and information related to SmarteStaff are crucial to Defendants' legitimate, nondiscriminatory reason for the termination of Riley's employment.   In or about January 2004, over six months <u>after</u> Riley made sexual harassment allegations against Defendant Chrisos, the female Assistant Branch Manager of the Wakefield office[6] reported to the Company that Riley had ceased performing her job.  After investigation, the Company concluded that Riley was not performing her management duties, was performing work on behalf of SmarteStaff during Company time, and was approaching employees of the Wakefield office about working for SmarteStaff.  (Hubacek Dec., ¶ 6).  As a result, the Company terminated Riley's employment. (<u>Id</u>.).

Riley's involvement with SmarteStaff, including the level and nature of activity during her employment with the Company, therefore forms the basis for the Company's decision to terminate Riley's employment.  <u>See</u> <u>Mole v. Univ. of Massachusetts</u>, 442 Mass. 582, 591 (2004) (in a Chapter 151B retaliation case, Defendants must articulate a non-discriminatory reason for the adverse action). Not only do Plaintiffs fail to inform the Court of this fact, but they disingenuously assert that information about SmarteStaff is entirely "unrelated to the claims or defenses in this litigation and unlikely to lead to the discovery of relevant evidence." (Plaintiffs' Memorandum, p. 5).  Plaintiff's counsel even went so far as to improperly instruct Plaintiff Medina during her deposition not to answer even basic questions related to SmarteStaff, despite the fact that Plaintiff Medina never worked for SmarteStaff:

---

[6] The Assistant Branch Manager was Defendant Kim Cullen, whom Riley accuses of intentional interference with advantageous relations because she reported Riley's neglect of her Company duties.

> Q:    So were you ever an employee of SMARTeSTAFF?
>
> A:    No.
>
> Q:    So what is it, to your understanding, that SMARTeSTAFF does?
>
> A:    Again, it's my understanding they have tools for employers, for HR people.
>
> Q:    What are those tools?
>
> Ms. Rodgers:  Objection.  Instruct you not to answer.

(Medina Tr., p. 112).

Plaintiffs' own allegations in this case demonstrate the compelling relevancy of information relating to SmarteStaff to Riley's claims of retaliation, as well as Plaintiffs' bad faith in seeking to prevent such discovery.  For example, in Plaintiffs' Amended Complaint, Plaintiffs allege that Riley's employment was terminated based on "fictitious charges of soliciting clients for a new enterprise" and other "false charges of competition."  (Amended Complaint, ¶ 106(t)). Plaintiffs also assert that:

> Riley began discussing a contingency business plan with Catalano and Panarello, to provide human resources assistance to companies (not a competitive recruiting business), and assured the support staff that if anything happened to them because of their coming forward, she would offer them a position in a new company.

(Settlement Proposal, ¶ 27).  Likewise, Plaintiffs state that "[i]n the wake of Plaintiff Panarello's termination from GEE and the intolerable working conditions experienced by Plaintiffs Riley and Medina, Plaintiffs undertook to begin developing a business plan to deal with the crisis." (Plaintiffs' Memorandum, p. 3).

Put simply, in light of their own representations to the Court about SmarteStaff's role in this case, Plaintiffs cannot in good faith claim that information and documents relating to SmarteStaff are somehow not relevant and/or beyond the scope of discovery.  To the contrary,

Plaintiffs' activities in starting a new business led to Riley's termination, and Defendants require discovery into that endeavor to support their defense.

**B.    SmarteStaff is Relevant to Riley's and Panarello's Claims of Intentional Interference with Advantageous Relations**

Documents and information related to SmarteStaff are also crucial to the defense of the claims of intentional interference with advantageous relations asserted by Riley and Panarello. In particular, Riley and Panarello assert in support of their intentional interference with advantageous relations claim that they "had an expectation of contractual employment with a successor corporation to perform services," and that the Company "filed suit in bad faith against Panarello and Riley in Chicago, IL for the purpose of causing the performance of that contract to become more expensive and burdensome, knowing that the plaintiffs were entitled to compete and run additional business which did not violate any confidentiality agreement." (Amended Complaint, ¶¶ 129-30).

Plaintiffs, therefore, have specifically asserted that their new business (i.e., SmarteStaff) somehow became more expensive and burdensome as a result of the actions of the Company in seeking to enforce an employment agreement Plaintiffs had entered into with the Company. They have affirmatively made SmarteStaff an issue in the case and the Company necessarily must explore these allegations through discovery in order to prepare its defense.

**C.    SmarteStaff Information Is Relevant To Plaintiffs' Efforts To Mitigate Their Damages**

Information and documents regarding SmarteStaff are also necessary for Defendants' exploration of Plaintiffs' efforts to mitigate their damages. Plaintiffs claim hundreds of thousands of dollars in alleged lost wages. Specifically, Riley claims to have lost $318,000.00, Panarello claims to have lost $214,000.00, and Catalano claims to have lost $119,000.00. (Plaintiffs' Initial Disclosures, pp. 17-18 (attached as Exhibit F to Brody Dec.)). These are

significant claims of lost wages and Defendants have a right to information regarding Plaintiffs' mitigation efforts, including efforts made in starting a new business, and income received from any subsequent employment.

### D.   Plaintiffs' Argument That They Were Not Subject To Non-Competition Agreements Is Not Relevant

Plaintiffs' reliance on the fact that they were not required to sign non-compete agreements during their employment with the Company is misplaced.  This assertion has no bearing on the issue of Defendants' right to discovery of SmarteStaff information.

As an initial matter, Plaintiffs neglect to inform the Court that Riley, Catalano, and Panarello signed employment agreements prohibiting them from using Company software or data for personal use, from contacting or soliciting Company clients or affiliated companies for one year after termination of employment, and from raiding Company employees.   The Company's employee handbook also prohibited Plaintiffs' use of Company information and equipment for non-work purposes.   Plaintiffs' activities with SmarteStaff violated their employment agreements, as well as Company policy.

Plaintiffs also fail to recognize that Riley's termination was based at least in part on her neglect of her job responsibilities as Branch Manager of the Wakefield office. Regardless of whether an employment agreement specifically prevented her from starting a competing business on her own time, an employer has every right to terminate the employment of one of its managers who is starting a competing business and/or neglecting her Branch Manager duties while she was still employed with the Company.  As set forth above, the Company's legitimate business reason for terminating Riley is the basis of its defenses to Riley's retaliation and discriminatory discharge claims.

E.     **Plaintiffs Allege that SmarteStaff Is Not Competitive**

Plaintiffs should not be permitted to prevent disclosure of SmarteStaff records due to their alleged concern about competition by Defendants.  While Plaintiffs purport to be concerned about the Company's receipt of information related to SmarteStaff based on competitive concerns, Plaintiffs also insist that SmarteStaff is only a "perceived business competitor." (Plaintiffs' Memorandum, p. 4-5).  Accordingly, Plaintiffs' argument that Defendants should not be permitted access to SmarteStaff information for competitive reasons is unavailing.

For the reasons listed above, the Court should deny Plaintiffs' motion for a protective order with respect to information related to SmarteStaff.

II.     **DEFENDANTS ARE ENTITLED TO INFORMATION ABOUT MEDINA'S AND RILEY'S MEDICAL AND MENTAL HEALTH TREATMENT**

Plaintiffs Medina and Riley seek six-figure emotional distress awards due to the physical and emotional distress they allegedly suffered.  These Plaintiffs have also put their emotional states at issue in this case through repeated references in their Amended Complaint and other filings with this Court.  Although M.G.L. c. 233, §20B[7] creates a statutory privilege with respect to communications between patients and psychotherapists, the privilege is waived in any proceeding in which the patient introduces her mental or emotional condition as an element of the claim or defense, and the court determines that it is more important to the interest of justice that the communication be disclosed.  M.G.L. c. 233, §20B(c).

Here, Plaintiffs have waived any alleged privilege as to the medical and mental health records of Medina and Riley and the interests of justice compel such information to be disclosed. The information is critical to Defendants' ability to defend against Plaintiffs' claims, including

---

[7] Massachusetts common law of privilege, rather than federal common law of privilege, applies because Plaintiffs allege only state law claims in their Amended Complaint.  See Vanderbilt v. Town of Chilmark, 174 F.R.D. 225, 226 (D. Mass 1997) (explaining that if state substantive law controls, as in a diversity case, Fed. R. Evid. 501 instructs a federal court to use applicable state law of privilege).

their substantial claims for emotional distress damages as well as their repeated assertions in Court filings that make reference to the alleged emotional states of Plaintiffs Medina and Riley during their employment with the Company. Medina and Riley have, therefore, unequivocally put their emotional states at issue and this Court should deny Plaintiffs' attempts to prevent Defendants from seeking relevant discovery on their claims.

A.     **Massachusetts Law Requires That Plaintiffs Prove Their Emotional Distress And Show A Sufficient Causal Connection Between Unlawful Acts and Their Alleged Emotional Distress**

The Supreme Judicial Court recently clarified the standard under which a Plaintiff in a claim under Chapter 151B is entitled to an award of emotional distress damages. In particular, under Massachusetts law, an emotional distress damages award "must rest on substantial evidence and its factual basis must be made clear[.]" Stonehill College v. Massachusetts Comm'n Against Discrimination, 441 Mass. 549, 576 (2004). In this new decision, the Supreme Judicial Court instructed that "emotional distress must be proved" to be compensable. Id. The Stonehill College Court further explained the burden upon a plaintiff who is seeking emotional distress damages as follows:

> [Plaintiffs] must show a sufficient causal connection between the respondent's unlawful act and the complainant's emotional distress. Emotional distress existing from circumstances other than the actions of the [Defendant], or *from a condition existing prior to the unlawful act*, is not compensable.

Id. (emphasis added).[8]

As a result, information that may suggest that Medina's and Riley's alleged physical and emotional distress are attributable to another source is relevant in this proceeding and critical to the defense. For example, in Guimares v. Del Prete, 5 Mass. L. Rep. 180, 1996 Mass. Super.

---

[8] The Stonehill College decision also instructs that when considering an award of emotional distress damages, the factors to be considered are "(1) the nature and character of the alleged harm; (2) the severity of the harm; (3) the length of time the complainant has suffered and reasonably expects to suffer; and (4) whether the complainant has attempted to mitigate the harm." 441 Mass. at 576.

LEXIS 588 (1996), an employee brought claims against her employer for sexual harassment, intentional infliction of emotional distress, and assault and battery.  The defendant employer moved to compel production of medical records from the employee's treating physician, gynecologist, cardiologist, psychologist, and licensed social worker.  The court granted the motion, holding specifically,

> In a civil case . . . the plaintiff's mental and physical health is a critical issue placed in issue by the plaintiff herself, and medical records may reveal mental and emotional distress caused by prior, unrelated events.

1996 Mass. Super. LEXIS 588, *2.  Similarly, in Tauro v. Gange & Sons, Inc., 1996 Mass. Super. LEXIS 486 (1996), the employer moved to compel production of an employee's medical psychological records during discovery of the employee's claim for sexual harassment.  The court ordered production of the records, concluding as follows:

> Defense counsel should have the right to inquire into plaintiff's treatment for the purpose of showing that the distress was caused at least in part by circumstances other than those that were job related.

Id. at *2.  See also Jacobs v. Vachon, 11 Mass. L. Rep. 307, 2000 Mass. Super. LEXIS 35 (Mass. Super. 2000) (the "court finds that defendant should have the opportunity to inquire into plaintiff's treatment for the purpose of showing that the impairment of plaintiff's mental health . . . may have been caused by circumstances not involving defendant").

Stonehill College and other established Massachusetts cases make clear that Defendants can defeat Plaintiffs' claims of emotional distress by proving that any alleged emotional distress was caused by events unrelated to Defendants' alleged conduct.  Plaintiffs should not be allowed to withhold such crucially relevant information, yet simultaneously seek exorbitant emotional distress awards.  For example, Medina concedes that she was diagnosed with depression during her employment and received treatment prior to the time the alleged harassment occurred. (Medina Statement, p. 1 (attached as Exhibit A to Hubacek Dec.)).  Likewise, Riley's medical

and mental health records are also related to her claims of unlawful acts from 2002. Specifically, Riley alleges she "felt emotionally unequipped" and was at "an extremely low point in [her] personal life" when allegedly propositioned by Chrisos in April 2002. (Amended Complaint, ¶ 39; Riley Statement, ¶¶ 5, 6 (attached as Exhibit B to Hubacek Dec.)). Riley also alleges that "[her] life had been on a razor's edge" around this time and "she felt threatened." (Settlement Proposal, ¶¶ 8, 9). Riley, therefore, was experiencing substantial personal trauma unrelated to work at the time of Chrisos's alleged proposition in April 2002.

Based on these compelling facts, it is entirely possible (and probable) that the physical and emotional distress Medina and Riley claim to have suffered from the allegedly unlawful conduct of Defendants is actually attributable to their preexisting mental health conditions, such as depression and drug and alcohol abuse, rather than any alleged conduct by Defendants. Defendants should have an opportunity to review Medina's and Riley's medical and mental health records to determine whether their alleged physical and emotional distress may have been caused by these other mental health conditions and/or by other factors unrelated to Defendants' actions. Accordingly, Plaintiffs' motion for a protective order should be denied.

**B.    Medina's Mental Or Emotional Condition Is Otherwise Directly Relevant To Her Claims and Defendants' Defenses.**

In addition to her claim for emotional distress damages, Medina's mental state is also at issue with regard to other critical matters in this case. In particular, Medina's mental health is relevant to Medina's job performance, her voluntary resignation, her alleged vulnerability due to her depression, and her memory of events.

**1.    Medina's Physical and Mental Condition is Relevant to Her Alleged Vulnerabilities And The Response To The Alleged Harassment**

Documents related to Medina's medical and mental health treatment are relevant to issues regarding her alleged vulnerability and the actual impact, if any, of the alleged harassment.

Indeed, Plaintiffs admit the relevancy of the Medina's mental state at the time of the alleged harassment in their memorandum in support of their motion for a protective order:

> Because Medina's particularly vulnerable emotional state at the time Chrisos sexually harassed her is ***relevant*** to her claims, Medina is willing to provide the Defendants with the dates of hospitalization for reasons related to her psychiatric health and the dates on which, prior to Chrisos's harassment, she had seen a therapist.

(Plaintiffs' Memorandum, p. 7 (emphasis added)).    Plaintiffs, therefore, clearly intend to rely upon Medina's mental state <u>prior</u> to the allegedly harassing event to support their claim.  They have placed her emotional state squarely at issue.  Plaintiffs cannot seek to introduce evidence of what they claim to be Medina's "vulnerable emotional state" at the time of the alleged harassment, yet simultaneously seek to prevent Defendants from exploring her emotional state through discovery by limiting such discovery to the dates of treatment.  In fact, Defendants expect that discovery would reveal that Medina was in no way traumatized by the alleged conduct of Defendant Chrisos.  She acknowledged in her deposition that she stayed up until 3:00 a.m. drinking alcohol and joking with friends immediately after the allegedly harassing incident. (Medina Tr., pp. 202-203).  She also apparently told a co-worker that she found the alleged incident to be comical and that it would "get her an office."  Defendants should have an opportunity to review Medina's mental health records to determine her alleged vulnerability at the time of the alleged harassment and refute Medina's allegations as to her mental state and reaction to Defendant Chrisos's alleged conduct.

### 2.    Medina's Physical and Mental Condition is Relevant to Her Job Performance And Her Voluntary Resignation

Documents related to Medina's medical and mental health treatment are also relevant to issues regarding her work performance and her voluntary resignation from the Company.  Prior to the alleged harassment in July 2003 that forms the basis of her claim, Medina took a "leave of

absence for personal, medical reasons" and returned to the Wakefield office in May 2003 on a reduced schedule. (Amended Complaint, ¶¶ 65, 77). Medina was allegedly diagnosed with depression and "was given medication" during this time period. (Medina Statement, p. 1). At her deposition, Medina testified about her history of drug and alcohol use when she admitted that (1) her conviction of driving under the influence of alcohol in June 2002; (2) her treatment for alcohol and drug abuse and admission to McLean Hospital in March 2003, during her employment with the Company; (3) her conviction of possession of drug paraphernalia in December 2004; and (4) her conviction of driving under the influence of alcohol in December 2004, subsequent to her voluntary resignation. (Medina Tr. pp. 25-29, 35-36, 38-39).

Defendants have information suggesting that Medina's drug and alcohol use and emotional issues affected her work performance and may have been the true reason behind her voluntary resignation. Upon information and belief, prior to the alleged harassment in July 2003, Medina often sat at her desk crying, was frequently absent and tardy, appeared to be hung over and not capable of performing her tasks while she was at work, used illegal drugs during her lunch break, and used alcohol and illegal drugs outside of the work day. Further, Medina admitted that her personal problems affected her work performance prior to the allegedly harassing incident at the Kowloon restaurant on July 11, 2003. In her written and verbal statement, which she provided to the Company during its investigation, Medina admitted that she informed Defendant Chrisos that she felt "stressed out by things in [her] personal life," that she "feared [her] personal problems were affecting [her] work," and that she:

> knew [her] productivity had recently decreased. [She also] told Chrisos that [she] was now seeing a therapist and taking medication to help [her] balance [her] personal anxieties and work responsibilities.

(Medina Statement, p. 2).

16

However, after the alleged harassment by Defendant Chrisos at the Kowloon restaurant on July 11, 2003, Medina's explanation for her performance deficiencies conspicuously changed. She suddenly attempted to blame her performance deficiencies on the alleged conduct of Defendant Chrisos. Specifically, she explained her lack of performance by stating that, since the alleged incident with Defendant Chrisos, she had not "been able to work or do almost anything" and wanted "to sleep all day." (Medina Statement, p. 3). In their Amended Complaint, Plaintiffs further attempt to connect Medina's poor performance and resignation, which she argues was actually a constructive discharge, with the allegedly "retaliatory environment" and its affect upon Medina's "ability to concentrate and make placements." (Amended Complaint, ¶ 106(x)).

Based on Medina's admissions prior to the alleged harassment regarding her drug and alcohol use and her poor performance, it is likely that her alleged "[in]ability to make placements" after the alleged harassment was merely a continuation of her performance issues prior to the alleged harassment, particularly given that Chrisos's employment with the Company ended in August 2003. It is also likely that her voluntary resignation had nothing to do with Defendants' alleged actions. Medina should not be allowed to rely on her alleged depression to justify her admitted poor performance prior to the alleged harassment, and then deprive Defendants of the opportunity to examine her mental condition in its defense of her claims, particularly with regard to her poor performance following the alleged harassment, as well as her ultimate resignation. Accordingly, the Court should allow Defendants to explore Medina's physical and mental state in their defense of her claims.

### 3.    Medina's Physical and Mental Condition Is Relevant to Her Memory of Events

Defendants also require Medina's medical and mental health records to examine her credibility, particularly in light of her admission that her recollection of events is "foggy." At her deposition, Medina testified that her memory of events prior to her drug and alcohol

17

treatment in March, 2003 is "foggy." (Medina Tr., p. 152). Medina was also unable to answer several questions about her work with the Company after her return from her treatment, including questions about her position, her job duties, and her work schedule. (Medina Tr. pp. 149-150, 153-155). However, Medina insisted that her memory was not impacted by the circumstances that gave rise to her drug and alcohol treatment. (Medina Tr. pp. 152-153).

As noted above, Medina testified that she was treated for drug and alcohol abuse in 2003, and has apparently continued to use drugs and alcohol subsequent to her treatment and subsequent to her resignation, as evidenced by her convictions for possession of drug paraphernalia and DUI in December 2004. Defendants are entitled to review Medina's medical and mental health records to determine Medina's credibility as a witness in this case, particularly with regard to her statements about the alleged harassment which allegedly occurred in July 2003, over two years ago.

### C.     Riley's Mental Or Emotional Condition Is Otherwise Directly Relevant To Her Claims and Defendants' Defenses

In addition to her claims of emotional distress discussed above, Riley's physical and mental state is also at issue in this case, particularly with regard to her job performance and her involvement in starting an arguably competing business while working for the Company, the allegedly unlawful acts of the Company, and the allegedly intimidating investigation of her claims by the Company.

### 1.     Riley's Physical and Mental Condition Is Relevant to Her Job Performance And Decision To Start A Competing Staffing Agency

Riley's physical and mental condition is relevant to her deficient work performance, which she denies. As noted above, Riley went from being a self-described "star performer" (Settlement Proposal, p. 12) to performing virtually no work on behalf of the Company while she continued to collect a salary. At some point in 2003, Riley's demeanor drastically changed, she

spent all her time at work in her office behind closed doors, she shirked her job responsibilities, and she was constantly criticizing the Company and management in the presence of the Wakefield staff. Moreover, Riley claimed that virtually every action taken by employees at the Company's corporate headquarters which may have adversely affected the Wakefield office was calculated retaliation against her. Defendants are entitled to explore any medical and mental health records which would reveal the reason behind Riley's sudden change from being a "star performer," her decision to cease performing Company work, and her true motives for claiming even the most innocuous acts were somehow retaliatory.

        **2.**      **<u>Riley's Physical and Mental Condition Is Relevant to Her Claims That The Company's Investigation of Her Claims Was Threatening And That Defendants Were Retaliating Against Her</u>**

Riley's medical and mental health records are also necessary to examine her claim that the Company's investigation into her claims was inadequate as well as "intimidating and threatening," and that the Company engaged in retaliatory acts against her. (Amended Complaint, ¶¶ 105, 106).

After making her complaint about Chrisos, Riley met with Sherry Hubacek, whom she had known for years, to speak about her allegations as part of its investigation into her claims. (Hubacek Dec., ¶ 5). Sherry Hubacek also met with other employees as part of the investigation. During the course of the investigation and subsequent to the investigation, Riley told the Wakefield office that everything done by the Company's corporate staff which in some way adversely affected someone in the Wakefield office was retaliation against her. Moreover, in ¶¶ 106(a) through 106(y) of the Amended Complaint, Plaintiffs list many alleged actions by the Company which they contend are retaliatory.

Defendants have reason to doubt that Riley was truly intimidated or threatened by the Company's investigation. In addition, Defendants maintain that none of their acts were

retaliatory and that Riley did not truly believe the acts to be retaliatory.  In order to support their

defense to these claims, Defendants need to review Riley's medical and mental health records.

### III.    ALLEGED CONFIDENTIALITY CONCERNS CAN BE ALLEVIATED THROUGH AN APPROPRIATE STIPULATION OF CONFIDENTIALITY

Plaintiffs concerns regarding confidential or sensitive information can easily be addressed

through an appropriate stipulation of confidentiality.    Defendants would agree to make

production of *confidential* SmarteStaff documents subject to an appropriate stipulation of

confidentiality, which would prevent Defendants from using such documents outside of the

litigation of this case.[9] Likewise, Defendants would agree to an appropriate stipulation of

confidentiality with respect to Plaintiffs' medical and mental health records.

### CONCLUSION

For the foregoing reasons, Defendants request that this Court deny Plaintiffs' motion to

for a protective order.

### REQUEST FOR ORAL ARGUMENT

Defendants respectfully request oral argument on this motion.

Respectfully Submitted,

| | |
|---|---|
| GENERAL EMPLOYMENT ENTERPRISES, INC., TRIAD PERSONNEL SERVICES, INC., HERBERT IMHOFF, JR., and KIM CULLEN By their attorneys, | GREGORY CHRISOS<br><br>By his attorneys, |
| /s/ Jeffrey S. Brody<br>Jeffrey S. Brody, BBO #566032<br>Heather L. Stepler, BBO #654269<br>JACKSON LEWIS LLP<br>75 Park Plaza, 4th Floor<br>Boston, MA  02116<br>(617) 367-0025; (617) 367-2155 – fax | /s/ Christian G. Samito (JSB)<br>Cheryl A. Waterhouse, BBO #547058<br>Christian G. Samito, BBO #639825<br>Donovan Hatem LLP<br>Two Seaport Lane<br>Boston, MA 02110<br>(617) 406-4500 |
| Dated:  November 8, 2005 | Dated:  November 8, 2005 |

---

[9] Of course, such a stipulation should not apply to non-confidential information such as the type of work performed by SmarteStaff, as Plaintiffs' counsel improperly instructed Plaintiff Medina not to answer during her deposition.