# EXHIBIT G

1

Volume I
Pages 1 to 243
Exhibits 1-6

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - -x
LISA RILEY, LISA MARIE          :
CATALANO, SANDY PANARELLO and   :
AMANDA MEDINA,                  :
          Plaintiffs,           :
                                :
          vs.                   :   Civil Action No.
                                :   04-12318RWZ
GENERAL EMPLOYMENT              :
ENTERPRISES, TRIAD PERSONNEL    :
SERVICES INC., GREGORY          :
CHRISOS, HERBERT IMHOFF and     :
KIM CULLEN,                     :
          Defendants.           :
- - - - - - - - - - - - - - - - -x

          DEPOSITION OF AMANDA L. MEDINA, a witness
called on behalf of the Defendants General
Employment Enterprises, Triad Personnel Services
Inc., Herbert Imhoff and Kim Cullen, taken pursuant
to the Federal Rules of Civil Procedure before Anne
H. Bohan, Registered Diplomate Reporter and Notary
Public in and for the Commonwealth of Massachusetts,
at the Offices of Jackson Lewis LLP, 75 Park Plaza,
Boston, Massachusetts, on Tuesday, October 25, 2005,
commencing at 10:15 a.m.

PRESENT:

    Rodgers, Powers & Schwartz LLP
        (by Elizabeth A. Rodgers, Esq.)
        18 Tremont Street, Boston, MA 02108,
        for the Plaintiffs.

    Jackson Lewis LLP
        (By Jeffrey S. Brody, Esq.)
        75 Park Plaza, Boston, MA 02116, for
        Defendants General Employment Enterprises,
        Triad Personnel Services Inc., Herbert
        Imhoff and Kim Cullen.

8

1     A.    Yes.

2     Q.    Are you taking any medications today?

3     A.    No.

4     Q.    Have you consumed any alcohol today?

5     A.    No.

6     Q.    Is there anything at all that might inhibit

7  your ability to give truthful testimony today?

8     A.    No.

9     Q.    Did you meet with anybody to prepare for

10  your deposition?

11     A.    With my lawyer.

12     Q.    When was that?

13     A.    Yesterday.

14     Q.    For how long did you meet?

15     MS. RODGERS:  I object.

16     Q.    You can answer the question unless your

17  lawyer instructs you not to.

18     MS. RODGERS:  I instruct you not to answer.

19     MR. BRODY:  On what basis?

20     MS. RODGERS:  On the basis that I think

21  that's privileged.

22     MR. BRODY:  For how long you met is

23  privileged?

24     MS. RODGERS:  Yes, it is.

1        MR. BRODY:  Are you instructing your client
2   not to answer that question?
3        MS. RODGERS:  Yes, I am.
4   Q.   Did you review any documents to prepare for
5   your deposition?
6   A.   Yes.
7   Q.   What documents did you review?
8        MS. RODGERS:  I object to the question.  I
9   instruct you not to answer.
10  Q.   Did you review any documents outside the
11  presence of your counsel to prepare for your
12  deposition?
13  A.   Can you repeat the question.
14  Q.   Sure.  Did you review any documents outside
15  the presence of your counsel to prepare for this
16  deposition?
17  A.   Yes.
18  Q.   What documents did you review?
19       MS. RODGERS:  I object on the grounds that
20  it was attorney-client communication.
21       MR. BRODY:  Are you instructing the witness
22  not to answer that question as well?
23       MS. RODGERS:  Yes, I am.
24       Other than attorney-client communication,

1   ever been convicted of something.  Other than that,

2   it's inadmissible.

3        Q.    Have you ever been convicted of a crime?

4        A.    Yes.

5        Q.    What was that crime?

6        A.    A DUI charge.

7        Q.    When was that?

8        A.    June 2002 and December 2005.

9        Q.    Sorry?

10       A.    Excuse me.  December 2004, excuse me.

11       Q.    So you were convicted twice of DUI?

12       A.    Yes.

13       Q.    By "DUI" you mean driving under the

14  influence?

15       A.    Yes.

16       Q.    Let's focus first on the June 2002

17  conviction.  Where did that take place?

18       A.    That took place on Interstate 95.

19       Q.    Can you be more specific?

20       A.    I believe it was in Woburn.

21       Q.    What was the substance that you were under

22  the influence of?

23       A.    Alcohol.

24       Q.    Is that it?

1      A.   Yes.

2      Q.   What was the conviction?  Was it a

3  misdemeanor or a felony?

4      A.   It was a misdemeanor.

5      Q.   Did you have to pay a fine?

6      A.   Yes.

7      Q.   How much was the fine?

8      A.   There were several different fines totaling

9  approximately, to the best of my memory, between

10  $900 to $1400.

11      Q.   What were the separate fines for?

12      A.   I don't recall exactly what they were for.

13      Q.   Generally what were they for?

14      A.   I'm sorry?

15      Q.   You don't recall exactly.  Generally what

16  do you recall?

17      A.   There was a -- I'm sure there were court

18  fees.  Some sort of restitution to the state, I

19  would imagine.  That's about all.  I do not recall

20  what the charges were for.

21      Q.   Did you suffer any type of punishment as a

22  result of that conviction?

23      A.   Yes.

24      Q.   What was that?

1    A.   I don't consider it punishment, but I was

2  instructed to enter a state-mandated treatment

3  center.

4    Q.   Did you do so?

5    A.   Yes.

6    Q.   During what time period?

7    A.   I believe I was enrolled in the program

8  between August of 2002 and I believe

9  September/October.

10    Q.   Did you complete the program?

11    A.   Yes.

12    Q.   Did you have any type of action taken with

13  respect to your driving privileges?

14    A.   Yes.  My license was suspended.

15    Q.   For how long?

16    A.   For 210 days.

17    Q.   Where was the DUI conviction that took

18  place in December of 2004?

19    A.   That was in Pasco County, Florida.

20    Q.   Going back to the June 2002 conviction, did

21  you have to take a breathalyzer?

22    A.   Yes.

23    Q.   What alcohol level?

24    A.   I believe, to the best of my memory, it was

28

1    .17.

2        Q.    Were you incarcerated for the June 2002

3    conviction, I mean incident?

4            MS. RODGERS:  Objection.

5        Q.    Did you have to go to jail?

6            MS. RODGERS:  Let me talk to my client for

7    a second.

8            MR. BRODY:  Sure.

9            (Attorney-client conference)

10       Q.    Having consulted with your counsel, can you

11   answer my question?

12           (Attorney-client conference)

13       A.    Yes.

14       Q.    For how long were you incarcerated?

15       A.    Approximately 12 hours.

16       Q.    Did someone have to bail you out?

17       A.    Yes.

18       Q.    Who did that?

19       A.    Sandy Panarello.

20       Q.    Turning to the December 2004 conviction,

21   what was the substance under which you were under

22   the influence?

23       A.    Alcohol.

24       Q.    Was it only alcohol?

1    A.    Yes.

2    Q.    Did you take a breathalyzer?

3    A.    Yes.

4    Q.    What was the reading on the breathalyzer?

5    A.    .12.

6    Q.    What was the outcome of that conviction?

7    A.    My license was suspended.  I have to pay

8    restitution and perform community service.

9    Q.    How much was the fine?

10   A.    Total $1400.

11   Q.    Did you have to inform the court in Florida

12   about the prior conviction in Massachusetts?

13   A.    I don't know if it was mandatory that I

14   did, but I did.

15   Q.    How long was your license suspended for?

16   A.    For six months.

17   Q.    Did you have to enter any type of treatment

18   center?

19   A.    No.  I do have to take a counterattack

20   program, which is more of an informatory program;

21   it's not a treatment.

22   Q.    Other than the two driving under the

23   influence convictions we just spoke about, one being

24   in June of 2002 and the other being in December of

35

1      A.    Yes.

2      Q.    All right.  You also indicated to me that

3   you had a -- was that worthless check charge in

4   Florida?

5      A.    Yes.

6      Q.    Did someone have to bail you out for that?

7      A.    Yes.

8      Q.    Who did that?

9      A.    Sandy Panarello.

10     Q.    You also indicated that you had some type

11  of a continuation of a charge?

12         MS. RODGERS:  I'm going to object to that.

13  There's no conviction.

14     Q.    What was the event that gave rise to that

15  event?

16         MS. RODGERS:  I'm going to object and

17  instruct you not to answer.

18     Q.    You also indicated that you were involved

19  in a possession of marijuana situation.

20     A.    Yes.

21     Q.    When did that take place?

22         MS. RODGERS:  Just a moment.

23         (Attorney-client conference)

24     Q.    When did that take place?

36

```
 1      A.    That took place in December of 2004.

 2      Q.    Where did that take place?

 3      A.    Also in Pasco County, Florida.

 4      Q.    Were you convicted of that crime?

 5      A.    Yes.

 6      Q.    How much marijuana did you possess?

 7      A.    It was a possession of paraphernalia.

 8      Q.    Of drug paraphernalia?

 9      A.    Yes.

10      Q.    What was the paraphernalia?

11      A.    It was a pipe.

12      Q.    A marijuana pipe?

13      A.    Yes.

14      Q.    Did you also have marijuana in your

15 possession when you were arrested?

16      A.    No.

17      Q.    Was it your marijuana pipe?

18      A.    Yes.

19      Q.    Did someone have to bail you out?

20      A.    That was tied into the DUI, so it was the

21 same -- I was incarcerated for both charges at once,

22 so yes.

23      Q.    So when I asked you before about the DUI

24 from December of 2004, you didn't tell me about the
```

38

1     A.    Um-hum.

2     Q.    Have there been any other arrests that you

3  haven't told me about?

4         MS. RODGERS:  Objection to questions on

5  arrests.  Convictions I will allow her to answer.

6         I instruct you not to answer on arrests.

7         MR. BRODY:  Are you asking her to not tell

8  me how many?

9         MS. RODGERS:  Yes.  I don't think arrests

10  are relevant, and I don't think they're admissible.

11  I'm going to object and instruct her not to answer

12  with respect to arrests.  Convictions you may

13  inquire.

14     Q.    Have you received any treatment for alcohol

15  or drug abuse other than the state-mandated program

16  you testified about?

17     A.    Yes.

18     Q.    When was that?

19     A.    In March of 2003.

20     Q.    Was that for drug abuse or alcohol abuse or

21  both?

22     A.    For both.

23     Q.    Is that the only time you sought that

24  treatment besides the court-mandated program you

1    told me about?

2        A.    Yes.

3        Q.    Where did you seek treatment?

4        A.    I spoke with a therapist and was admitted

5    to McLean's Hospital.

6            (Attorney-client conference)

7        Q.    For how long were you at McLean's Hospital?

8        A.    I do not recall the exact dates.

9        Q.    Can you be general for me?

10       A.    Yes.  It was in March of 2003.

11       Q.    Do you recall how long you were in the

12   hospital for?

13       A.    I believe, to the best of my memory, that

14   it was between five to ten days; I don't remember

15   exactly.

16      *Q.    What were the drugs that you had been

17   taking that you sought treatment for?

18           MS. RODGERS:  Objection.  I'm going to

19   instruct her not to answer.

20       Q.    During that time frame of early 2003** --

21           MS. RODGERS:  Just for the record, I have a

22   protective order which I think it would be

23   appropriate to give you at this point.  This is our

24   plaintiffs' motion for a protective order on the

63

1    employment?

2        A.    I was at the time collecting unemployment.

3            MS. WATERHOUSE:  Excuse me, I didn't hear

4    you.

5            THE WITNESS:  I was collecting

6    unemployment.

7        Q.    When did you start collecting unemployment?

8        A.    September when I left Generation

9    Technologies.

10       Q.    What was the reason that you gave

11   unemployment for leaving General Employment?

12           MS. RODGERS:  Objection.  It's not

13   admissible evidence, and it's against the law to

14   reveal any information given to unemployment in

15   Massachusetts.

16           MR. BRODY:  You're instructing her not to

17   answer?

18           MS. RODGERS:  I'm instructing her not to

19   answer.

20       Q.    During what time period did you collect

21   unemployment?

22       A.    I want to say September until maybe

23   November when my unemployment was denied.

24       Q.    So you received unemployment for some

64

1    period of time and then it was denied?

2        A.    Yes.

3        Q.    Did you attend any kind of unemployment

4    hearing?

5        A.    I don't believe so.

6        Q.    What was your understanding as to why your

7    unemployment was denied?

8        A.    It was refused by Generation Technologies.

9        Q.    How much did you collect?

10            MS. RODGERS:   Objection.   I instruct her

11   not to answer.   It's not relevant and not likely to

12   lead to discoverable evidence and it's illegal to

13   reveal.

14       Q.    Did you indicate on your tax returns the

15   unemployment compensation that you received?

16       A.    Excuse me?

17       Q.    Did you indicate on your tax returns the

18   amount of unemployment compensation that you

19   received?

20       A.    I'm sorry, did I --

21       Q.    Did you report on your tax returns the

22   income that you received from unemployment?

23       A.    I haven't filed my tax returns for this

24   year.

66

1    A.    H&R Block.

2    Q.    Do you still have your tax returns?

3    A.    I could look through my files for them, if

4    you'd like me to.

5    Q.    Have you done that yet?

6    A.    If you'd like me to, I said I could.

7    Q.    Have you done that yet before today?

8    A.    No.

9    Q.    I'd ask you to do that, please, and provide

10   them to your counsel, if you wouldn't mind.

11   A.    Yes.

12   Q.    Thank you.

13   A.    You're welcome.

14        MS. RODGERS:  For the record, I'm going to

15   object to producing the amount of income received

16   from unemployment as a collateral source under the

17   Collateral Source Rule.

18   Q.    Did you appeal the denial of your

19   unemployment compensation benefits?

20        MS. RODGERS:  Objection.  It's not relevant

21   or likely to lead to relevant information and not

22   admissible.

23   Q.    You can answer the question.

24   A.    Will you repeat the question, I'm sorry.

67

1     Q.   Did you appeal the denial of your

2  unemployment benefits?

3     A.   I don't believe so.

4     Q.   Did you discuss the unemployment issue with

5  Lisa Riley?

6     A.   What issue?

7     Q.   Did you ever discuss the fact that you

8  received unemployment compensation benefits with

9  Lisa Riley?

10     A.   Yes.

11     Q.   What did you tell Lisa Riley?

12     A.   That I had filed for unemployment.

13     Q.   What did Lisa Riley say?

14     A.   I don't recall.

15     Q.   Did Lisa Riley indicate to you that you

16  should file for unemployment compensation?

17     A.   Well, I don't believe so.

18     Q.   Did she indicate to you whether you should

19  be entitled to unemployment compensation?

20     MS. RODGERS:  I'm going to object and

21  instruct her not to answer any questions about

22  discussions with her employer at the time about

23  unemployment compensation, because I think

24  communications pertaining to unemployment

1    compensation and reasons therefor between an

2    employee and an employer are excluded as admissible

3    evidence in any proceedings under Massachusetts law.

4            MR. BRODY:  I'm sorry, you're instructing

5    your client not to answer a question about a

6    conversation she had with my client?

7            MS. RODGERS:  Yes, because any information

8    discussed between an employee and an employer about

9    unemployment compensation is not admissible, and

10   it's criminal to use any communication regarding the

11   application for unemployment compensation between an

12   employee and an employer.  I advised you about the

13   statute before we took the depo.

14           MR. BRODY:  You certainly never advised you

15   weren't going to allow her to discuss conversations

16   she had with employees at my client.  Just so I'm

17   clear, are you instructing her not to answer that

18   question?

19           MS. RODGERS:  Yes.  I'm instructing her not

20   to answer questions about unemployment, because I

21   think it is against the law to disclose

22   communications pertaining to unemployment unless DET

23   is a party to the hearing.  It's express in the

24   statute.

69

1      Q.    Did Lisa Riley advise you to seek

2  unemployment compensation benefits?

3           MS. RODGERS:  Objection.  Noted.

4      A.    Did she encourage me; is that what you

5  asked?

6      Q.    Sure.  Did she encourage you?

7      A.    I don't believe she encouraged me, no.

8      Q.    What did she tell you?

9           MS. RODGERS:  I'm going to object.  She was

10  the employer at the time and I'm going to object.

11  But you may answer.

12      A.    As I stated before, I don't really recall

13  Lisa's response to me telling her I was going to

14  file for unemployment.  I don't believe she

15  encouraged nor discouraged me to.

16    *Q.    Did she indicate to you whether she thought

17  you were entitled to it?

18           MS. RODGERS:  Objection.  I'm going to

19  object on the grounds that you're asking for illegal

20  communication.

21           Subject to that, you may answer.

22           MR. BRODY:  You're permitting her to

23  answer?

24           MS. RODGERS:  I'm permitting her to answer.

1              AFTERNOON SESSION
2       BY MR. BRODY:
3       Q.    What is SMARTeSTAFF?
4       A.    To my knowledge, it is an Internet-based
5    resource for employers.
6       Q.    You said it was an Internet based --
7       A.    Resource tool.  It has tools for an
8    employer.
9       Q.    What type of tools does it have?
10           MS. RODGERS:  I'm going to object on the
11   grounds of our protective order, that going into the
12   details of the employment of SMARTeSTAFF is subject
13   to our protective order.
14           MR. BRODY:  Liz, do you think this is on
15   their actual Internet Web site?
16           MS. RODGERS:  If it's on their Web site,
17   then you can have it.  I don't know what's on their
18   Web site, and I should perhaps.
19           MR. BRODY:  So you're instructing her not
20   to answer that question?
21           MS. RODGERS:  I don't think that this
22   witness should be asked about the details of a
23   potential competitor, and I don't know what -- so I
24   am instructing her not to answer, subject to our

112

1      A.    I don't recall the exact date, but that

2  would probably be maybe later in July, maybe early

3  August would be the first time that the idea was

4  even brought to my attention.

5      Q.    Are you talking about 2003?

6      A.    Yes.

7      Q.    How was the idea brought to your attention?

8      A.    Through discussions of possibly the idea of

9  Lisa opening a business, and she just bounced around

10 different ideas, and it was something that she had

11 told me about but that wasn't currently in

12 existence.

13     Q.    So were you ever an employee of

14 SMARTeSTAFF?

15     A.    No.

16     Q.    So what is it, to your understanding, that

17 SMARTeSTAFF does?

18     A.    Again, it's my understanding they have

19 tools for employers, for HR people.

20     Q.    What are those tools?

21         MS. RODGERS:  Objection.  Instruct you not

22 to answer.

23         MR. BRODY:  Just so it's clear for the

24 record, Liz, are you actually taking the position

1   that a nonemployee who has been given information

2   about SMARTeSTAFF can't testify about that

3   information?  How could it possibly be confidential

4   if a nonemployee has that information?

5        MS. RODGERS:  Because this was in the

6   incubator period, and she may have been privy to

7   confidential or trade information about what tools

8   they were planning to use.  And I think that that is

9   before she was an employee, so I think it's part of

10  the efforts by the company to try to understand the

11  business model and is Lisa Riley and Sandy

12  Panarello's proprietary information.

13       Q.   Have you had conversations with Ms. Riley

14  and/or Ms. Panarello since SMARTeSTAFF began

15  operation?

16       A.   I'm sorry, who?

17       Q.   Have you had conversations with Ms. Riley

18  and/or Ms. Panarello about SMARTeSTAFF since

19  SMARTeSTAFF became operational?

20       A.   I had conversations with Sandy, because,

21  again, I had volunteered that I was going to do some

22  research for her, that it might have possibly even

23  been a job opportunity that I might have looked at.

24  So yes, after they were operational, I had a

 1  conversation with them about it.

 2      Q.   Based on those conversations that you had,

 3  what's your understanding as to the type of tools

 4  that SMARTeSTAFF offers employers?

 5          MS. RODGERS:  I'm going to object and ask

 6  that the Court delineate what right the company has

 7  on the grounds that it's not discoverable and may

 8  not lead to discoverable information what tools

 9  SMARTeSTAFF has.

10          MR. BRODY:  Are you making a relevancy

11  objection?

12          MS. RODGERS:  I'm making both a trade

13  secrets and a relevancy objection.

14      Q.   Again, how is it that a nonemployee who is

15  told information has access to trade secrets?

16          MS. RODGERS:  Because they were discussing

17  it in the context of forming a company that might be

18  a job opportunity for her down the road, and this

19  was not information that was widely disseminated.

20          MR. BRODY:  I'm not going to waste more

21  time on this, because I don't want to be having my

22  precious time taken away from me, but I think that's

23  a highly inappropriate objection and we'll certainly

24  take it up with the Court.

149

1    specifically that was upsetting you?

2        A.    No.    Other than that, that's the only main

3    thing that I can pinpoint.

4        Q.    That being your brother's Army enlistment?

5        A.    Yes.

6        Q.    Was the company good to you with respect to

7    your leave of absence?

8        A.    Yes.

9        Q.    Did they allow you to take all the time off

10   that you needed?

11       A.    Yes.

12       Q.    Did the company also give you a modified

13   schedule upon your return to work?

14       A.    Yes.

15       Q.    What schedule did you have when you came

16   back?

17       A.    I was working on a part-time basis, I was

18   no longer -- I don't believe I was a full-time

19   employee.

20       Q.    What was your part-time schedule?

21       A.    It was from ten to four, and I believe it

22   was Monday to Friday, but I don't really recall.

23       Q.    You believe it was Monday through Friday,

24   but you don't recall?

150

1      A.    Yeah.

2      Q.    So it may have been five days; it may not

3   have been?

4      A.    Yes.

5      Q.    Did you have a set schedule, or was it

6   something that varied depending on how you were

7   feeling that day?

8      A.    I believe it was a set schedule.

9      Q.    Did you discuss your need for a leave and

10  the reasons for your leave with anyone besides Ms.

11  Riley at General Employment?

12     A.    I don't recall.

13     Q.    Did you injure your foot sometime on or

14  about the time you went on your leave of absence?

15     A.    Yes.

16     Q.    When was that?

17     A.    I don't recall.  I believe it was before,

18  but I don't recall.

19     Q.    How did you injure your foot?

20     A.    I fell down the stairs.

21     Q.    Where was that?

22     A.    At my house.

23     Q.    When you fell down the stairs, was it

24  because you were under the influence of either

151

1    alcohol or drugs?

2        A.    Yes.

3        Q.    Which was it, alcohol or drugs or both?

4              MS. RODGERS:  We've established that any

5    questions about unlawful conduct she's taking the

6    Fifth Amendment privilege.

7              MR. BRODY:  My apologies.

8        Q.    Was it because you were under the influence

9    of alcohol?

10       A.    At the time?

11       Q.    Yes.

12       A.    Possibly.

13       Q.    You don't recall?

14       A.    I don't recall.

15       Q.    Did you black out?

16       A.    I didn't black out, no.

17       Q.    Did you tell anybody at work as to why it

18   was you fell down the stairs?

19       A.    I don't recall.

20       Q.    Would you have medical records that

21   established when you went to the doctor to get

22   treatment?

23       A.    I don't believe I -- I don't know if I was

24   actually treated for my foot.

1      Q.    Did you have crutches at any point in time
2    because of it?
3      A.    Um-hum.
4      Q.    Where did you get the crutches?
5      A.    I believe we had them.  I don't really
6    recall.
7      Q.    You don't know if you saw a doctor about it
8    or not?
9      A.    I don't believe so.
10     Q.    You don't remember?
11     A.    Foggy.
12     Q.    Is that period of your life particularly
13   foggy for some reason?
14     A.    The period that -- before I was treated,
15   yes.
16     Q.    So what time period is foggy, just so I
17   know?
18     A.    Well, it's a little hard for me to remember
19   three years back.
20     Q.    But you just pinpointed the time before you
21   were treated.
22     A.    Yes.
23     Q.    So my question to you is, is the reason why
24   or one of the reasons why you're foggy because of

1  the either drug and/or alcohol abuse that you were

2  engaged in?

3      A.   I don't believe so, no.

4      Q.   You just testified a second ago that the

5  time before the leave was foggy.

6      A.   Um-hum.

7      Q.   Which leads me to believe the time after

8  the leave was not foggy.

9      A.   There are things I can't remember from two

10  days ago; there are things I can't remember from

11  three years ago.

12     *Q.   Is it your belief that your memory is in

13  any way impacted by the circumstances that gave rise

14  to your leave in March of 2003?

15     A.   Excuse me, can you repeat it.

16         MR. BRODY:  Can you repeat that, please.

17         *(Question read)

18     A.   No.

19     Q.   When you returned from your leave of

20  absence, were you still employed as a recruiter?

21     A.   When I returned from my leave of absence, I

22  believe I returned as a research assistant.

23     Q.   When you say you believe that, are you

24  guessing?

1     A.    I'm not guessing.

2     Q.    Well, are you sure about that?  You use the

3    word "believe" I think if you're not sure about your

4    testimony; that's why I'm asking.

5     A.    I'm not sure of my exact title.  I'm

6    guessing my title was at that time research

7    assistant.

8     Q.    But you're guessing.

9     A.    Yes.

10     Q.    Were your job duties any different than

11   before you went on leave?

12     A.    Yes.

13     Q.    How were they different?

14     A.    I don't remember exactly what they were,

15   but if my title had changed, my position had

16   changed.

17     Q.    But you don't recall either way?

18     A.    I don't recall what?

19     Q.    Whether your position changed.

20     A.    My position changed?

21     Q.    Right.

22     A.    I don't recall what my exact duties were.

23     Q.    You don't recall either, it sounds like.

24   Let's back up.

155

1            Do you recall whether your position

2     changed?

3         A.    Do I recall when?

4         Q.    Whether.

5         A.    Whether.

6         Q.    Do you recall whether your position changed

7     when you came back from your leave?

8         A.    No, I don't recall.

9         Q.    Do you recall whether your job duties

10    changed when you came back from your leave?

11        A.    Apparently, no, I don't recall.

12        Q.    Is it true that you were concerned at that

13    point in time that your personal problems were

14    affecting your work?

15        A.    Yes.

16        Q.    Is it true that your productivity

17    decreased?

18        A.    Yes.

19        Q.    Is it also true that you were worried that

20    you were not connecting with the team because of

21    your new part-time schedule and the issues that were

22    impacting you outside of work?

23        A.    Yes.

24        Q.    Did your pay rate change when you came back

202

1    Q.    Why were people going to the Kowloon?  Was

2    it for some type of celebration?

3    A.    I'm not sure if it was a celebration.  I

4    don't know what it was for.

5    Q.    With whom did you leave the Kowloon when

6    you left that night?

7    A.    Marcea Taylor.

8    Q.    Did Marcea drive or did you drive?

9    A.    Marcea.

10    Q.    Where did the two of you go?

11    A.    We went to Brett Romanowski's house.

12    Q.    Where was that?

13    A.    In I believe it was North Reading.

14    Q.    Do you remember what you were wearing the

15    night of the Kowloon?

16    A.    No.

17    Q.    Do you recall whether you changed after

18    work to go out?

19    A.    I didn't go home after work so...

20    Q.    Do you recall that you brought something

21    with you to change into?

22    A.    I don't recall, no.

23    Q.    You don't recall?

24    A.    I don't recall.

203

1      Q.    Who went back to Brett's house?

2      A.    Myself and Marcea.

3      Q.    Did you drink alcohol at Brett's house?

4      A.    Yes.

5      Q.    Do you remember how late you stayed there?

6      A.    No.  It wasn't long.

7      Q.    Well, if Marcea would say it was three

8   o'clock in the morning, would that sound right to

9   you?

10     A.    Yes.  Approximately that time.

11     Q.    Do you recall at some point Marcea went to

12  pick up her husband?

13     A.    Yes.

14     Q.    So her husband joined you at the apartment?

15     A.    Yes.

16     Q.    And the four of you socialized and joked

17  around for a few hours?

18     A.    I wouldn't say a few hours, but we

19  socialized for a period of time, yes.

20     Q.    And you joked around?

21     A.    Yes.

22     Q.    Do you recall telling Marcea Taylor that

23  you'd get an office out of this, referring to Greg

24  Chrisos' conduct?

243

1  COMMONWEALTH OF MASSACHUSETTS)

2  SUFFOLK, SS.                    )

3      I, Anne H. Bohan, Registered Diplomate Reporter

4  and Notary Public in and for the Commonwealth of

5  Massachusetts, do hereby certify that there came

6  before me on the 25th day of October, 2005, at 10:15

7  a.m., the person hereinbefore named, who was by me

8  duly sworn to testify to the truth and nothing but

9  the truth of her knowledge touching and concerning

10  the matters in controversy in this cause; that she

11  was thereupon examined upon her oath, and her

12  examination reduced to typewriting under my

13  direction; and that the deposition is a true record

14  of the testimony given by the witness.

15      I further certify that I am neither attorney or

16  counsel for, nor related to or employed by, any

17  attorney or counsel employed by the parties hereto

18  or financially interested in the action.

19      In witness whereof, I have hereunto set my hand

20  and affixed my notarial seal this 2nd day of

21  November, 2005.

22                          

23                          Notary Public

24              My commission expires 12/25/09

DORIS O. WONG ASSOCIATES, INC.
(617) 426-2432 ~ Fax (617) 482-7813